1 | PAUL T. FRIEDMAN (CA SBN 98381)
PFriedman@mofo.com
2 | DEANNE E. MAYNARD (*Pro Hac Vice*)
DMaynard@mofo.com
3 | MORRISON & FOERSTER LLP
425 Market Street
4 | San Francisco, California  94105-2482
Telephone: 415.268.7000
5 | Facsimile:  415.268.7522

6 | Attorneys for Defendant SOTHEBY'S, INC.

7 | *Additional Counsel Listed on Following Page*

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | CENTRAL DIVISION

11 |

12 | ESTATE OF ROBERT GRAHAM, CHUCK CLOSE, LADDIE JOHN DILL, individually and on behalf of all others similarly situated,

CASE NO.:  2:11-cv-08604-JHN-FFM

**(1) DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINTS;**

13 | Plaintiffs,

14 | v.

**(2) REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINTS** (filed under separate cover);

16 | SOTHEBY'S, INC.,

17 | Defendant.

**(3) DECLARATION OF JASON D. RUSSELL IN SUPPORT OF JOINT MOTION TO DISMISS THE COMPLAINTS** (filed under separate cover);

**(4) [PROPOSED] ORDER** (lodged under separate cover).

Hon. Jacqueline H. Nguyen
Courtroom:  790
Hearing:  March 12, 2012 at 2:00 p.m.

| | |
|---|---|
| THE SAM FRANCIS FOUNDATION; ESTATE OF ROBERT GRAHAM; CHUCK CLOSE; LADDIE JOHN DILL; individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>           v.<br><br>CHRISTIE'S, INC., a New York corporation,<br><br>                    Defendant. | CASE NO.:  2:11-cv-08605-JHN-FFM |

*Additional Counsel*

STEVEN A. REISS (*Pro Hac Vice*)
steven.reiss@weil.com
HOWARD B. COMET (*Pro Hac Vice*)
howard.comet@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: 212.310.8000
Facsimile:  212.310.8007

Attorneys for Defendant SOTHEBY'S, INC.

JASON D. RUSSELL (CA SBN 169219)
jason.russell@skadden.com
HILLARY A. HAMILTON (CA SBN 218233)
hillary.hamilton@skadden.com
JENNIFER E. LAGRANGE (CA SBN 238984)
jennifer.lagrange@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:  213.687.5000
Facsimile:   213.687.5600

Attorneys for Defendant CHRISTIE'S, INC.

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 12, 2012 at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 790 of the above-entitled Court, located at 255 East Temple Street, Los Angeles, California 90012, Defendants Sotheby's, Inc. and Christie's, Inc. (collectively, "Defendants") will, and hereby do, move the Court for an order dismissing this action pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6).

Plaintiffs' claims are based on the California Resale Royalties Act, California Civil Code § 986(a) ("CRRA"). The grounds for this Motion are that: (1) the CRRA is unconstitutional, and therefore unenforceable, because it violates the Commerce Clause of the U.S. Constitution in that it constitutes an impermissible direct regulation of interstate commerce and serves no legitimate local interest; (2) the CRRA is unconstitutional, and therefore unenforceable, because it effects a *per se* taking of private property in violation of the U.S. and California constitutions; (3) the Copyright Act of 1976 both expressly and impliedly preempts the CRRA; (4) punitive damages are unavailable as a matter of law; (5) the claims of the Estate of Robert Graham must be dismissed because an estate or trust is not a legal entity and has no capacity to sue; and (6) in any event, Plaintiffs failed to sufficiently plead their claims, notably, the existence of timely sales allegedly subject to the CRRA.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, all pleadings and files in two related matters—*Estate of Robert Graham, et al. v. Sotheby's, Inc.*, No. 2:11-cv-08604-JHN-FFM (C.D. Cal.), and *The Sam Francis Foundation, et al. v. Christie's, Inc.*, No. 2:11-cv-08605-JHN-FFM (C.D. Cal.), all matters of which this Court may take judicial notice, and upon such other and further oral or documentary evidence as may be presented to the Court at or prior to the hearing on this Motion.

This Motion is made following the conference of counsel pursuant to Central District of California Local Rule 7-3, which took place on January 9, 2012, although

1  counsel have been discussing the basis for the Motion since November 2011. During

2  that conference, the parties discussed the grounds for this Motion, and Plaintiffs'

3  counsel indicated that they would oppose the relief requested.

4  Dated:      January 12, 2012      Respectfully submitted,

5                                                     By:   /s/ Paul T. Friedman
6                                                                Paul T. Friedman

7                                                     Attorneys for Defendant SOTHEBY'S, INC.

8                                                     By:   /s/ Jason D. Russell
9                                                                Jason D. Russell

10                                                   Attorneys for Defendant CHRISTIE'S, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................v

INTRODUCTION ...............................................................................1

STATEMENT OF FACTS...................................................................3

    I.     THE CALIFORNIA RESALE ROYALTIES ACT.............................3

          A.    Statutory Provisions ..................................................3

          B.    Legislative History ...................................................4

    II.    PLAINTIFFS' COMPLAINTS .................................................5

LEGAL STANDARD ...........................................................................7

ARGUMENT ....................................................................................7

    I.     THE CRRA VIOLATES THE COMMERCE CLAUSE ..................7

          A.    The CRRA Implicates The Dormant Commerce Clause ...........8

          B.    The CRRA Is *Per Se* Invalid Because It Directly Regulates Interstate Commerce ..................................................9

               1.    The CRRA Overtly Controls Conduct Outside California ...................................................9

               2.    The Practical Effect Of The CRRA Is To Control Commerce Beyond California's Borders ...................11

          C.    The CRRA Places An Undue Burden On Interstate Commerce To The Extent It Requires Royalties To Non-California Artists...................................................14

               1.    The CRRA Substantially Burdens Interstate Commerce...................................................14

               2.    To The Extent The CRRA Requires Resale Royalties To Non-California Residents, It Serves No Legitimate Local Purpose ..................................16

    II.    THE CRRA EFFECTS A TAKING OF PRIVATE PROPERTY IN VIOLATION OF THE U.S. AND CALIFORNIA CONSTITUTIONS ........................................................17

          A.    The CRRA Confiscates Private Property ..................................19

          B.    The CRRA Effects A *Per Se* Taking Of Private Property ........21

    III.    THE COPYRIGHT ACT OF 1976 PREEMPTS THE CRRA CLAIM..................................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

   A.  The Copyright Act And CRRA Cover The Same Subject Matter ...................................................................................25

   B.  Plaintiffs' CRRA Claim Conflicts With And Thus Is Preempted By The Copyright Act's First Sale Doctrine...........26

      1.  The First Sale Doctrine Precludes Restraints On Alienation ...............................................................27

      2.  The CRRA Cannot Be Reconciled With The First Sale Doctrine ............................................................29

      3.  *Morseburg* Did Not Address The 1976 Copyright Act And Is Superseded By More Recent Supreme Court Precedent ....................................................32

   C.  Alternatively, Section 301 Expressly Preempts The CRRA Claims.................................................................................33

      1.  The CRRA Claims Fall Within The Subject Matter Of Copyright .............................................................33

      2.  Plaintiffs' CRRA Claims Are Equivalent To The Exclusive Rights Protected By Federal Law...................34

   D.  *Baby Moose* Does Not Control This Case.................................36

IV.  PLAINTIFFS SEEK RELIEF PRECLUDED AS A MATTER OF LAW ...................................................................................39

   A.  Punitive Damages Are Not Available Under The UCL ...........39

   B.  Punitive Damages Are Not Recoverable Under The CRRA ....40

      1.  The CRRA Does Not Provide For Punitive Damages....40

      2.  The Legislative History Shows That Punitive Damages Are Not An Available Remedy Under The CRRA...................................................................41

      3.  The Express Inclusion Of A Punitive Damages Remedy In A Contemporary Artist Protection Statute Demonstrates That Punitive Damages Are Not Authorized Under The CRRA...........................................42

V.  THE CLAIMS OF THE ESTATE OF ROBERT GRAHAM FAIL .......................................................................................45

VI.  PLAINTIFFS' PLEADING OF THEIR CLAIMS IS INSUFFICIENT .....................................................................45

   A.  Plaintiffs Have Not Alleged Facts To Support Their Claims ...46

   B.  Plaintiffs' Discovery Theory Is Insufficient ............................47

CONCLUSION .............................................................................50

1

## **<u>TABLE OF AUTHORITIES</u>**

2

## CASES

Page(s)

3
4

*Abramson v. Brownstein*,
    897 F.2d 389 (9th Cir. 1990) ..................................................14

5

*Allison v. Vintage Sports Plaques*,
    136 F.3d 1443 (11th Cir. 1998) ...........................................28

6
7

*Anthony v. Superior Court*,
    109 Cal. App. 3d 346, 167 Cal. Rptr. 246 (1980) .......................43

8

*Armstrong v. United States*,
    364 U.S. 40, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960)......................18

9
10

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).......................7

11

*Baby Moose Drawings, Inc. v. Valentine*,
    No. 2:11-cv-00697,
    2011 WL 1258529 (C.D. Cal. Apr. 1, 2011) ................................25, 36, 37, 38

12
13

*Bautista v. Los Angeles County*,
    216 F.3d 837 (9th Cir. 2000) ..................................................46, 47

14
15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)..........................7

16

*Bibb v. Navajo Freight Lines, Inc.*,
    359 U.S. 524-30, 79 S. Ct. 962, 3 L. Ed. 2d 1003 (1959) ..................15

17
18

*Board of Regents of State Colleges v. Roth*,
    408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) ..................19

19

*Bobbs-Merrill Co. v. Straus*,
    210 U.S. 339, 28 S. Ct. 722, 52 L. Ed. 1086 (1908) ................28, 29

20
21

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
    489 U.S. 141, 109 S. Ct. 971, 103 L. Ed. 2d 118 (1989)..................27

22

*Brewer v. Premier Golf Properties*,
    168 Cal. App. 4th 1243, 86 Cal. Rptr. 3d 225 (2008)......................41

23
24

*Briarpatch Ltd. v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004) ..................................................34

25

*Bricker v. Rockwell International Corp.*,
    22 F.3d 871 (9th Cir. 1993) ..................................................12

26
27

*Brotherton v. Cleveland*,
    923 F.2d 477 (6th Cir. 1991) ..................................................20

28

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
    476 U.S. 573, 106 S. Ct. 2080, 90 L. Ed. 2d 552 (1986).....................7, 9

*Brown v. Legal Foundation of Washington*,
    538 U.S. 216, 123 S. Ct. 1406, 155 L. Ed. 2d 376 (2003)...................... 18, 22

*CTS Corp. v. Dynamics Corp. of America*,
    481 U.S. 69, 107 S. Ct. 1637, 95 L. Ed. 2d 67 (1987) ...................................11

*Calder v. Bull*,
    3 U.S. 386, 3 Dall. 386, 1 L. Ed. 648 (1798) ................................................24

*California Correctional Peace Officers' Association v. State*,
    188 Cal. App. 4th 646, 115 Cal. Rptr. 3d 361 (2010).....................................43

*Carolina Trucks & Equipment, Inc. v. Volvo Trucks of North America, Inc.*,
    492 F.3d 484 (4th Cir. 2007)...........................................................................9

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
    20 Cal. 4th 163, 83 Cal. Rptr. 2d 548 (1999) .................................................39

*Chapman v. Pier I Imports (U.S.) Inc.*,
    631 F.3d 939 (9th Cir. 2011).........................................................................46

*Chicago, Burlington & Quincy Railroad Co. v. City of Chicago*,
    166 U.S. 226, 175 S. Ct. 581, 41 L. Ed. 979 (1897) .......................................18

*Clark v. Superior Court*,
    50 Cal. 4th 605, Cal. Rptr. 3d 876 (2010) ......................................................39

*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989)................ 24, 30, 33

*Connecticut ex rel. Blumenthal v. Crotty*,
    180 F. Supp. 2d 392 (N.D.N.Y. 2001) ...........................................................15

*Conservation Force, Inc. v. Manning*,
    301 F.3d 985 (9th Cir. 2002) ................................................................ 7, 8, 16

*Cummings v. Stanley*,
    177 Cal. App. 4th 493, 99 Cal. Rptr. 3d 284 (2009)......................................43

*Dan Clark Family Ltd. Partnership v. Miramontes*,
    193 Cal. App. 4th 219, 122 Cal. Rptr. 3d 284 (2011) ....................................14

*Danielson v. Wells Fargo Bank*,
    No. CV11-5927 PSG(DLAx),
    2011 WL 4480849 (C. D. Cal. Sept. 26, 2011).............................................39

*De Anza Santa Cruz Mobile Estates Homeowners Ass'n v. De Anza Santa Cruz Mobile Estates*,
    94 Cal. App. 4th 890, 114 Cal. Rptr. 2d 708 (2001)......................................41

*Dean v. United States*,
    556 U.S. 568, 129 S. Ct. 1849, 173 L. Ed. 2d 785 (2009).............................40

*Doe v. City of Los Angeles*,
    42 Cal. 4th 531, 67 Cal. Rptr. 3d 330 (2007) ................................................40

*Durgom v. Janowiak,*
    74 Cal. App. 4th 178, 87 Cal. Rptr. 3d 330 (1999) ........................................38

*Eastern Enterprises v. Apfel,*
    524 U.S. 498, 118 S. Ct. 2131, 141 L. Ed. 2d 451 (1998)............................24

*Edgar v. MITE Corp.,*
    457 U.S. 624, 102 S. Ct. 2131, 141 L. Ed. 2d 451 (1982)................. 9, 16, 17

*Edwards v. Horsemen's Sales Co.,*
    560 N.Y.S. 2d 165 (Sup. Ct. 1989) ..............................................................21

*Estate of Migliaccio v. Midland National Life Insurance Co.,*
    436 F. Supp. 2d 1095 (C.D. Cal. 2006) ........................................................45

*Facenda v. N.F.L. Films, Inc.,*
    542 F.3d 1007 (3d Cir. 2008) ........................................................................26

*Fulton Corp. v. Faulkner,*
    516 U.S. 325, 116 S. Ct. 848, 133 L. Ed. 2d 796 (1996)..............................16

*G. S. Rasmussen & Associates v. Kalitta Flying Service, Inc.,*
    958 F.2d 896 (9th Cir. 1992) ........................................................................19

*Galdjie v. Darwish,*
    113 Cal. App. 4th 1331, 7 Cal. Rptr. 3d 178 (2003)......................................45

*Geier v. American Honda Motor Co.,*
    529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000)............................26

*Guerrero v. Gates,*
    442 F.3d 697 (9th Cir. 2006) ........................................................................49

*HFH Ltd. v. Superior Court of Los Angeles County,*
    15 Cal. 3d 508, 125 Cal. Rptr. 365 (1975) ...................................................18

*Hadjavi v. CVS Pharmacy, Inc.,*
    No. CV 10-04886 SJO(RCx),
    2011 WL 7695383 (C. D. Cal. Sept. 22, 2010)...................................... 39, 40

*Hall v. North American Van Lines, Inc.,*
    476 F.3d 683 (9th Cir. 2007) ........................................................................37

*Hawaii Housing Authority v. Midkiff,*
    467 U.S. 229, 104 S. Ct. 2491, 105 L. Ed. 2d 275 (1984)............................19

*Hawkins v. Comparet-Cassani,*
    251 F.3d 1230 (9th Cir. 2001) ......................................................................47

*Healy v. Beer Institute, Inc.,*
    491 U.S. 324, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989).............9, 10, 11, 12

*Horne v. U.S. Department of Agriculture,*
    No. 10-15270, __ F.3d __;
    2011 WL 2988902 (9th Cir. July 25, 2011) ..................................................22

vii

*Intri-Plex Technologies v. Crest Group, Inc.*,
499 F.3d 1048 (9th Cir. 2007) ..................................................7

*K2 America Corp. v. Roland Oil & Gas, LLC*,
653 F.3d 1024 (9th Cir. 2011) ................................................37

*Kathrein v. City of Evanston*,
636 F.3d 906 (7th Cir. 2011) .................................................23

*Keilholtz v. Lennox Hearth Products Inc.*,
No. C 08-00836 CW,
2009 WL 2905960 (N.D. Cal. Sept. 8, 2009)..................................50

*Kelo v. City of New London*,
545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005)..............................19

*In re Kolb*,
326 F.3d 1030 (9th Cir. 2003) ................................................40

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29 (2003) ........................... 40, 41

*Korn v. Polo Ralph Lauren Corp.*,
644 F. Supp. 2d 1212 (E.D. Cal. 2008) ....................................41

*Kotarski v. Cooper*,
866 F.2d 311 (9th Cir. 1989) ............................................ 12, 43

*Kremen v. Cohen*,
337 F.3d 1024 (9th Cir. 2003) ...............................................19

*Lauter v. Anoufrieva*,
No. CV 07-6811 JVS (JC),
2010 WL 3504745 (C.D. Cal. July 14, 2010) ...............................48

*Laws v. Sony Music Entertainment, Inc.*,
448 F.3d 1134 (9th Cir. 2006).........................................34, 35, 36, 37

*Lee v. Oregon*,
107 F.3d 1382 (9th Cir. 1997) ..............................................47

*Lierboe v. State Farm Mutual Automobile Insurance Co.*,
350 F.3d 1018 (9th Cir. 2003) ..............................................47

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982)........................ 21, 23

*Lubner v. City of Los Angeles*,
45 Cal. App. 4th 525, 53 Cal. Rptr. 2d 24 (1996) ...........................44

*In re Lynch's Estate*,
62 Cal. App. 687, 217 P. 807 (1923) ........................................11

*Madrigal v. Tommy Bahama Group, Inc.*,
No. CV 09-08924 SJO(MANx),
2010 WL 4384235 (C. D. Cal. Oct. 18, 2010) ........................ 39, 40

viii

*Maita Distributors, Inc. of San Mateo v. DBI Beverage, Inc.*,
  667 F. Supp. 2d 1140 (N.D. Cal. 2009) ....................................................... 40, 43

*Martin-Marietta Corp. v. Bendix Corp.*,
  690 F.2d 558 (6th Cir. 1982) ......................................................................16

*Martinez v. CACH, LLC*,
  No. 10CV1625DMS (JMA),
  2011 WL 2560251 (S.D. Cal. June 27, 2011) ...............................................46

*McIntyre v. Bayer*,
  339 F.3d 1097 (9th Cir. 2003) ......................................................................20

*McKelvey v. Boeing N.A., Inc.*,
  74 Cal. App. 4th 151, 86 Cal. Rptr. 2d 645 (1999)......................................50

*MeadWestvaco Corp. v. Illinois Department of Revenue*,
  553 U.S. 16, 128 S. Ct. 1498, 170 L. Ed. 2d 404 (2008)..............................24

*Midwest Title Loans, Inc. v. Mills*,
  593 F.3d 660 (7th Cir. 2010),
  *cert. denied, Mills v. Midwest Title Loans, Inc.*,
  131 S. Ct. 83 (2010) ..................................................................... 9, 12, 13

*Montalvo v. Spirit Airlines*,
  508 F.3d 464 (9th Cir. 2007) ......................................................................26

*Montz v. Pilgrim Films & Television, Inc.*,
  649 F.3d 975 (9th Cir. 2011) ..........................................33, 34, 36, 38

*Moore-Thomas v. Alaska Airlines, Inc.*,
  553 F.3d 1241 (9th Cir. 2009) ......................................................................37

*Morseburg v. Balyon*,
  621 F.2d 972 (9th Cir. 1980) ............................................................... 22, 32

*Murphy v. Kenneth Cole Productions, Inc.*,
  40 Cal. 4th 1094, 56 Cal. Rptr. 880 (2007) ................................................43

*National Collegiate Athletic Ass'n v. Miller*,
  10 F.3d 633 (9th Cir. 1993) ..................................................................8, 14

*Nathan Kimmel, Inc. v. DowElanco*,
  275 F.3d 1199 (9th Cir. 2002) ......................................................................26

*Pacific Ready-Cut Homes v. Title Guaranty & Trust Co.*,
  103 Cal. App. 1, 283 P. 263 (1929) ..............................................................11

*Palazzolo v. Rhode Island*,
  533 U.S. 606, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001).......................19-20

*Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.*,
  832 F. Supp. 1378 (C.D. Cal. 1993) ............................................................28

ix

*In re Park West Galleries, Inc.,*
    No. 09-2076RSL,
    2010 WL 56044 (W.D. Wash. Jan. 5, 2010) ...............................................8, 10

*People ex rel. Gwinn v. Kothari,*
    83 Cal. App. 4th 759, 100 Cal. Rptr. 2d 29 (2000)....................................43

*People v. Galvan,*
    168 Cal. App. 4th 846, 85 Cal. Rptr. 3d 776 (2008)..................................44

*People v. Goodloe,*
    37 Cal. App. 4th 485, 44 Cal. Rptr. 2d 15 (1995) ....................................43

*People v. Hunt,*
    74 Cal. App. 4th 939, 88 Cal. Rptr. 2d 524 (1999)....................................44

*People v. Valenzuela,*
    92 Cal. App. 4th 768, 112 Cal. Rptr. 2d 209 (2001)..................................43

*In re Peterson,*
    156 Cal. App. 4th 676, 67 Cal .Rptr. 3d 584 (2007)..................................45

*Phillips v. Washington Legal Foundation,*
    524 U.S. 156, 118 S. Ct. 1925, 141 l. Ed. 2d 174 (1998) .................19, 20, 21

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137, 90 S. CT. 844, 25 L. Ed. 2d 174 (1970) ...........................8, 14

*Platt Electric Supply, Inc. v. EOFF Electric, Inc.,*
    522 F.3d 1049 (9th Cir. 2008) ...............................................................49

*Quality King Distributors, Inc. v. L'anza Research International, Inc.,*
    523 U.S. 135, 118 S. Ct. 1125, 140 L. Ed. 2d 254 (1998)...............28, 29, 33

*Raymond Motor Transportation, Inc. v. Rice,*
    434 U.S. 429, 98 S. Ct. 787, 54 L. Ed. 2d 664 (1978)..............................14

*Richtek Tech. Corp. v. UPI Semiconductor Corp.,*
    No. C 09-5659 WHA,
    2011 WL 166292 (N.D. Cal. Jan. 19, 2011).................................................46

*Robert H. Jacobs, Inc. v. Westoaks Realtors, Inc.,*
    159 Cal. App. 3d 637, 205 Cal. Rptr. 620 (Ct. App. 1984).........................31

*Rocket Acquisition Corp. v. Ventana Medical System, Inc.,*
    No. CIV 07-1278-PHX-MHM,
    2007 WL 2422082 (D. Ariz. Aug. 22, 2007) ...............................................16

*Rodrigue v. Rodrigue,*
    218 F.3d 432 (5th Cir. 2000) ...................................................................27

*Ross v. O'Neal,*
    No. 2:11-cv-06124-JNH-Ex,
    2011 WL 5041967 (C.D. Cal. Oct. 17, 2011) ..........................................7, 14

*Rutledge v. Boston Woven Hose & Rubber Co.*,
    576 F.2d 248 (9th Cir. 1978) ........................................................... 48

*S.D. Myers, Inc. v. City & County of San Francisco*,
    253 F.3d 461 (9th Cir. 2001) .................................................... 11, 12

*Sadsad v. Washington Mutual Bank F.A.*,
    No. CV 09-03890 DDP (RZx),
    2009 WL 4349801 (C.D. Cal. Nov. 25, 2009) ................................ 49

*San Luis & Delta-Mendota Water Authority v. Salazar*,
    638 F.3d 1163 (9th Cir. 2011) .......................................................... 8

*San Remo Hotel, L.P. v. City & County of San Francisco*,
    27 Cal. 4th 643, 117 Cal. Rptr. 2d 269 (2002) ........................... 18

*Santa Maria v. Pacific Bell*,
    202 F.3d 1170 (9th Cir. 2000) ...................................................... 49

*Schneider v. California Department of Corrections ("Schneider I")*,
    151 F.3d 1194 (9th Cir. 1998) .................................................. 18, 20

*Schneider v. California Department of Corrections ("Schneider II")*,
    345 F.3d 716 (9th Cir. 2003) .................................................... 22, 24

*Sony Corp. of America v. Universal Studios, Inc.*,
    464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984) ............... 27

*Suguri v. Wells Fargo Bank, N.A.*,
    No. CV09-1828 PSG (PJWx),
    2009 WL 2486546 (C. D. Cal. Aug. 07, 2009) ............................ 39

*T.T. Exclusive Cars, Inc. v. Christie's Inc.*,
    No. 96 CIV. 1650 LMM,
    1996 WL 737204 (S.D.N.Y. Dec. 24, 1996) ................................ 48

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
    535 U.S. 302, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002) ............ 23

*Taylor v. Westly*,
    402 F.3d 924 (9th Cir. 2005) ........................................................ 24

*Terry v. Yamashita*,
    643 F. Supp. 161 (D. Haw. 1986) ................................................ 16

*Thorman v. American Seafoods Co.*,
    421 F.3d 1090 (9th Cir. 2005) ...................................................... 48

*Tibble v. Edison International*,
    639 F. Supp. 2d 1122 (C.D. Cal. 2009) ................................... 46-47

*Turnacliff v. Westly*,
    546 F.3d 1113 (9th Cir. 2008) ...................................................... 40

*UMG Recordings, Inc. v. Augusto*,
    628 F.3d 1175 (9th Cir. 2011) ............................................ 28, 33, 35

*United Feature Syndicate, Inc. v. Miller Feature Syndicate, Inc.,*
    216 F. Supp. 2d 198 (S.D.N.Y. 2002) ........................................21

*Valente-Kritzer Video v. Pinckney,*
    881 F.2d 772 (9th Cir. 1989) .............................................26

*Vasquez v. State,*
    45 Cal. 4th 243, 85 Cal. Rptr. 3d 466 (2008) ...................................40

*Vernor v. Autodesk, Inc.,*
    621 F.3d 1102 (9th Cir 2010) .............................................35

*Webb's Fabulous Pharmacies, Inc. v. Beckwith,*
    449 U.S. 155, 101 S. Ct. 446. 66 L. Ed. 2d 358 (1980)...........................20, 21

*Wells Fargo Bank v. Superior Court,*
    53 Cal. 3d 1082, 282 Cal. Rptr. 841 (1991) ..................................43

*Whittlestone, Inc. v. Handi-Craft Co.,*
    618 F.3d 970 (9th Cir. 2010) .............................................39

*Yeager v. Blue Cross of California,*
    175 Cal. App. 4th 1098, 96 Cal. Rptr. 3d 723 (2009)............................43

*Yumul v. Smart Balance, Inc.,*
    733 F. Supp. 2d 1117 (C.D. Cal. 2010) ....................................49

## FEDERAL AUTHORITIES

17 U.S.C. § 101 ..............................................................24, 26, 27

17 U.S.C. § 102 ..................................................................25

17 U.S.C. § 106 ..............................................................24, 27, 35

17 U.S.C. § 109 .........................................................25, 27, 28, 30

17 U.S.C. § 301 ...............................................................25, 33

U.S. Const. amend. V ............................................................17

U.S. Const. § 8, cl. 3 ..............................................................7

## STATE AUTHORITIES

Cal Bus. & Prof. Code § 17203 .....................................................40

Cal. Civ. Code § 654..............................................................19

Cal. Civ. Code § 986.........................................................*passim*

Cal. Civ. Code § 987 .............................................................44, 45

Cal. Civ. Proc. Code § 1510........................................................24

1  Cal. Com. Code § 2328(2) ........................................................................11

2  Cal. Const. art. I, § 19(a) .........................................................................18

3
4                              **MISCELLANEOUS**

5  2 Melville B. Nimmer and David Nimmer,
       *Nimmer on Copyright* (Matthew Bender)................................................. 29, 31

6  2 William F. Patry, *Copyright Law and Practice* (1994) ...........................................31

7  Emily Eschenbach Barker, *The California Resale Royalty Act: Droit [not so]*
       *Suite*, 38 Hastings Const. L.Q. 387 (2011) ......................................................23
8
9  H.R. Rep. No. 101-514 (1990),
       *reprinted in* 1990 U.S.C.C.A.N. 6915 .........................................................38

10 Jeffrey C. Wu, *Art Resale Rights and the Art Resale Market:*
       *A Follow-Up Study*, 46 J. Copyright Soc'y U.S.A. 531, 550 (1999) .............19

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

xiii

**INTRODUCTION**

1   In these putative class actions, Plaintiffs seek to enforce the California Resale
2   Royalties Act ("CRRA") on behalf of a class of artists.   The CRRA purports to
3   require owners of artworks to pay royalties, when they resell those artworks, to the
4   artists who created the works.   Specifically, the CRRA provides that, whenever a
5   work of fine art is resold in California or is resold anywhere by a California resident,
6   the seller or seller's agent must pay a 5% royalty to the artist.

7   The CRRA thus seeks to impose downstream and extraterritorial restrictions
8   on the resale of fine art.   These restrictions run afoul of several provisions of the U.S.
9   and California Constitutions.   If accepted, Plaintiffs' claims would impede the free
10   flow of interstate commerce in violation of the federal Commerce Clause, violate
11   prohibitions on the taking of private property, and impair the rights accorded
12   property owners by federal copyright law.   Accordingly, for multiple independent
13   reasons, the Court should dismiss these actions.

14   *First*, Plaintiffs' claims are barred by the Commerce Clause of the U.S.
15   Constitution.   Plaintiffs' primary claims are that New York-based auction houses,
16   Sotheby's, Inc. ("Sotheby's") and Christie's, Inc. ("Christie's"), failed to pay
17   royalties required by the CRRA when they acted as sellers' agents in auctions
18   conducted outside California.   While the CRRA purports to apply to such sales if the
19   seller is a California resident, that application is plainly unconstitutional.   The
20   Supreme Court long has held that state laws which seek to regulate economic activity
21   outside the State violate the Commerce Clause.   Indeed, California's own Legislative
22   Counsel recognized as much, opining the CRRA "would constitute an undue burden
23   on interstate commerce in contravention of the Federal Constitution in its application
24   to sales which occur outside the State of California."   (Russell Decl., Ex. 5 at 99.)

25   *Second*, Plaintiffs seek to mandate a forcible transfer of property from the
26   owners of artworks and their agents to the artists who created those works and
27   previously sold them.   Such a compelled transfer of private property without just

1  compensation violates the Fifth Amendment to the U.S. Constitution and the

2  corresponding provision of the California Constitution.

3      *Third*, Plaintiffs' demand for resale royalties is preempted by the Copyright

4  Act of 1976.  As the Supreme Court has held, the 1976 Act established a uniform

5  national copyright law and broadly preempted state regulation.  Specifically, the

6  federal first sale provision entitles the buyer of a work of art or other copyrighted

7  work to resell that work without incurring any obligation to the person who created it.

8  Yet the CRRA purports to require that the artist be paid royalties for those resales.

9  Because that requirement squarely conflicts with the federal first sale provision, as

10 the federal Register of Copyrights and a chorus of commentators have concluded, the

11 1976 Copyright Act preempts the CRRA.

12     *Fourth*, Plaintiffs also seek punitive damages, even though there is no

13 provision in the CRRA for such relief and the legislative history indicates that it was

14 not intended by the Legislature.  Under settled law, the claim for punitive damages

15 must be dismissed.  *Fifth*, the "Estate of Robert Graham" has no capacity to sue.

16     *Finally*, Plaintiffs' complaints suffer from obvious pleading defects.  Plaintiffs

17 plead "on information and belief" that they are "owed Royalties in connection with

18 the sale of works of Fine Art."  (SoCompl. ¶ 14; ChCompl. ¶ 15.)[1]  But Plaintiffs do

19 not disclose the basis for their belief or even identify any specific sales of their works.

20 Instead, they merely recite the legal elements of their claims.  That is insufficient.

21 Likewise, in an effort to assert claims dating back more than thirty years, Plaintiffs

22 allege that Defendants' concealment prevented them from "discovering the

23 occurrence of auctions and sales for which a Royalty is due."  (SoCompl. ¶ 13;

24 _____

25 [1] All references to "SoCompl." herein are to the Complaint in *Estate of Robert
   Graham, et al. v. Sotheby's, Inc.*, No. 2:11-cv-08604-JHN-FFM (C.D. Cal.) (the
26 "Sotheby's Action"); "ChCompl." refers to the Complaint in *The Sam Francis
   Foundation, et al. v. Christie's, Inc.*, No. 2:11-cv-08605-JHN-FFM (C.D. Cal.); and
27 "Russell Decl." refers to the concurrently filed Declaration of Jason D. Russell.  All
   emphasis in quotations is added, and internal citations and quotation marks are
28 omitted, unless otherwise noted.

1   ChCompl. ¶ 14.)   Plaintiffs' complaints are insufficient to invoke the discovery

2   exception to the three-year statute of limitations, because they fail to plead when and

3   how they discovered either the alleged concealment or their untimely claims.

## STATEMENT OF FACTS

### I.   THE CALIFORNIA RESALE ROYALTIES ACT

#### A.   Statutory Provisions

7        The CRRA provides that "[w]henever a work of fine art is sold and the seller

8   resides in California or the sale takes place in California, the seller or the seller's

9   agent shall pay to the artist of such work of fine art or to such artist's agent 5 percent

10  of the amount of such sale."   Cal. Civ. Code § 986(a).   An artist can "waive" the

11  right to this royalty "only by a contract in writing providing for an amount in excess

12  of 5 percent of the amount of such sale."   *Id.*   As such, the artist receives *at least* 5%

13  and cannot choose to accept less.

14       Under the statute, a work of "[f]ine art" is "an original painting, sculpture, or

15  drawing, or an original work of art in glass."   *Id.* § 986(c)(2).   An "[a]rtist" is "the

16  person who creates a work of fine art and who, at the time of resale, is a citizen of

17  the United States, or a resident of the state who has resided in the state for a

18  minimum of two years."   *Id.* § 986(c)(1).   The statute thus applies to all artists who

19  are U.S. citizens, regardless of where they reside.   One of the named Plaintiffs in

20  these actions, Chuck Close, resides in New York.   (SoCompl. ¶ 3; ChCompl. ¶ 4.)

21       The CRRA also provides that, if a work is sold by the seller's agent, "the

22  agent shall withhold 5 percent of the amount of the sale, locate the artist and pay the

23  artist."   Cal. Civ. Code § 986(a)(1).   If the agent cannot find the artist within 90 days,

24  it must pay the royalty to the California Arts Council, which is required to search for

25  the artist for seven years.   After that time, the funds effectively escheat to the Arts

26  Council to "use in acquiring fine art."   *Id.* § 986(a)(3) & (5).   If the seller or seller's

27  agent does not pay the royalty, "the artist may bring an action for damages within

28

DEFENDANTS' JOINT MOTION TO DISMISS

1  three years after the date of sale or one year after the discovery of the sale, whichever
2  is longer." *Id.* § 986(a)(3).

3       The heirs of a deceased artist may assert the artist's royalty rights for 20 years
4  after the artist's death.  *Id.* § 986(a)(7).  Two of the artists involved in these actions
5  are deceased.  Their rights are being asserted by the Sam Francis Foundation and the
6  Estate of Robert Graham.  (SoCompl. ¶ 2; ChCompl. ¶¶ 2-3.)[2]

7       The CRRA excludes resales for "a gross sales price of less than one thousand
8  dollars" or "a gross sales price less than the purchase price paid by the seller."  Cal.
9  Civ. Code § 986(b)(2) & (4).  As such, if the gross sales price is over $1,000 and
10  more than the purchase price paid by the seller, the CRRA requires the seller or
11  agent to pay a royalty of 5% of the gross sales price, without any deduction for
12  expenses incurred in the resale (e.g., commissions, shipping, insurance, etc.).

13       Finally, the CRRA provides that "[a]ny amounts of money held by any seller
14  or agent for the payment of artists pursuant to this section shall be exempt from
15  enforcement of a money judgment by the creditors of the seller or agent."  *Id.*
16  § 986(a)(6).  This provision essentially creates a lien, giving the artist priority over
17  all judgment creditors.

18       **B.   Legislative History**

19       The bill that became the CRRA, Assembly Bill 1391, was introduced by
20  Assemblyman, and later Senator, Alan Sieroty in 1975.  (Russell Decl., Ex. 1 at 3.)
21  It initially required a resale royalty only when "an original work of fine art [was]
22  sold at an auction or by a gallery or museum in California."  (*Id.*, Ex. 1 at 4:3-4.)
23  Sales occurring outside California were listed as exceptions to the scope of the
24  proposed law.  (*Id.*, Ex. 2 at 41.)

25       In response to AB 1391, a noted art law expert, Professor John Henry
26  Merryman of Stanford Law School, wrote to the Legislature.  (*Id.*, Ex. 3 at 66-67.)

27
28
---
[2] The Sam Francis Foundation is a plaintiff in the Christie's action, but not the Sotheby's action.  The other plaintiffs are identical in the two actions.

1  Professor Merryman commented that the bill applied only to California sales and
2  would therefore encourage sellers to consign their artworks to dealers and auction
3  houses outside California.  (*Id.*, Ex. 3 at 66.)  The bill was thereafter amended to
4  apply "[w]henever a work of fine art is sold *and the buyer or the seller resides in*
5  *California or the sale takes place* in California."  (*Id.*, Ex. 4 at 74:3-6.)  The bill was
6  amended again to delete the reference to California buyers, but it continued to
7  require royalties for sales outside California.  (*Id.*, Ex. 6 at 108:3-5.)

8      California's Legislative Counsel, George H. Murphy, analyzed this
9  extraterritorial provision of AB 1391 and advised both Senator Sieroty and the
10  Governor that the bill "would constitute an undue burden on interstate commerce in
11  contravention of the Federal Constitution in its application to sales which occur
12  outside the State of California."  (*Id.*, Ex. 5 at 99, 103; Ex. 7 at 143.)  The bill was
13  nonetheless adopted with the extraterritorial provision and became effective in 1977.
14  Cal. Civ. Code § 986.[3]

15  **II.  PLAINTIFFS' COMPLAINTS**

16      Plaintiffs' complaints are identical, alleging that the auction houses (Sotheby's
17  and Christie's) auctioned works of art on behalf of California sellers, or acted as the
18  seller's agent for sales in California, but failed to withhold 5% of the sales proceeds
19  and remit those funds to the artists.  (SoCompl. ¶¶ 9-11; ChCompl. ¶¶ 10-12.)  Each
20  complaint pleads a putative class action on behalf of artists who created artworks for
21  which no royalty was paid.  (SoCompl. ¶¶ 16-25; ChCompl. ¶¶ 17-26.)

22      Because of the CRRA's three-year statute of limitations, Plaintiffs request
23  sub-classes for:  (1) claims based on sales by California sellers or sales in California
24  within three years of the filing of these actions; and (2) claims based on such sales

---

[3] After the CRRA passed, the Executive Director of Bay Area Lawyers for the Arts, Inc., which supported AB 1391 (Russell Decl., Ex. 2 at 43), trumpeted the statute as a regulation of the "international" art market, which is "why it extends to resales by a California resident which may in fact take place in New York or London" (*id.*, Ex. 9 at 187).

1    three or more years before the actions were filed, if the Defendant did not disclose
2    that the seller was a California resident or that the sale took place in California.
3    (SoCompl. ¶ 16; ChCompl. ¶ 17.)   The second subclass extends back to 1977, when
4    the CRRA became effective.

5          The named Plaintiffs do not specify whether their claims fall within the first or
6    second subclass, or both.  Nor do they allege when or how they discovered any sales
7    that fall into the second subclass.  Plaintiffs do not even identify any sales—either
8    within the last three years or earlier—on which their claims are based.  Instead, they
9    allege, on undisclosed "information and belief," that they are entitled to royalties for
10   unidentified sales.  They also assert that, "at this time[,] [they] can only surmise the
11   total amount of Royalties owed to them."  (SoCompl. ¶ 14; ChCompl. ¶ 15.)

12         Plaintiffs allege that Defendants failed to tell artists about sales that gave rise
13   to royalty obligations and "affirmatively engaged in a pattern of conduct intended to
14   conceal … circumstances [that] entitled plaintiffs and class members to a Royalty."
15   (SoCompl. ¶ 12; ChCompl. ¶ 13.)  This "pattern of conduct" allegedly consisted of a
16   failure to disclose the residence of sellers in Defendants' auction catalogs or to
17   otherwise identify in the catalogs those lots "for which the artist will be entitled to
18   the Royalty…."  (SoCompl. ¶ 12; ChCompl. ¶ 13.)

19         Plaintiffs allege that Defendants' nondisclosures prevented them and other
20   putative class members from discovering "the occurrence of auctions and sales for
21   which a Royalty was due."  (SoCompl. ¶ 13; ChCompl. ¶ 14.)  Plaintiffs, however,
22   do not explain when or how they discovered Defendants' alleged concealment or
23   obtained information about auctions and sales on which to base their CRRA claims.

24         Each complaint alleges a violation of California Business and Professions
25   Code section 17200, the Unfair Competition Law, based on Defendants' alleged
26   "willful failure to comply with the [CRRA]."  (SoCompl. ¶¶ 33-46; ChCompl. ¶¶ 34-
27   47.)

28         Plaintiffs seek:  (1) damages consisting of royalties and interest; (2) punitive

1  damages; (3) attorneys' fees; and (4) injunctive relief. (SoCompl. at 10-11;

2  ChCompl. at 10.)

3  **LEGAL STANDARD**

4       To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege

5  "sufficient factual matter, accepted as true, to state a claim to relief that is plausible

6  on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp.*

7  *v. Twombly*, 550 U.S. 544, 570 (2007)). "Courts need not accept as true [t]hreadbare

8  recitals of the elements of a cause of action, supported by mere conclusory

9  statements." *Ross v. O'Neal*, No. 2:11-cv-06124-JNH-Ex, 2011 WL 5041967, at *1

10  (C.D. Cal. Oct. 17, 2011) (Nguyen, J.). The Court's consideration of judicially

11  noticeable documents does not convert a motion to dismiss into a summary judgment

12  motion. *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir.

13  2007).

14  **ARGUMENT**

15  **I.    THE CRRA VIOLATES THE COMMERCE CLAUSE**

16       As California's Legislative Counsel recognized when AB 1391 was under

17  consideration, the CRRA violates the Commerce Clause. (Russell Decl., Ex. 5 at 99

18  ("The provisions of subdivision (a) of proposed Section 986 would constitute an

19  undue burden on interstate commerce in contravention of the Federal Constitution in

20  its application to sales which occur outside the State of California ….").) The

21  Commerce Clause grants Congress the power to regulate interstate commerce. U.S.

22  Const. art. I, § 8, cl. 3. Its negative aspect, the dormant Commerce Clause, prevents

23  States from discriminating against or burdening "the interstate flow of articles of

24  commerce." *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 991 (9th Cir. 2002).

25       In evaluating a Commerce Clause challenge, the Court first must determine

26  whether the Commerce Clause applies. *Id.* at 992. If it does, the Court uses a "two-

27  tiered approach." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476

28  U.S. 573, 578-79 (1986). It "first ask[s] whether the [s]tatute: 1) directly regulates

1   interstate commerce; 2) discriminates against interstate commerce; or 3) favors in-
2   state economic interests over out-of-state interests." *Nat'l Collegiate Athletic Ass'n*
3   *v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993). If the answer is yes, the statute "violates
4   the Commerce Clause *per se*," and the Court "must strike it down without further
5   inquiry." *Id.* If "the [s]tatute has only indirect effects on interstate commerce and …
6   regulates evenhandedly," it may still be struck down under the balancing test in *Pike*
7   *v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *See Miller*, 10 F.3d at 638.

8         Here, the Commerce Clause applies and requires the Court to strike down the
9   CRRA because it directly regulates interstate commerce and fails *Pike* balancing.

10         **A.**    **The CRRA Implicates The Dormant Commerce Clause**

11         The dormant Commerce Clause applies when the regulated activity "has a
12   substantial effect on interstate commerce such that Congress could regulate the
13   activity." *Manning*, 301 F.3d at 993. Courts consider several factors in evaluating
14   whether Congress can regulate activity under the "substantial effects" test, the
15   crucial one of which is "whether the statute has anything to do with commerce or any
16   sort of economic enterprise." *San Luis & Delta-Mendota Water Auth. v. Salazar*,
17   638 F.3d 1163, 1174 (9th Cir. 2011). Thus, the dormant Commerce Clause applies
18   where a statute purports to regulate the flow of goods across state lines. *See*
19   *Manning*, 301 F.3d at 994 (flow of "goods in commercial markets"); *Miller*, 10 F.3d
20   at 638 ("state economic regulations").

21         The CRRA satisfies the "substantial effects" test because it directly regulates
22   an economic enterprise—the sale of art. Cal. Civ. Code § 986(a). It purports to
23   regulate the sale of art across state lines when it is sold by a California seller or agent
24   outside California. *Id.* § 986(a)-(b). Such interstate art sales trigger the Commerce
25   Clause. *See, e.g.*, *In re Park West Galleries, Inc.*, 2010 WL 56044, at *4 (W.D.
26   Wash. Jan. 5, 2010) (sale of artwork in international waters).

27

28

**B.**   **The CRRA Is *Per Se* Invalid Because It Directly**
<u>**Regulates Interstate Commerce**</u>

"The Commerce Clause … permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited." *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (plurality); *accord Brown-Forman Distillers Corp.*, 476 U.S. at 579. Direct regulation occurs in two ways. *First*, it occurs where a state statute overtly targets "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State[.]" *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). *Second*, it also occurs where a state statute does not overtly target out-of-state commerce, but the "practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.* Under either inquiry, the CRRA is an impermissible direct regulation.

**1.**   <u>**The CRRA Overtly Controls Conduct Outside California**</u>

The CRRA directly regulates interstate commerce by expressly regulating art sales that occur outside California. "[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid…." *Healy*, 491 U.S. at 336. As such, where State A purports to regulate the sale of goods occurring in State B simply because that sale involves a resident of State A, the regulation is invalid. *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 662, 666 (7th Cir. 2010) (where Indiana statute regulated title loans made in Illinois, simply because transaction involved an Indiana resident, extraterritoriality argument was even stronger than in *Healy* because the effect of the statute on Illinois business was more direct); *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 488-90 (4th Cir. 2007) (interpreting South Carolina statute to reach only sales in South Carolina because the alternative interpretation, which would reach sales occurring in Georgia simply because they involved a South Carolina resident, would constitute a direct regulation).

9

1    For example, in *In re Park West Galleries, Inc.*, a federal court addressed

2  whether plaintiff could sue under Florida's consumer protection statute ("FDUTPA")

3  based on the sale of artwork that occurred in international waters.  2010 WL 56044,

4  at *3.  The plaintiff's theory was that the FDUTPA "travel[ed] with him wherever he

5  [went], such that a shop owner in Milan, a tour guide in Costa Rica, and an

6  auctioneer in the Baltic Sea [would] all [be] required to comply with the statute if

7  their customer [was] a Florida resident."  *Id*. at *4.  The court held that application of

8  the FDUTPA under these circumstances would violate the Commerce Clause

9  because "the projection of FDUTPA into international waters would result in the

10  regulation of commerce wholly outside Florida's boundaries."  *Id*.  "Not even

11  Florida's substantial and legitimate interest in protecting its citizens from unfair trade

12  practices can justify the direct and substantial effect FDUTPA would have on

13  international commerce if it were applied to foreign transactions whenever a Florida

14  citizen were involved."  *Id*.

15    Here, the CRRA expressly applies when a work of fine art is sold ***outside***

16  California and merely involves a California resident seller.  Cal. Civ. Code § 986(a)

17  (requiring royalty "[w]henever a work of fine art is sold and the seller resides in

18  California ***or*** the sale takes place in California").  But as explained above, "no State

19  may force an out-of-state merchant to seek regulatory approval in one State before

20  undertaking a transaction in another."  *Healy*, 491 U.S. at 337.  Therefore, when the

21  CRRA applies to transactions outside California, it is unconstitutional.

22    Although Plaintiffs failed to plead the existence of a single sale on which their

23  claims are based, they sued Sotheby's and Christie's, both of which are New York

24  auction houses.  (SoCompl. ¶ 5; ChCompl. ¶ 6.)  Plaintiffs seek recovery based on

25  works sold in New York auctions.  (SoCompl. ¶¶ 1, 9, 12, 16; ChCompl. ¶¶ 1, 10, 13,

26  17.) [4]  To the extent they do, Plaintiffs are relying on an unconstitutional, and

27  _____

28  [4] An auction sale in New York takes place wholly outside California even if the
owner of the auctioned item is a California resident.  The sale occurs where the

*(cont'd)*

1    therefore unenforceable, statute and cannot state a claim for relief.

2              **2.      The Practical Effect Of The CRRA Is To Control**
3                        <u>Commerce Beyond California's Borders</u>

4         Because the CRRA expressly regulates commerce outside California, it

5    violates the Commerce Clause *per se*, and the Court need look no further to dismiss

6    Plaintiffs' claims based on out-of-state auction sales.  However, even if the CRRA

7    could be read to not expressly regulate interstate commerce, this would not end the

8    inquiry.  Where, unlike here, a statute "contains no language explicitly or implicitly

9    targeting either out-of-state entities or entities engaged in interstate commerce," then

10   courts assess whether the statute nonetheless regulates interstate commerce by

11   looking to the "practical effects" of the statute.  *See S.D. Myers, Inc. v. City & Cnty.*

12   *of S.F.*, 253 F.3d 461, 468-69 (9th Cir. 2001) (where statute could be read as not

13   overtly targeting interstate commerce, the "'practical effect' of a challenged statute

14   [becomes] 'the critical inquiry' in [Commerce Clause analysis] determining whether

15   that statute constitutes direct regulation"); *accord CTS Corp. v. Dynamics Corp. of*

16   *Am.*, 481 U.S. 69, 88-89 (1987) ("inconsistent regulations" alone can invalidate a

17   statute).

18        Even if the CRRA did not expressly regulate commerce outside California—

19   and it does—the CRRA would still constitute an impermissible direct regulation

20   because its practical effect is to regulate commerce outside California.  "[T]he

21   practical effect of the statute must be evaluated not only by considering the

22   consequences of the statute itself, but also by considering how the challenged statute

23   may interact with the legitimate regulatory regimes of other States and what effect

24   would arise if not one, but many or every, State adopted similar legislation."  *Healy*,

25

_____
26   *(cont'd from previous page)*
     auction takes place because that is where both the offer and acceptance occur.  *See In*
27   *re Lynch's Estate*, 62 Cal. App. 687, 689-90 (1923) (bid itself was offer); *Pac.*
     *Ready-Cut Homes v. Title Guar. & Trust Co.*, 103 Cal. App. 1, 6 (1929) (offer to buy
28   commences sale); Cal. Com. Code § 2328(2) ("acceptance" occurs "when the
     auctioneer so announces by the fall of the hammer or in other customary manner").

1  491 U.S. at 336.  "[T]he Commerce Clause protects against inconsistent legislation
2  arising from the projection of one state regulatory regime into the jurisdiction of
3  another State." *Id*. at 336-37.  In the Ninth Circuit, a "practical effects" analysis
4  considers whether "conflicting, legitimate legislation is already in place or … the
5  threat of such legislation is both actual and imminent." *Myers*, 253 F.3d at 469-70.

6         Although *Myers* refers to legislation "in place," considered but failed
7  legislation on the same subject is also conflicting legislation.   A legislature's
8  consideration of legislation, and failure to pass it, indicates that its inaction is not
9  wholly inadvertent. *See Bricker v. Rockwell Int'l Corp.*, 22 F.3d 871, 875 (9th Cir.
10 1993) ("[V]arious attempts at legislation may suggest that Congress' inaction,
11 whatever its reason, was not wholly inadvertent.").  Where a legislature's inaction is
12 not inadvertent, courts should defer to that legislative judgment. *See Kotarski v.*
13 *Cooper*, 866 F.2d 311, 312 (9th Cir. 1989) ("So long as Congress' failure to provide
14 money damages, or other significant relief, has not been inadvertent, courts should
15 defer to its judgment.").   Where one state has considered but declined to enact
16 legislation on an issue that another state has acted upon, this is evidence that the state
17 "thinks [the matter] shouldn't be restricted in the way that [the other state] thinks [it]
18 should be." *Mills*, 593 F.3d at 667.

19        Relevant to this analysis, it has been reported that at least 15 states—
20 Connecticut, Florida, Iowa, Illinois, Maine, Michigan, Minnesota, Nebraska, Nevada,
21 New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Texas—have
22 considered whether to adopt resale royalty legislation and ***declined to do so***.
23 (Russell Decl., Ex. 26 at 6177 ("[The CRRA's] enactment has prompted other States,
24 including New York, Florida, and Texas, to consider similar legislation.").)[5] Texas
25

26 _____
27 [5] (Russell Decl., Ex. 27 at 75 (Connecticut, Florida, Illinois, Iowa, Maine, Michigan,
   Nebraska, New York, Ohio, Rhode Island, and Texas introduced similar bills but
   "[t]o date, none has become state law"); *id*., Ex. 28 at 2 (similar initiatives were
28 defeated in New York, Pennsylvania, and Ohio); *id*., Ex. 29  at 367 n.9 ("Rhode
   Island, Texas, Florida, New York, Connecticut, Maine, Iowa, Michigan, and
   Nebraska are the states considering resale royalties rights at the present time….
   *(cont'd)*

considered the issue in the 1970s.  (*Id.*, Ex. 25 at LIS-1b.)  New York considered the issue several times, beginning in the 1970s and as recently as 2010.  (*Id.*, Ex. 23 at LIS-1, -4; *id.*, Ex. 24 at LIS-1, -4, -7, -10, -13, -16, -19, -22, -25, -28.)

This considered but failed legislation demonstrates that the "practical effect" of the CRRA is to create inconsistent legislation by projecting California's regulatory regime into other jurisdictions, and exalting it over the public policy of at least fifteen other states that have decided not to restrict the sale of artworks within their borders.  *See Mills*, 593 F.3d at 667-68 ("To allow Indiana to apply its law against title loans when its residents transact in a different state that has a different law would be arbitrarily to exalt the public policy of one state over that of another").

In particular, New York has introduced resale royalty legislation more than 10 times.  (Russell Decl., Ex. 23 at LIS-1, -4; *id.*, Ex. 24 at LIS-1, -4, -7, -10, -13, -16, -19, -22, -25, -28.)  Each time, the legislation would have imposed a resale royalty when a work of art is sold in New York.  (*Id.*)  Yet each time, New York refused to restrict the sale of art in this way.

Plaintiffs are nonetheless suing two New York auction houses, seeking recovery for sales in New York auctions.  Plaintiffs would have the Court ignore the New York Legislature's repeated refusal to impose a royalty on art sales within New York's borders, and yet allow California to impose a royalty on art sales within New York's borders.  Thus, even if the CRRA did not expressly regulate interstate commerce, the "practical effect" of the CRRA is to regulate conduct outside California's borders, which renders the CRRA *per se* invalid.

---

*(cont'd from previous page)*
Illinois had considered such a bill, but the House of Representatives rejected it…."); *id.*, Ex. 30 at 15 ("Bills drafted to accomplish similar objectives are presently under consideration in at least eight other states, including Florida, Iowa, Maine, Minnesota, New York, Ohio, Rhode Island and Texas."); *id.*, Ex. 31 at 1 ("Other states are considering similar legislation … including Ohio, Nevada, Florida, Connecticut, New Jersey and New York.").)

1

**C.    The CRRA Places An Undue Burden On Interstate Commerce To The Extent It Requires Royalties To Non-California Artists**

2

3        Because the CRRA is a direct regulation and violates the Commerce Clause

4   *per se*, this ends the analysis, and the Court "need not balance the burden on

5   interstate commerce against the local benefit derived from the Statute."  *Miller*, 10

6   F.3d at 640.  But even if this Court were to somehow conclude that the CRRA has

7   only an incidental effect—rather than an express and practical effect—on interstate

8   commerce, then it would still need to strike the CRRA to the extent it requires

9   payment to non-California artists because the statute provides no legitimate local

10  benefit.[6]

11       The *Pike* balancing test provides that "[w]here [a] statute regulates even-

12  handedly to effectuate a legitimate local public interest, and its effects on interstate

13  commerce are only incidental, it will be upheld unless the burden imposed on such

14  commerce is clearly excessive in relation to the putative local benefits."  *Pike*, 397

15  U.S. at 142.  "If a legitimate local purpose is found, then the question becomes one

16  of degree," "[a]nd the extent of the burden that will be tolerated will … depend on

17  the nature of the local interest involved, and on whether it could be promoted … with

18  a lesser impact on interstate activities."  *Id.*

19                **1.    The CRRA Substantially Burdens Interstate Commerce**

20       The CRRA substantially burdens interstate commerce.  Regulations place a

21  substantial burden on interstate commerce when they "increase the cost" of the

22  movement of goods or "slow the movement of goods in interstate commerce."

23  *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 445 (1978); *see also Dan Clark*

24  *Family Ltd. P'ship v. Miramontes*, 193 Cal. App. 4th 219, 232 (2011) ("A statute

25  imposes a burden when it inhibits the flow of goods interstate.").  Regulations also

26  burden interstate commerce when they create a disincentive for companies to engage

27

28  [6] *See Ross*, 2011 WL 5041967, at *2 (Nguyen, J.) (dismissing complaint under *Pike* balancing test); *accord Abramson v. Brownstein*, 897 F.2d 389 (9th Cir. 1990).

1    in interstate commerce.  *See Conn. ex rel. Blumenthal v. Crotty*, 180 F. Supp. 2d 392,

2    400-01 (N.D.N.Y. 2001) (statute burdened interstate commerce where it

3    "establish[ed] a substantial disincentive to lobsterers who want to fish in the FISMA

4    to engage in the commercial lobstering trade in interstate commerce"); *accord Bibb v.*

5    *Navajo Freight Lines, Inc.*, 359 U.S. 520, 524-30 (1959) (Illinois statute that

6    required contoured mudflaps on Illinois highways placed unconstitutional burden on

7    interstate commerce where it increased costs of installment and maintenance, slowed

8    movement between states, and prevented carriers from doing business with those

9    who used straight mudflaps).

10        By imposing a royalty on the seller or his agent, the CRRA increases the cost

11   of the movement of art.  Given that no other state imposes such an obligation, there

12   is a substantial disincentive for anyone—resident or not—to sell art in California.

13   There is also a substantial disincentive for any California resident to sell art and for

14   any agent to work with a California resident to sell art.

15        Moreover, by imposing a royalty based on the gross amount of the sale per

16   California Civil Code § 986(a)(1), instead of the profit, the CRRA discourages sales

17   by increasing the cost of art via a blunt and inequitable tool deliberately oblivious to

18   the art investment market.  As a very basic example, where the CRRA applies, if

19   someone buys a work of art for $1,000 and sells it three years later recognizing only

20   marginal nominal appreciation in value to $1,050, then the entire "profit" would go

21   back to the artist—plus an additional out-of-pocket $2.50.[7]

22        Finally, the CRRA increases the cost of art and slows sales by requiring a

23   seller's agent to at least:  (1) determine the seller's "residence"; (2) determine and

24   track the artist's citizenship, residency, and lifespan; and (3) undertake some form of

---

[7] This so-called "profit" does not even account for costs incurred by the seller, such as sales commissions, insurance, shipping or storage fees, etc., so the artist may actually profit at the seller's expense, and may even impose a loss on the seller. (Russell Decl., Ex. 10 at 9.)  Plainly, this result increases the costs of art sales and imposes very real (but ignored) burdens on anyone attempting to sell art that has even the most tenuous of connections to California.

1  effort to locate the artist.

2     **2. To The Extent The CRRA Requires Resale Royalties To Non-California Residents, It Serves No Legitimate Local Purpose**

3

4     Given these burdens, to the extent the CRRA requires payment to non-

5  California artists, the CRRA fails the *Pike* balancing test because it serves no

6  legitimate "local" purpose. "States have broad powers to regulate in the interests of

7  their citizens." *Manning*, 301 F.3d at 995. But a state has no legitimate interest in

8  regulating or protecting the interests of nonresidents. *See Edgar*, 457 U.S. at 644

9  ("While protecting local investors is plainly a legitimate state objective, the State has

10  no legitimate interest in protecting nonresident shareholders."); *Fulton Corp. v.*

11  *Faulkner*, 516 U.S. 325, 334 (1996) ("North Carolina has no general sovereign

12  interest in taxing income earned out of state").[8]

13     The CRRA was neither designed nor drafted to further legitimate "local"

14  concerns—such as benefiting *California* artists. Rather, the CRRA was enacted to

15  provide the equivalent of residual rights to *all* visual artists even if they have *no*

16  connection to California at all. (Russell Decl., Ex. 2 at 41.) The rationale was that

17  all artists other than visual artists received residuals for their work on a contractual

18  basis, and providing statutory royalties to visual artists would put visual artists on the

19  same playing field as other artists. (*Id.*; *see also id.*, Ex. 7 at 145.) The bill was

20  "predicated on the assumption that every sale of a work of art is for more money

21  than the buyer paid, that every sale shows a profit." (*Id.*, Ex. 2 at 42.) The theory

22  behind residuals is that the royalty-holder "is going to make an additional profit"

23  _____

24  [8] *See also Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 566 (6th Cir. 1982)

25  ("the provisions constitute an unconstitutional burden on interstate commerce because there exists no legitimate state interest in the protection of non-resident shareholders"); *Terry v. Yamashita*, 643 F. Supp. 161, 166 (D. Haw. 1986) ("Hawaii

26  has no legitimate interest in protecting nonresident stockholders"); *Rocket Acquisition Corp. v. Ventana Med. Sys., Inc.*, 2007 WL 2422082, at *7 (D. Ariz. Aug.

27  22, 2007) ("While Arizona clearly has an interest in protecting businesses that have significant contacts with Arizona, such as Defendant, Arizona clearly has no interest

28  in protecting nonresident shareholders of nonresident corporations.").

1   from a re-release or re-run.  (*Id.*)  The legislature thought artists should similarly
2   "always make a profit from a re-release or re-run."  (*Id.*; *see also id.*, Ex. 15 at 58
3   (CRRA based on giving the artist a "share in the profits").)

4          The CRRA attempts to allow artists to benefit from later resales of their works
5   by requiring a resale royalty.  Cal. Civ. Code § 986(a).  But the CRRA requires
6   payment to *any* artist—not any California artist—"who, at the time of resale, is a
7   citizen of the United States, or a resident of the state who has resided in the state for
8   a minimum of two years."  *Id.* § 986(c)(1).  Indeed, one of the named Plaintiffs in
9   this case is a nonresident who seeks to benefit from the statute.  (SoCompl. ¶ 3;
10  ChCompl. ¶ 4.)

11         California's Legislative Counsel recognized this fatal flaw in the CRRA.  It
12  opined that "[w]hile the state has a legitimate local interest in furthering the fiscal
13  rights of artists in this state, we find little such interest where the artist resides out of
14  the state or country, especially where there may be duplicative provisions of law
15  affecting a sale of fine art, and where the sale occurs other than in California.  We
16  think this raises a substantial possibility of impeding the free flow of interstate
17  commerce."  (Russell Decl., Ex. 5 at 105.)  Given "the absence of a 'local' problem,"
18  "especially where the artist resides outside California," the Legislative Counsel
19  concluded that the CRRA is invalid under the Commerce Clause.  (*Id.* at 104-05.)
20  Accordingly, where the artist is not a California resident, California has no legitimate
21  "local" interest and "there is nothing to be weighed in the balance to sustain the
22  law."  *Edgar*, 457 U.S. at 644.

23  **II.    THE CRRA EFFECTS A TAKING OF PRIVATE PROPERTY IN
24          VIOLATION OF THE U.S. AND CALIFORNIA CONSTITUTIONS**

25         The Fifth Amendment provides that "private property" shall not "be taken for
26  public use, without just compensation."  U.S. Const. amend. V.[9]  This constitutional

_____

27
28  [9] This provision of the Fifth Amendment, commonly known as the Takings Clause,
    "has long been held to apply to the States through the Due Process Clause of the

                                                                                    *(cont'd)*

1   guarantee "was designed to bar Government from forcing some people alone to bear

2   public burdens which, in all fairness and justice, should be borne by the public as a

3   whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).[10]   The CRRA stands in

4   direct contradiction to this principle:  it confiscates the private property of select

5   individuals and transfers that property to other private individuals for their sole use

6   and benefit, bestowing no discernable benefit on the greater public.   Under well-

7   established Takings Clause jurisprudence and the long recognized purposes of the

8   Fifth Amendment, the CRRA effects an impermissible taking of private property

9   without just compensation.

10          The Ninth Circuit has set forth a two-step analysis to determine whether a

11   taking has occurred.   First, the claimant must have a constitutionally protected

12   property interest.   *See Schneider I*, 151 F.3d at 1198.   Second, the court must

13   "determine whether the expropriation of that interest constitutes a 'taking' within the

14   meaning of the Fifth Amendment."   *Id.*   Both criteria are met here:   under

15   fundamental notions of property law, a 5% interest in the proceeds from the sale of a

16   work of fine art is "private property" warranting Fifth Amendment protection; and

17   because the CRRA effects a direct appropriation of that property, it is a *per se* taking

18   of private property.   Where there has been a "taking" of "private property," the Fifth

19   Amendment requires "just compensation" and that the property be put to public use.

20   *See Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231-32 (2003).   As the CRRA

21   _____

22   (cont'd from previous page)
     Fourteenth Amendment."   *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1198 (9th
     Cir. 1998) ("*Schneider I*") (citing *Chicago, Burlington & Quincy R.R. Co. v. City of*

23   *Chicago*, 166 U.S. 226, 239 (1897)).

24   [10] The California Constitution provides: "Private property may be taken *or damaged*

25   for a public use and only when just compensation, ascertained by a jury unless waived,
     has first been paid to, or into court for, the owner."   Cal. Const. art. I, § 19(a).   The
     California Supreme Court has acknowledged the "broader protections granted

26   landowners by the addition of 'or damaged' to the language of our state's
     compensation clause," *HFH Ltd. v. Superior Court*, 15 Cal. 3d 508, 517-18 (1975),

27   but has generally construed the federal and state takings clauses "congruently," *San
     Remo Hotel, L.P. v. City & Cnty. of S.F.*, 27 Cal. 4th 643, 664 (2002) (collecting

28   cases).

1    provides no compensation, it cannot stand under the Fifth Amendment.[11]

2         **A.**     **The CRRA Confiscates Private Property**

3         "[T]he existence of a property interest is determined by reference to existing

4    rules or understandings that stem from an independent source such as state law."

5    *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of*

6    *State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  Under California law, "[p]roperty is

7    a broad concept that includes every intangible benefit and prerogative susceptible of

8    possession or disposition."  *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003);

9    *see also* Cal. Civ. Code § 654 (ownership of property includes "the right … to

10   possess and use it to the exclusion of others").  Protected interests include a property

11   owner's reasonable investment-backed expectations.  "Opinions defining property

12   for takings purposes often use the phrase 'reasonable investment-backed

13   expectations' to describe such claims….  The phrase aptly describes the nature of the

14   interest needed to establish property rights for the purposes of California law."  *G. S.*

15   *Rasmussen & Assocs. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 903 n.13 (9th Cir.

16   1992).[12]

17   ────────────────

18   [11] In addition to providing no compensation, the CRRA is also invalid because it
     confiscates one person's private property for the purpose of conferring a benefit on
19   another private individual, not the public.  *See Kelo v. City of New London*, 545 U.S.
     469, 477 (2005) ("[T]he City would no doubt be forbidden from taking petitioners'
20   land for the purpose of conferring a private benefit on a particular private party.");
     *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984) ("[T]he Court's cases have
21   repeatedly stated that one person's property may not be taken for the benefit of
     another private person without a justifying public purpose, even though compensation
22   be paid.").  The CRRA confers no benefit on the public in general or the citizens of
     California in particular, but instead mandates a transfer to a private individual—the
23   original artist—who need not be a California citizen or resident.  Nor does the CRRA
     generally encourage the creation and sale of art by up-and-coming artists.  Because the
24   CRRA applies only to *resales* of art (and resales over $1,000 at that), the artists who
     benefit are, overwhelmingly, well established and successful.  *See* Jeffrey C. Wu, *Art*
25   *Resale Rights and the Art Resale Market: A Follow-Up Study*, 46 J. Copyright Soc'y
     U.S.A. 531, 550 (1999) ("[T]he secondary market for contemporary art that does exist
26   is highly skewed towards a few established artists.").

27   [12] A state regulation that confiscates private property cannot escape Takings Clause
     scrutiny on the theory that the regulation itself redefines traditional property rights.
28   *Phillips*, 524 U.S. at 167 ("[A] State may not sidestep the Takings Clause by
     disavowing traditional property interests."); *see also Palazzolo v. Rhode Island*, 533

     *(cont'd)*

1      Accordingly, it is well settled that the Fifth Amendment protects personal
2   property, including monetary interests, in addition to real property.  *See, e.g.*, *Webb's*
3   *Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980).   In *Webb's*, the
4   Supreme Court held that interest earned on interpleader funds deposited with a court
5   was private property that could not be taken without just compensation: "[t]he
6   earnings of a fund are incidents of ownership of the fund itself and are property just
7   as the fund itself is property."  *Id.* at 164.  Similarly, settled law provides that interest
8   earned on deposited funds is the protected private property of the funds' beneficial
9   owners and therefore subject to the protections of the Takings Clause.  *See, e.g.*,
10   *Phillips*, 524 U.S. at 172 ("[T]he interest income generated on funds held in IOLTA
11   accounts is the 'private property' of the owner of the principal"); *McIntyre v. Bayer*,
12   339 F.3d 1097, 1099-1100 (9th Cir. 2003) ("[W]e have held that the interest income
13   generated by the accounts constitutes a property interest sufficiently fundamental
14   that states may not appropriate it without implicating the Takings Clause.") (quoting
15   *Schneider I*, 151 F.3d at 1201).

16      Applying these principles here, it is clear that the CRRA confiscates private
17   property protected by the Fifth Amendment.   A work of fine art indisputably is
18   protected private property.  The owner thus enjoys all of the rights incident to such
19   ownership, including the right to possess and use the artwork to the exclusion of
20   others, as well as the right to dispose of it.  *See Phillips*, 524 U.S. at 170; *see also*
21   *Brotherton v. Cleveland*, 923 F.2d 477, 481 (6th Cir. 1991) ("The 'bundle of rights'
22   which have been associated with property include the rights to possess, to use, to
23   exclude, *to profit, and to dispose*.").

24      The proceeds realized from any sale of an artwork are also private property.

25   _____
*(cont'd from previous page)*
26   U.S. 606, 626-27 (2001) (rejecting the argument that a state "by prospective
     legislation … can shape and define property rights and reasonable investment-backed
     expectations, and subsequent owners cannot claim any injury from lost value");
27   *Webb's*, 449 U.S. at 164 ("[A] State, by *ipse dixit*, may not transform private property
     into public property without compensation….   This is the very kind of thing that the
28   Taking Clause of the Fifth Amendment was meant to prevent.").

1   An owner's reasonable investment-backed expectations necessarily include the

2   unencumbered right to sell the piece of art and retain the proceeds from such sale.

3   (Russell Decl., Ex. 27 at 134 (Copyright Report warning that resale royalty acts

4   "abandon well-settled principles of free-alienability in Anglo-American property

5   jurisprudence").)   Indeed, the expectation that one controls—and thus retains the

6   proceeds generated from the sale of—his or her wholly owned property is even more

7   firmly rooted than the expectation that "interest follows the principal." *See, e.g.*,

8   *Webb's*, 449 U.S. at 162.  Although the owner cannot be assured of the specific price

9   for a later sale, the owner has a property interest in all proceeds actually produced

10  from the sale. *See Phillips*, 524 U.S. at 168 ("[R]egardless of whether the owner of

11  the principal has a constitutionally cognizable interest in the *anticipated* generation

12  of interest by his funds, any interest that *does* accrue attaches as a property right

13  incident to the ownership of the underlying principal.") (emphasis in original).

14          In this instance, moreover, Plaintiffs seek to confiscate trust funds, *i.e.*, funds

15  that Defendants hold in trust for their principals, the owners of the artworks.  *E.g.,*

16  *United Feature Syndicate, Inc. v. Miller Feature Syndicate, Inc.*, 216 F. Supp. 2d 198,

17  216-20 (S.D.N.Y. 2002) (funds collected by agents for their principals are trust

18  funds); *Edwards v. Horsemen's Sales Co.*, 560 N.Y.S.2d 165, 166 (Sup. Ct. 1989)

19  (same with respect to auctioneers).  The CRRA likewise purports to provide that,

20  prior to payment, the required royalties are held as distinct assets.  Cal. Civ. Code

21  § 986(a)(6) (funds held for royalty payments are exempt from judgment claims

22  against the seller or the seller's agent).   Accordingly, the proceeds of a resold

23  artwork are private property protected from confiscation by the Fifth Amendment.

24      **B.    The CRRA Effects A *Per Se* Taking Of Private Property**

25          At its core, the Fifth Amendment categorically requires just compensation for

26  a permanent physical invasion or occupation of private property, no matter how

27  minor that invasion may be.  *See Loretto v. Teleprompter Manhattan CATV Corp.*,

28  458 U.S. 419, 434-35 (1982) ("[W]hen the character of the governmental action … is

permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public purpose or has only minimal economic impact on the owner."). Unlike a regulation that restricts or regulates the *use* of private property, the forcible *transfer* of property from one private individual to another (or to the government) is equivalent to a forced physical occupation of property, which triggers the government's categorical duty to pay just compensation.  *Compare Horne v. U.S. Dep't of Agric.*, __ F.3d __, 2011 WL 2988902, at *6 (9th Cir. July 25, 2011) (regulations that required raisin handlers to set aside a portion of their raisins for resale by an industry committee did not effect a taking because they were "use restriction[s]" integral to the stabilization of the highly regulated raisin market, and not a direct appropriation of the raisins), *with Brown*, 538 U.S. at 235 (because "the interest earned in the IOLTA accounts is the private property of the owner of the principal … the transfer of the interest to the Foundation here seems more akin to the occupation of a small amount of rooftop space in *Loretto*"); *see also Schneider v. Cal. Dep't of Corr.*, 345 F.3d 716, 720 (9th Cir. 2003) ("*Schneider II*") ("In *Brown* … the Supreme Court further clarified that *per se* takings analysis was the proper framework with which to evaluate [a] law [requiring] that the interest on [an individual's] funds be transferred to a different owner for a legitimate public use.").

Here, the CRRA does not impose a regulatory restriction on an owner's use or resale of property.  The CRRA instead mandates the transfer of part of the proceeds of the resale of an artwork from the seller or the seller's agent to the artist. *Morseburg v. Balyon*, 621 F.2d 972, 976-79 (9th Cir. 1980) ("[T]he inescapable effect of the [CRRA] is to burden [the seller] with an unbargained-for obligation to pay a royalty to the creator of that work or the Arts Council upon resale.").  The CRRA's direct appropriation of part of the proceeds is thus subject to the same *per se* rule that was applied in *Loretto* and *Brown* to physical takings.  *See Brown*, 538 U.S. at 235 (rejecting a regulatory takings approach in favor of a *per se* rule when

1    analyzing the *transfer* of private property from one individual to another).

2        It is of no moment that the CRRA confiscates only 5% of the proceeds from

3    the resale of artwork.   A *per se* taking occurs whenever private property is

4    confiscated by the government, regardless of the size or amount taken.  *See, e.g.*,

5    *Loretto*, 458 U.S. at 436 ("But constitutional protection for the rights of private

6    property cannot be made to depend on the size of the area permanently occupied.");

7    *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S.

8    302, 322 (2002) ("When the government physically takes possession of an interest in

9    property for some public purpose, it has a categorical duty to compensate the former

10   owner … regardless of whether the interest that is taken constitutes an entire parcel

11   or merely a part thereof.").   Moreover, the confiscation of 5% of the *gross*

12   *proceeds*—not profit—from the resale of a work of art will, in many instances, be a

13   substantial sum; and given the statute's $1,000 threshold, it will always be at least

14   $50.  Indeed, unless a piece of artwork is sold for more than 105% of its purchase

15   price, the CRRA not only will confiscate the seller's *entire* profit, but it also will

16   leave the seller with less money than he or she originally paid for the artwork.

17       Finally, the CRRA does not impose a tax.   The resale royalty is neither

18   exacted from the general public nor transferred to any government agency.  Instead,

19   the royalty is a forced transfer from one private individual to another.  *See Kathrein v.*

20   *City of Evanston*, 636 F.3d 906, 911 (7th Cir. 2011) ("The quintessential tax is

21   imposed upon a broad population by a legislature to raise the revenue a government

22   needs in order to function."); *see also* Emily Eschenbach Barker, *The California*

23   *Resale Royalty Act: Droit [not so] Suite*, 38 Hastings Const. L.Q. 387, 393-97 (2011).

24   Defendants are aware of no case in which the compelled transfer of property from

25   one private party to another has been upheld as a tax.[13]

26   _____

27   [13] In some instances, the CRRA transfers title to the collected royalty payment to the
     California Arts Council, but that occurs only if the artist cannot be located after a
28   seven-year search.  Cal. Civ. Code § 986(a)(3) & (5).  That is not a "tax" on the seller
     of the artwork.  Instead, it is an abandonment at that point of the artist's rights to the

*(cont'd)*

1   In sum, the CRRA effects a direct appropriation of private property from one

2   individual to another without compensation. The Supreme Court has long

3   recognized this as among the core concerns implicated by the Fifth Amendment: "It

4   is against all reason and justice to presume that the legislature has been entrusted

5   with the power to enact a law that takes *property* from A and gives it to B."

6   *E. Enters. v. Apfel*, 524 U.S. 498, 523 (1998) (quoting *Calder v. Bull*, 3 Dall. 386,

7   388 (1798) (opinion of Chase, J.) (emphasis in original)). Nor is the government

8   "absolved of its constitutional duty to pay 'just compensation' to an individual

9   whose property has been taken for public use merely because the same government

10  has benevolently conferred value on another…." *Schneider II*, 345 F.3d at 721.

11  Because the CRRA takes 5% of the value of a resold work of art and transfers it to

12  another person for his sole benefit without any compensation, the CRRA violates the

13  Fifth Amendment and the California Constitution.

14  ## III.   THE COPYRIGHT ACT OF 1976 PREEMPTS THE CRRA CLAIM

15  Plaintiffs' CRRA claim also must be dismissed because it is preempted by the

16  Copyright Act of 1976 ("Copyright Act"). 17 U.S.C. § 101 *et seq.* In enacting the

17  Copyright Act, Congress had the "express objective of creating national, uniform

18  copyright law by broadly pre-empting state statutory and common-law copyright

19  regulation." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740-41 (1989).

20  The Copyright Act strikes a careful balance between the interests of creators and the

21  public at large. Congress provided creators with certain rights—including the

22  exclusive right to "distribute" their copyrighted works. 17 U.S.C. § 106(3). But

_____

23  *(cont'd from previous page)*

24  royalty and an escheat of the artist's unclaimed property to the state. *See Taylor v. Westly*, 402 F.3d 924, 926 (9th Cir. 2005) (discussing escheat principles); Cal. Civ.

25  Proc. Code § 1510 *et seq.* (providing for unclaimed property to escheat to the state).

26  If the statute were construed as a tax, that would raise other constitutional concerns. Most notably, as regards sales of artwork that occur outside California, the CRRA

27  would offend well-established prohibitions against extra-territorial taxation. *See generally MeadWestvaco Corp. v. Ill. Dep't of Revenue*, 553 U.S. 16, 24 (2008) ("The

28  Commerce Clause and the Due Process Clause impose distinct but parallel limitations on a State's power to tax out-of-state activities.").

1 Congress also limited the restraints that a creator, once he has distributed his work,
2 can place on the art's subsequent alienation.  Specifically, the "first sale" provision
3 of the Copyright Act entitles a lawful owner of a copyrighted work to resell that
4 work without restriction by, or payment to, the creator.  17 U.S.C. § 109.

5 The CRRA creates a restraint on the distribution of copyrighted works that
6 runs headlong into the Copyright Act's prohibition against such restraints.  By
7 purporting to entitle an artist to a 5% royalty for certain resales, the CRRA creates a
8 scheme of copyright-like rights that is directly contrary to the federal first sale
9 provision.  That is why, from the CRRA's inception, virtually every commentator to
10 address the question has concluded that the CRRA is incompatible with the
11 Copyright Act, particularly its first sale doctrine—a view confirmed by the federal
12 Register of Copyrights.  (*See infra* at 31-32.)

13 Plaintiffs' CRRA claim thus is preempted by the federal Copyright Act in two
14 independent ways:  (1) it conflicts with the Copyright Act's carefully wrought
15 balance between creator control and the free trade in copyrightable works, and (2) it
16 is expressly preempted because it purports to create state law rights that are
17 "equivalent" to those protected by the Copyright Act, which the Copyright Act
18 expressly forbids, *id.* § 301(a).

19 To be sure, in remanding to state court in *Baby Moose Drawings, Inc. v.*
20 *Valentine*, 2011 WL 1258529, at *4 (C.D. Cal. Apr. 1, 2011), this Court ruled that
21 the Copyright Act's express preemption clause did not provide an unequivocal basis
22 to remove that case to federal court.  But as explained below, that ruling should not
23 guide the analysis here, because it addressed only whether there was sufficient
24 federal jurisdiction for removal.

25 **A.    The Copyright Act And CRRA Cover The Same Subject Matter**

26 The Copyright Act provides that the subject matter of copyright includes
27 "pictorial, graphic, and sculptural works," 17 U.S.C. § 102(a)(5), which the Act
28 defines to "include two-dimensional and three-dimensional works of fine, graphic,

1  and applied art, photographs, prints and art reproductions, maps, globes, charts,

2  diagrams, models, and technical drawings, including architectural plans," *id.* § 101.

3  The CRRA applies to identical subject matter—including "fine art," which is defined

4  as "an original painting, sculpture, or drawing, or an original work of art in glass."

5  Cal. Civ. Code § 986(c)(2).

6       Moreover, under both the Copyright Act and the CRRA, an artist

7  automatically obtains rights simply by creating an original work.   The 1976

8  Copyright Act did away with the requirement of registration, so federal copyrights

9  now flow from mere creation of an original work.   So too do the rights under the

10  CRRA.   The CRRA's right to a 5% resale royalty attaches without the need for any

11  steps beyond creation of a work of "fine art."

12       **B.   Plaintiffs' CRRA Claim Conflicts With And Thus Is Preempted By**

13          **The Copyright Act's First Sale Doctrine**

14       Under conflict preemption principles, a state law is preempted when it

15  "actually conflicts with federal law or when a state law stands as an obstacle to the

16  accomplishment and execution of the full purposes and objectives of Congress in

17  enacting the federal law."   *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir.

18  2007).   These principles apply to the Copyright Act.   "Courts have found conflict

19  preemption where state laws interfere with federal copyright law's goal of leaving

20  some works, or uses of works, in the public domain."   *Facenda v. N.F.L. Films, Inc.*,

21  542 F.3d 1007, 1028 (3d Cir. 2008); *see also Valente-Kritzer Video v. Pinckney*, 881

22  F.2d 772, 774 (9th Cir. 1989) (Copyright Act requires written transfers, so State

23  cannot authorize oral agreements).

24       Conflict principles apply even when the federal statute contains an express

25  preemption clause.   *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 867 (2000)

26  (federal motor vehicle regulations preempted a state tort suit under conflict principles

27  even though the suit was not preempted by the express statutory preemption

28  provision); *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1204 (9th Cir. 2002).

1   Thus, even if the Copyright Act's express preemption provision did not preempt
2   Plaintiffs' CRRA claim (which, as explained below, it does), Plaintiffs' claim
3   nevertheless would be preempted because it conflicts with the Copyright Act.  *See*
4   *Rodrigue v. Rodrigue*, 218 F.3d 432, 441 (5th Cir. 2000) (rejecting express
5   preemption of state community property law under Section 301 of the Copyright Act,
6   but acknowledging partial preemption based on conflict principles).

7        Plaintiffs' claim is directly counter to the Copyright Act's first sale provision:
8   under the federal law, once a first sale of a copyrighted work has been made, the
9   creator cannot restrict or claim royalties for subsequent resales.  17 U.S.C. § 109(a).
10  But that is exactly what Plaintiffs seek under the CRRA.

11        **1.    The First Sale Doctrine Precludes Restraints On Alienation**

12       Federal copyright law embodies "a difficult balance between the interests of
13  authors and inventors in the control and exploitation of their writings and discoveries
14  on the one hand, and society's competing interest in the free flow of ideas,
15  information, and commerce on the other hand."  *Sony Corp. of Am. v. Universal*
16  *Studios, Inc.*, 464 U.S. 417, 429 (1984).  States cannot disregard the balance of
17  competing interests that Congress has adopted.  "Where is it clear how [federal
18  intellectual property] laws strike that balance in a particular circumstance, that is not
19  a judgment the States may second-guess."  *See Bonito Boats, Inc. v. Thunder Craft*
20  *Boats, Inc.*, 489 U.S. 141, 152 (1989).

21       The first sale doctrine is an essential component in striking that balance.
22  Under Section 106(3), the Copyright Act grants to the owner of a copyright the
23  exclusive right "to distribute copies … of the copyrighted work to the public by sale
24  or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 106(3).[14]
25  But this right is not absolute.  Rather, as the Supreme Court has recognized, an
26  artist's distribution right is expressly limited by the first sale doctrine in Section

27
28  [14] The Copyright Act defines "copies" to include "the material object, other than a phonorecord, in which the work is first fixed."  17 U.S.C. § 101.

1  109(a).  *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135,
2  141-42 (1998).  Section 109(a) provides that, "[n]otwithstanding the provisions of
3  section 106(3), the owner of a particular copy … lawfully made under this title, or
4  any person authorized by such owner, is entitled, *without the authority of the*
5  *copyright owner, to sell or otherwise dispose of the possession of that copy* …."  17
6  U.S.C. § 109(a).

7      This first sale provision does more than merely prohibit restraints on the
8  subsequent *transfer* of ownership.  It also prevents copyright owners from
9  unilaterally dictating the terms under which a subsequent owner may sell a work.
10  "The seminal illustration of the principle is found in *Bobbs-Merrill Co. v. Straus*,
11  210 U.S. 339, 341 (1908)."  *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1179
12  (9th Cir. 2011).  In *Bobbs-Merrill*, the Supreme Court held that the first sale doctrine
13  prevented a copyright owner from dictating that its copyrighted work could not be
14  resold for less than $1.  *See* 210 U.S. at 350-51.  Similarly, in *Allison v. Vintage*
15  *Sports Plaques*, the Eleventh Circuit concluded that the first sale doctrine must limit
16  state law rights of publicity, lest the latter interfere with federal copyright law and
17  "upset the delicate balance between the interests of the celebrity and those of the
18  public."  136 F.3d 1443, 1448-49 (11th Cir. 1998).

19      "The whole point of the first sale doctrine is that once the copyright owner
20  places a copyrighted item in the stream of commerce by selling it, *he has exhausted*
21  *his exclusive statutory right to control its distribution*."  *Quality King*, 523 U.S. at
22  152.  More pointedly, "taken together, the distribution right and the first sale doctrine
23  rest on the principle that the copyright owner is entitled to realize no more and no
24  less than the full value of each copy or phonorecord upon its disposition."  *Parfums*
25  *Givenchy, Inc. v. C & C Beauty Sales, Inc.*, 832 F. Supp. 1378, 1389 (C.D. Cal.
26  1993).  Through the first sale doctrine, Congress has mandated that, after a first sale,
27  copyright owners may not demand any compensation or other particular terms in
28  connection with subsequent resales.

## 2.   The CRRA Cannot Be Reconciled With The First Sale Doctrine

The CRRA cannot be reconciled with the Copyright Act's first sale doctrine. It impermissibly places restraints on the alienation of works of fine art and attempts to dictate the terms of resale. The CRRA entitles an artist to a continuing 5% royalty in connection with resales meeting certain conditions and creates a cause of action for the artist to recover any unpaid royalty. This gives the artist a continuing financial interest in the further distribution of the artwork and, like the restraint struck down in *Bobbs-Merrill*, the ability to enforce certain conditions on subsequent resales of copyrighted material. *Bobbs-Merrill*, 210 U.S. at 349-50 ("The purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he may not publish a new edition of it.").

But under the Copyright Act, "[a]fter the first sale of a copyrighted item … any subsequent purchaser, … from a … reseller, is obviously an 'owner' of that item." *Quality King*, 523 U.S. at 145. Thus, "[r]ead literally, § 109(a) unambiguously states that such an owner is entitled, without authority of the copyright owner, to sell that item." *Id.* In other words, it is simply not possible to comply with both Section 109(a) and the CRRA. The state law must give way.

Moreover, the CRRA permits elimination of the 5% royalty only where it is replaced by a writing entitling an artist to an amount *greater* than 5%. Cal. Civ. Code § 986(a). The CRRA's restriction thus is continuing and effectively unwaivable. The rights associated with copyright, in contrast, are freely assignable on any terms the creator is willing to accept. As a leading treatise has explained, the CRRA thus "inhibit[s] the privilege to distribute those works of authorship to which it pertains." 2 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 8C.04 (Matthew Bender).

Nor are the CRRA's burdens on resale merely monetary. The CRRA also encumbers the sale of copyrighted works by requiring the seller or seller's agent to

1   bear the burden of identifying whether an artist is entitled to a resale royalty by,
2   among other things, determining an artist's "citizen[ship]" and the seller's
3   "residenc[y]."  Cal. Civ. Code § 986(a), (c)(1).  Even if those terms were defined,
4   which they are not, citizenship status is not always simple to determine and
5   residency over the course of multiple years is even more difficult to track.  Moreover,
6   the CRRA is not limited to artists in California, thus exacerbating the administrative
7   burden placed on sellers to track the movements of artists whose works they have
8   acquired.  And if the artist has died, a seller must first determine that fact and then
9   seek out the artist's "heirs, legatees, or personal representative." *Id.* § 986(a)(7).  If
10  an artist or his heirs cannot be found, the seller must instead pay the resale royalty to
11  the California Arts Council. *Id.* § 986(a)(2).

12         Each of these state law obligations on the resale of copyrighted works—works
13  that have been lawfully distributed under Section 106 and are subject to the first sale
14  doctrine in Section 109—raises the costs of reselling a work of fine art and reduces
15  the expected future value of that same work.  These burdens, in other words, inhibit
16  the right of an owner of such works to "sell or otherwise dispose of the possession
17  of" the art that has been acquired, in contravention of the federal statute. *Id.* § 109(a).

18         Here, the complaints make clear that Plaintiffs seek to restrain the free
19  alienation of copyrighted works in violation of Section 109(a).  Notwithstanding that
20  Plaintiffs previously sold their copyrighted works, they allege that Defendants failed
21  to make royalty payments on unspecified subsequent sales.  (SoCompl. ¶¶ 11, 27;
22  ChCompl. ¶¶ 12, 28.)  In direct contravention of Section 109(a), which prohibits a
23  creator from setting terms subsequent to the first sale, the complaints assert that
24  Defendants were "required to withhold at the time of the auction or sale, and then
25  pay to the artist (or agent or estate thereof) within 90 days, five percent of the
26  amount of such sales."  (SoCompl. ¶ 10; ChCompl. ¶ 11.)

27         If claims such as these were not preempted, the intent of Congress in creating
28  national, uniform copyright law would be subverted. *Reid*, 490 U.S. at 740-41.  In

1  the absence of preemption, States could, for instance, "extend the term of protection
2  for a work that would otherwise enter the public domain under the federal Copyright
3  Act."  2 *Nimmer on Copyright* § 8C.04(C)(2).  Or they could impose a prohibitive
4  royalty on the resale of other works, such as books, to destroy the secondhand
5  market in used books.  *Id.*  And other States could enact similar resale royalty
6  legislation, the combination of which might leave resellers of fine art with so little
7  remuneration as to make the sale of fine art a practical impossibility.

8       For these reasons, a chorus of commentators has concluded that the CRRA is
9  preempted by Section 109.  *See, e.g.*, *id.* § 8C.04 ("[I]t may be said that the federal
10 policy contained in the first sale doctrine, which permits uninhibited resale of a work
11 of art following its final sale, may not be countered by a contrary state law, even
12 though the state law's inhibition is by way of royalty rather than prohibition."); 
13 2 William F. Patry, *Copyright Law and Practice* 1129 n.235 (1994) ("[T]he [resale
14 royalty] right clearly conflicts with §109 of the Copyright Act, which generally
15 exhausts the copyright owner's rights with respect to a particular copy once that copy
16 is lawfully distributed.").  California courts similarly have suggested that the CRRA
17 is preempted.  *See Robert H. Jacobs, Inc. v. Westoaks Realtors, Inc.*, 159 Cal. App.
18 3d 637, 644 (1984) (declining to extend the *droit de suite* to architectural works and
19 citing Nimmer for the argument that the CRRA is preempted by the Copyright Act of
20 1976).

21      Indeed, the federal Register of Copyrights, reporting on the *droit de suite*
22 following enactment of the Visual Artists Rights Act ("VARA"), notes that the
23 CRRA is incompatible with the Copyright Act.  (Russell Decl., Ex. 27 at 86.)  In
24 discussing the feasibility of integrating resale royalty legislation into U.S. law, the
25 Register wrote:  "[D]oes Congress want to eliminate, or even qualify, the First Sale
26 doctrine, and abandon well-settled principles of free alienability in Anglo-American
27 property jurisprudence?"  (*Id.*, Ex. 27 at 134.)  In making final conclusions and
28 recommendations, the Register further explained, "Implementation of the royalty

1  would require qualification of the First Sale doctrine." (*Id.*, Ex. 27 at 148.)  In short,

2  the Register recognized that the CRRA conflicts with the objectives of the Copyright

3  Act and is therefore preempted.  This Court should reach the same conclusion.

4                **3.**    ***Morseburg* Did Not Address The 1976**

                      **Copyright Act And Is Superseded By More**

5                        **Recent Supreme Court Precedent**

6       *Morseburg v. Balyon* does not preclude this Court from finding preemption.

7  In that case, the Ninth Circuit held that the 1909 Copyright Act did not preempt the

8  CRRA.  Addressing a prior iteration of the first sale doctrine, the court held it was no

9  bar to the CRRA because, "[t]echnically speaking," the CRRA "in no way restrict[s]

10  the transfer of art works."  621 F.2d at 977.  The court acknowledged that "the

11  imposition of the royalty may well influence the duration of a purchaser's holding

12  period of a work of fine art."  *Id.* at 978.  But the court nonetheless concluded that,

13  "on the facts before us, the obligation to pay a resale royalty does not impermissibly

14  restrict resales by the owners of works of fine art."  *Id.*  The court declined to reach

15  the question of whether the CRRA would be preempted where "circumstances could

16  make transfer of the work of fine art a practical impossibility."  *Id.*

17       *Morseburg* does not control here.  The Ninth Circuit explicitly limited its

18  holding in that case to the 1909 Act.  *See id.* at 975 ("Before commencing this

19  statement we emphasize that this case concerns the preemptive effect of the 1909 Act

20  only.  We do not consider the extent to which the 1976 Act, particularly section

21  301(a) and (b), … may have preempted the California Act.").  Indeed, the Ninth

22  Circuit stressed that, although "certain of our reasons will be weighed and measured

23  to determine their applicability to the 1976 Act," "[n]onetheless, our holding, as well

24  as our reasons, to repeat, are addressed to the 1909 Act only."  *Id.*  As a matter of law,

25  *Morseburg* thus is not binding precedent with respect to preemption under the

26  separate 1976 Copyright Act at issue here.

27       Intervening Supreme Court precedent also means that *Morseburg* is not

28  persuasive on the relationship between the right to distribute and the first sale

1   doctrine under the 1976 Copyright Act.  As the Supreme Court has noted, Congress
2   intended the 1976 Act to "creat[e] national, uniform copyright law by broadly pre-
3   empting state statutory and common-law copyright regulation."  *Reid*, 490 U.S. at
4   740.   Post-*Morseburg*, therefore, the Supreme Court has articulated a more
5   expansive scope of the first sale doctrine—indeed, *Quality King* reversed the Ninth
6   Circuit's narrow interpretation of that doctrine.  As discussed above, *Quality King*
7   made plain that under the 1976 Act, the first sale doctrine does more than prevent
8   wholesale prohibitions on the transfer of works; it affirmatively provides that "once
9   the copyright owner places a copyrighted item in the stream of commerce by selling
10  it, he has exhausted his exclusive statutory right to control its distribution."  *Quality*
11  *King*, 523 U.S. at 152.[15]

12  **C.**   **Alternatively, Section 301 Expressly Preempts The CRRA Claims**

13  Section 301(a) of the Copyright Act provides an independent basis to preempt
14  Plaintiffs' CRRA claims.  Section 301(a) expressly preempts state law claims where
15  a plaintiff's work "come[s] within the subject matter of copyright," and state law
16  grants "legal or equitable rights that are equivalent to any of the exclusive rights
17  within the general scope of copyright."  17 U.S.C. § 301(a).  These two requirements
18  are generally known as the "subject matter" and "general scope" requirements.
19  *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (en
20  banc).  When, as here, both are satisfied, state law is preempted and the Copyright
21  Act provides the only protection for a creator's work.  *Id.* at 980.

22  **1.**   **The CRRA Claims Fall Within The Subject**
23      **Matter Of Copyright**

24  As discussed above, Plaintiffs' claims fall squarely within the subject matter

25  ───────────────────────────

26  [15] To be sure, the Ninth Circuit has stated that the first sale doctrine as codified in the
    1909 Act and that doctrine as codified in the 1976 Act are "substantively identical."
27  *UMG Recordings*, 628 F.3d at 1183 n.7.  But even assuming that is so, the Supreme
    Court's reversal of the Ninth Circuit in *Quality King* indicates that the Ninth Circuit
28  had previously—including at the time of *Morseburg*—taken a too-narrow view of the
    first sale doctrine.

1  of copyright, and thus satisfy the first requirement for copyright preemption under

2  Section 301(a).  Both the Copyright Act and the CRRA apply to sales of fine art,

3  which is the subject of Plaintiffs' claims.  (SoCompl. ¶ 9; ChCompl. ¶ 10.)

### 2.   Plaintiffs' CRRA Claims Are Equivalent To The Exclusive Rights Protected By Federal Law

6  Plaintiffs' state law claims also meet the "general scope" requirement for

7  copyright preemption under Section 301(a) because the CRRA confers rights

8  comparable to those granted (and protected) by federal law.

9  "Section 106 provides a copyright owner with the exclusive rights of

10 reproduction, preparation of derivative works, distribution, and display."  *Laws v.*

11 *Sony Music Entm't, Inc.*, 448 F.3d 1134, 1143 (9th Cir. 2006).  Thus, "[t]o survive

12 preemption, the state cause of action must protect rights which are qualitatively

13 different from the copyright rights."  *Id.*  In the Ninth Circuit, "the state claim must

14 have an extra element which changes the nature of the action."  *Id.*  For example,

15 "[c]ontract claims generally survive preemption because they require proof of such

16 an extra element."  *Montz*, 649 F.3d at 980.  "The extra element, the implied

17 agreement of payment for use of a concept, is a personal one, between the parties."

18 *Id.* [16]

19 But where the "essence" of a plaintiff's claim is the same as the rights

20 conferred by federal law, the claim is preempted.  *Laws*, 448 F.3d at 1144.  In *Laws*,

21 the Ninth Circuit thus held the plaintiff's claim preempted by the Copyright Act

22 where the essence of her claim was an objection to having a sample of her song used

23 in someone else's recording.  The court reasoned that the plaintiff gave up the right

24 to reproduce her voice in a recording of the song when she granted the defendant the

25 copyright in the master recording, including the right "to lease, license, convey or

---

26
27  [16] Most courts of appeals have "take[n] a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim."  *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d
28  296, 306 (2d Cir. 2004).  But under any view, Plaintiffs' CRRA claims squarely fall within the exclusive rights in Section 106 and are therefore preempted.

1    otherwise use or dispose of such master recordings." *Id.*

2    So too do Plaintiffs' claims meet the "general scope" requirement for

3    copyright preemption under Section 301(a).  Plaintiffs' alleged state law rights are no

4    different from the exclusive rights conferred on artists by Section 106(3) to prevent

5    unauthorized distribution of their copyrighted works.  *See* 17 U.S.C. § 106(3)

6    (granting exclusive right "to distribute … the copyrighted work to the public by sale

7    or other transfer of ownership").   Plaintiffs seek damages based on allegedly

8    unlawful distributions of their copyrighted works—*i.e.*, distributions for which no

9    royalty was paid.

10   The first sale doctrine, expressly incorporated in Section 106, governs

11   precisely the same distributions as the CRRA.  By its very terms, the CRRA limits

12   the distribution of certain copyrighted works—*i.e.*, as a condition for distribution, the

13   state law imposes a royalty for transfers of copyrighted material and provides a cause

14   of action for the copyright owner to recover such royalties to the extent they are not

15   paid.  But by selling their fine art creations, Plaintiffs have "given up" their right to

16   further restrict the "distribution" of the particular copyrighted works at issue in this

17   dispute.  *Cf. Laws*, 448 F.3d at 1144 (noting that plaintiff had given up her right to

18   "reproduce" copyrighted materials—*i.e.*, to prevent the certain reproductions of her

19   voice—when she sold those rights).

20   While federal law provides copyright owners with an exclusive right to

21   distribute copyrighted material (and a cause of action for unauthorized distributions),

22   that right is subject to the limitation that subsequent sales of the copyrighted material

23   cannot be restricted.  *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010).

24   As the Ninth Circuit has explained, "once the copyright owner places a copyrighted

25   item in the stream of commerce …, he has exhausted his exclusive statutory right to

26   control its distribution."  *UMG Recordings*, 628 F.3d at 1179.  As a consequence,

27   whenever the CRRA applies, it aims to govern a sale already governed by Section

28   106 of the Copyright Act and the federal law's expressly defined and incorporated

1   limits.

2       Nor is it relevant that the elements of a CRRA action may not be precisely
3   identical to those for unauthorized distribution under the Copyright Act.  Rather,
4   "[t]o survive copyright preemption, a state cause of action must assert rights that are
5   qualitatively different from the rights protected by copyright."  *Montz*, 649 F.3d at
6   980.  As the Ninth Circuit has explained, the mere existence of an "extra element" by
7   itself—here, the requirement that a royalty be paid—does not avoid express
8   preemption where the "underlying nature" of the cause of action is "part and parcel
9   of a copyright claim."  *Laws*, 448 F.3d at 1144.

10       Plaintiffs' state law claims are based on the premise that defendants
11   unlawfully distributed their copyrighted works—*i.e.*, without payment of a royalty.
12   But Plaintiffs previously sold their copyrighted works, and by doing so gave up any
13   right to further restrain the distribution of the fine art at issue here.  Thus, the state
14   law existence of a "royalty right" does not change the fact that the underlying nature
15   of the action is one for unlawful distribution.  Indeed, the CRRA restricts the
16   exclusive right of copyright owners to distribute their goods (a right expressly
17   conferred by Section 106(3)), as the provisions of the CRRA cannot even be
18   voluntarily waived by the artists, unless the artist receives "an amount in excess of 5
19   percent of the amount of such sale."  Cal. Civ. Code § 986(a).

20       **D.**   ***Baby Moose* Does Not Control This Case**

21       Defendants recognize that this Court previously concluded, in the context of a
22   motion to remand to state court, that the Copyright Act does not completely preempt
23   the CRRA.  *See Baby Moose*, 2011 WL 1258529, at *2-3 & n.4.  But that ruling does
24   not resolve the copyright preemption issue in this case for several reasons.

25       *First*, in *Baby Moose*, the Court considered only whether the Copyright Act
26   "completely preempted" the CRRA, *id.*, not whether the Copyright Act defensively
27   preempted the CRRA.  "Complete preemption (a jurisdictional issue) converts a
28   well-pleaded state law claim into an inherently federal claim for jurisdictional

DEFENDANTS' JOINT MOTION TO DISMISS

1 purposes; defensive preemption (a substantive issue) does not enable removal, but
2 does constitute a complete defense to a state law claim." *Hall v. N. Am. Van Lines,*
3 *Inc.*, 476 F.3d 683, 689 n.8 (9th Cir. 2007).  "The general rule is that a defense of
4 federal preemption of a state-law claim, even conflict preemption under [a federal
5 statute], is an insufficient basis for original federal question jurisdiction under
6 § 1331(a) and removal jurisdiction under § 1441(a)." *K2 Am. Corp. v. Roland Oil &*
7 *Gas, LLC*, 653 F.3d 1024, 1029 n.6 (9th Cir. 2011).

8     This Court's *Baby Moose* decision necessarily reflects the Ninth Circuit's
9 strong presumption against removal, particularly where removal is based on a claim
10 of complete preemption.  *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241,
11 1244 (9th Cir. 2009).  The Court did not need to fully decide the preemption issue,
12 because "*any doubt* about the right of removal require[d] resolution in favor of
13 remand."  *Id.* at 1244.  Thus, while the Court was constrained by complete
14 preemption principles in the context of that case, no such principles constrain its
15 analysis here, where Defendants have conclusively demonstrated that the Copyright
16 Act defensively preempts the CRRA.

17     *Second*, in *Baby Moose*, this Court had no occasion to analyze whether the
18 Copyright Act preempts the CRRA under principles of conflict preemption.  *Baby*
19 *Moose*, 2011 WL 1258529, at *2-3.  As demonstrated above, it does.

20     *Third*, because "any doubt" as to a federal court's removal jurisdiction
21 requires remand to state court, *Moore-Thomas*, 553 F.3d at 1244, the mere existence
22 of any extra element may create enough "doubt" as to complete preemption, without
23 requiring an analysis of whether that element "transform[s] the nature of the action,"
24 *Laws*, 448 F.3d at 1144.  This Court did not engage in that latter analysis in *Baby*
25 *Moose*.  2011 WL 1258529, at *3.  But where, as here, this Court's Article III
26 jurisdiction is not contested, the Court must go beyond that analysis.  As discussed
27 above, under a more extensive examination, Plaintiffs' CRRA claims are preempted.

28     Moreover, to the extent *Baby Moose* concluded that the CRRA's 5% resale

1   royalty right is qualitatively different from the rights granted to copyright holders
2   and thus not expressly preempted, *id.*, Defendants respectfully submit that
3   conclusion is inconsistent with Supreme Court and Ninth Circuit precedent.  This
4   Court relied on *Durgom v. Janowiak*, 74 Cal. App. 4th 178, 186-87 (1999), for the
5   proposition that "a state-law right to receive royalties pursuant to contract is not
6   equivalent to any of the exclusive rights secured by a federal copyright."  *Baby*
7   *Moose*, 2011 WL 1258529, at *3.   In *Durgom*, however, the "essence" of the
8   plaintiff's claims involved an extra element—the personal agreement between two
9   parties to pay for use of the song, 74 Cal. App. 4th at 181—and therefore it falls
10  squarely within the reasoning of *Montz*.  *See Montz*, 649 F.3d at 980.   Here, by
11  contrast, there is no such personal agreement.   The obligation to pay a 5% resale
12  royalty is imposed by law.   More importantly, it directly conflicts with the limits
13  imposed by the first sale doctrine.  *Durgom* is therefore inapposite.

14         *Finally*, although this Court cited certain portions of legislative history in
15  support of its remand order, that history states nothing more than that the *VARA*—not
16  the Copyright Act—did not preempt state resale royalty legislation.  *Baby Moose*,
17  2011 WL 1258529, at *3.   In considering enactment of the VARA, Congress
18  explained that "[s]tate artists' rights laws that grant rights not equivalent to those
19  accorded under the proposed law are not preempted…   For example, the law will
20  not preempt a cause of action for a misattribution of a reproduction of a work of
21  visual art or for a violation of a right to a resale royalty."  *See* H.R. Rep. No. 101-514,
22  at 20 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 6915, 6931.  This comment did not
23  address preemption under the 1976 Copyright Act generally, let alone the limited
24  distribution right and the first sale doctrine.  Indeed, nowhere did the subsequently
25  enacted VARA amend Section 301(a), which is the preemption provision at issue.  In
26  this respect, it is telling that the federal Register of Copyrights, reporting on resale
27  royalty rights *after* enactment of the VARA, expressly questioned a resale royalty's
28  compatibility with the first sale doctrine and noted that the Copyright Act is

1  incompatible with the CRRA.  (*See supra* at 31-32.)

2  **IV.   PLAINTIFFS SEEK RELIEF PRECLUDED AS A MATTER OF LAW**

3          Although Plaintiffs seek punitive damages for Defendants' alleged

4  "intentional election to flout the law" (SoCompl. ¶¶ 1, 32; ChCompl. ¶¶ 1, 33), there

5  is no basis to award punitive damages under the law governing either of the claims

6  Plaintiffs have asserted.  "The Ninth Circuit has implicitly authorized the use of a

7  12(b)(6) motion to challenge a prayer for damages precluded by law," *Danielson v.*

8  *Wells Fargo Bank*, 2011 WL 4480849, at *3 (C.D. Cal. Sept. 26, 2011) (citing

9  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010)), and courts

10  in this district routinely reject requests for damages the law does not authorize.[17]

11  Plaintiffs' request for punitive damages must thus be dismissed.

12          **A.    Punitive Damages Are Not Available Under The UCL**

13          It is well-established that Plaintiffs "may not receive damages, much less

14  *treble* damages" under the UCL.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular*

15  *Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  "In a private unfair competition law action,

16  the remedies are generally limited to injunctive relief and restitution ....   Not

17  recoverable are damages, including punitive damages and increased or enhanced

18  damages."  *Clark v. Superior Court*,  50 Cal. 4th 605, 610 (2010) (trebling provision

19  of Cal. Civ. Code section 3345 not applicable to award of restitution under the unfair

20

21  _____

22  [17]  Until recently, the usual procedural device for challenging a request for punitive
   damages was a motion to strike.  *See, e.g.*, *Madrigal v. Tommy Bahama Grp., Inc.*,
23  2010 WL 4384235, at *7-9 (C.D. Cal. Oct. 18, 2010) (dismissing claims for punitive
   damages under Labor Code provisions and FLSA and attorney fees and punitive
24  damages under UCL); *Hadjavi v. CVS Pharmacy, Inc.*, 2011 WL 7695383, at *3-4
   (C.D. Cal. Sept. 22, 2010) (striking request for disgorgement of defendants' profits,
25  penalties, and attorneys' fees because non-restitutionary damages are not permitted
   under UCL as a matter of law); *Suguri v. Wells Fargo Bank, N.A.*, 2009 WL 2486546,
26  at *9 (C.D. Cal. Aug. 07, 2009) (granting motion to strike claim for punitive damages
   under TILA, UCL and 42 U.S.C. § 2000d).  After *Whittlestone*, however, it appears
27  the appropriate route is through a motion to dismiss.  618 F.3d at 974.  However
   styled, the result here is the same:  as a matter of law, Plaintiffs are not entitled to
28  punitive damages.

1  competition law).[18]  Acknowledging this settled law, Plaintiffs do not list punitive

2  damages as relief they seek under the UCL.  (SoCompl ¶ 46; ChCompl. ¶ 47.)  There

3  is thus no dispute that Plaintiffs cannot pursue punitive damages under their UCL

4  claim.

5       **B.**    **Punitive Damages Are Not Recoverable Under The CRRA**

6            **1.**    **The CRRA Does Not Provide For Punitive Damages**

7       Courts "ordinarily resist reading words or elements into a statute that do not

8  appear on its face."  *Dean v. United States*, 129 S. Ct. 1849, 1853 (2009); *accord*

9  *Maita Distribs., Inc. of San Mateo v. DBI Beverage, Inc.*, 667 F. Supp. 2d 1140,

10  1145 (N.D. Cal. 2009) ("The court is to avoid reading into the statute words that are

11  not there.").  Indeed, in construing any statute, a court's "office is simply to

12  ascertain and declare what the statute contains, not to change its scope by reading

13  into it language it does not contain or by reading out of it language it does," and the

14  court "may not rewrite the statute to conform to an assumed intention that does not

15  appear in its language."  *Vasquez v. State*, 45 Cal. 4th 243, 253 (2008); *accord Doe v.*

16  *City of Los Angeles*, 42 Cal. 4th 531, 545 (2007) (court's role "is simply to ascertain

17  and declare what is in the relevant statutes, not to insert what has been omitted, or to

18  omit what has been inserted").[19]

19       On its face, there is no provision for punitive damages in Section 986, which

20  says only that "the artist may bring an action for damages within three years" and

21  provides for an award of "reasonable attorney fees" to the "prevailing party."  Cal.

22

23  [18] *See also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144, 1148 (2003) ("[w]hile the scope of conduct covered by the UCL is broad, its remedies are

24  limited … [in that] damages cannot be recovered" and "[a] court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes

25  might deter unfair practices"); Cal. Bus. & Prof. Code § 17203 (courts may grant injunctive relief and restitution); *Madrigal*, 2010 WL 4384235, at *8-9 (dismissing

26  claims for punitive damages under UCL); *Hadjavi*, 2011 WL 7695383, at *3-4 (same).

27  [19] When interpreting a California statute, federal courts apply California's rules of statutory construction. *Turnacliff v. Westly*, 546 F.3d 1113, 1117-18 (9th Cir. 2008);

28  *accord In re Kolb*, 326 F.3d 1030, 1037 (9th Cir. 2003) (applying California's rules of statutory construction to interpretation of California statute).

1  Civ. Code § 986(a)(3).  Because the plain terms of Section 986 do not encompass

2  punitive damages, Plaintiffs' claim for punitive damages must be dismissed as a

3  matter of law.[20]

**2.    The Legislative History Shows That Punitive Damages
Are Not An Available Remedy Under The CRRA**

6  Where, as here, a sought-after remedy "is not expressly authorized by the

7  statute," the court can look to the legislative history to "determine whether the

8  Legislature intended to authorize such a remedy."  *Korea Supply*, 29 Cal. 4th at 1146

9  ("If the statutory language is ambiguous, [the court] may look to the history and

10  background of the statute").  Here, the CRRA's legislative history shows that

11  punitive damages were never authorized nor intended by the Legislature.

12  The provision allowing recovery of reasonable attorneys' fees was added in

13  1982 in an amendment proposed by the CRRA's author, Senator Sieroty.  (Russell

14  Decl., Ex. 14 at 45-47.)  Recognizing that "[o]ne of the principal weaknesses of the

15  Resale Royalties Act is that it provides no state enforcement mechanism or criminal

16  penalties," the amendment "authorize[d] an award for reasonable attorneys' fees to

17  the prevailing party in an action brought by an artist for nonpayment of royalties"

18  since "[c]urrent law does not provide for attorneys' fees in such cases."  (*Id*., Ex. 15

19  at 57-58; *see also id*., Ex. 16 at 65.)  As the Legal Affairs Department noted, in

---

21  [20] Because the CRRA creates new rights not previously existing at common law, and

22  provides only for compensatory damages and not punitive damages, plaintiffs may
seek only compensatory damages.  *See Brewer v. Premier Golf Props.*, 168 Cal. App.

23  4th 1243, 1252 (2008) ("[W]here a statute creates new rights and obligations not
previously existing in the common law, the express statutory remedy is deemed to be

24  the exclusive remedy available for statutory violations, unless it is inadequate."); *De
Anza Santa Cruz Mobile Estates Homeowners Ass'n v. De Anza Santa Cruz Mobile*

25  *Estates*, 94 Cal. App. 4th 890, 916 (2001) ("since the only basis for liability in this
case was the 'established fact' that De Anza/MHC had violated section 798.41, the

26  penalty provided in section 798.86 was the exclusive penalty available, and the
punitive damages judgment must therefore be reversed"); *Korn v. Polo Ralph Lauren*

27  *Corp.*, 644 F. Supp. 2d 1212, 1219 (E.D. Cal. 2008) (striking private citizen's claim
for injunctive relief where Song Beverly Act created new rights and provided that

28  plaintiffs could sue for civil penalties, but the government could sue for civil
penalties and injunctive relief).

1  recommending the governor sign the amendment, "[t]he purpose of the bill is to
2  strengthen the Resale Royalties Act by providing for attorney fees, assignment of
3  rights and inheritability." (*Id.*, Ex. 19 at 112.)

4          Given the rationale for adopting the attorney fees provision—to "strengthen"
5  the CRRA by providing a remedy not currently available under the statute—it is
6  highly significant that, in the initial discussions of potential amendments in 1982,
7  Senator Sieroty proposed both the attorney fees provision ***and*** the "awarding of
8  ***punitive damages*** (3x or amount not to exceed ??)" as remedies, suggesting that
9  "[f]or a willful failure by a reseller to pay a royalty, an artist may be awarded ***a***
10 ***treble royalty payment***" and "[i]f a judge finds that a pattern of avoidance of
11 obligations under this law exists, ***he can assess punitive damages***." (*Id.*, Ex. 11 at
12 14; *id.*, Ex. 12 at 16; *see also id.*, Ex. 13 at 28 (California Arts Council memo noting
13 punitive damages among proposed amendments).)  This history confirms that when
14 the CRRA was enacted, the Legislature did not intend to make punitive damages
15 recoverable under the Act—if the Legislature had so intended, Senator Sieroty's
16 proposal to authorize such damages as a potential *further* enforcement mechanism
17 under the CRRA would have been unnecessary.  It makes no sense that the author of
18 the CRRA would propose adding a remedy already available under the existing
19 statute.  Thus, Plaintiffs' pursuit of punitive damages here is inconsistent with the
20 legislative history and intent of the CRRA.

21          **3.    The Express Inclusion Of A Punitive Damages Remedy In A**
           **Contemporary Artist Protection Statute Demonstrates That**
22         **Punitive Damages Are Not Authorized Under The CRRA**

23         It is also apparent that punitive damages are not available under the CRRA
24 because, to paraphrase the California Supreme Court, the Legislature "certainly
25 knows how to impose [punitive damages] when it wants to, having established the
26 availability" of punitive damages in another statute also ostensibly extending

27
28

DEFENDANTS' JOINT MOTION TO DISMISS

protection to artists.[21] "It is hornbook law that where [the Legislature] has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *Wells Fargo Bank v. Superior Court*, 53 Cal.3d 1082, 1096-97 (1991).[22] This rule applies even if the court is comparing two different but related statutes. *See People v. Goodloe*, 37 Cal. App. 4th 485, 491 (1995) ("When a particular provision appears in one statute but is omitted from a related statute, the most obvious conclusion from the omission is that a different legislative intent existed"); *Anthony v. Superior Court*, 109 Cal. App. 3d 346, 356 (1980) ("[W]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject … is significant to show that a different intention existed.").[23] *Cf. Kotarski v. Cooper*, 866 F.2d 311, 312 (9th

---

[21] *See Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1107 (2007) (citing use of the word "penalty" throughout Labor Code to reject plaintiff's characterization of mandated payment for additional hour of work as a "penalty"); *Yeager v. Blue Cross of Cal.*, 175 Cal. App. 4th 1098, 1103 (2009) (noting that since "[t]he Legislature knows how to establish a health plan's coverage and costs when it chooses," that "[t]he Legislature's refusal to dictate the amount of coverage and its cost is not ambiguity—it is silence" and a court "may not make a silent statute speak by inserting language the Legislature did not put in the legislation"); *Maita Distribs.*, 667 F. Supp. 2d at 1147 ("Had the legislature intended to grant a right to cancel, it easily could have done so. It did not, however, and the court cannot read into the statute words that are not there.").

[22] *See also Cal. Corr. Peace Officers' Ass'n v. State*, 188 Cal. App. 4th 646, 654 (2010) (refusing to interpret Labor Code section 220(a)'s list of specific exemptions as implying that the statute was generally applicable to public entities because "[s]uch an interpretation would violate the maxim that [w]hen the Legislature has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded"); *Cummings v. Stanley*, 177 Cal. App. 4th 493, 509 (2009).

[23] *Accord People v. Valenzuela*, 92 Cal. App. 4th 768, 776-78 (2001) (where some statutes within the chapter entitled "Burglarious and Larcenous Instruments and Deadly Weapons" had explicit knowledge requirements and some did not, the court concluded that "the Legislature carefully delineated instances in which a specific criminal intent is required for conviction," and refused to imply a knowledge requirement into Penal Code section 466.5); *Yeager*, 175 Cal. App. 4th at 1103-04 (comparing Health and Safety Code section 1374.55 with different acts found within the same Article—sections 1374.72, 1374.58, 1373.4, 1367.18); *People ex rel. Gwinn v. Kothari*, 83 Cal. App. 4th 759, 770 (2000) ("[I]t is significant that in enacting the Uniformed Controlled Substances Act and providing for injunctive relief under the Drug Abatement Act, the Legislature used the same language in Health and Safety Code section 11571 as it used in Penal Code section 11226, but did not include

*(cont'd)*

1    Cir. 1989) ("So long as Congress' failure to provide money damages, or other
2    significant relief, has not been inadvertent, courts should defer to its judgment").

3          The California Art Preservation Act ("CAPA") was enacted in 1979, three
4    years after the CRRA was enacted, but three years before the CRRA was amended as
5    described above.   Codified as California Civil Code section 987, and appearing
6    immediately after the CRRA in the same chapter governing fine art, the CAPA
7    expressly addresses punitive damages. Specifically, the CAPA prohibits "the
8    intentional commission of, any physical defacement, mutilation, alteration, or
9    destruction of a work of fine art" and provides that "[t]o effectuate the rights created
10   by this section, the artist may commence an action to recover or obtain" various
11   remedies, including injunctive relief, actual damages, attorneys' fees and punitive
12   damages.   Cal. Civ. Code § 987(c)(1) & (2)(e).[24]   The inclusion of this express
13   authorization for punitive damages in the CAPA, a related statute also designed to
14   protect artists, demonstrates that no such remedy is available under the CRRA.  *See*
15   *People v. Galvan*, 168 Cal. App. 4th 846, 854 (2008) (presuming "the Legislature,
16   when enacting a statute, is aware of related code sections and intends to maintain a
17   consistent body of rules").

18         Further, it is telling that a punitive damages award under the CAPA does ***not***
19   inure to the artist—instead, the law requires that if punitive damages are awarded,

20   _____
     *(cont'd from previous page)*
21   'assignees' in its definition of 'person' for Health and Safety Code section 11571.  If
     the Legislature has included one provision in one part of a statute but excluded it from
22   another, a court should not imply the omitted provision in the part of the statute that
     does not contain it."); *People v. Hunt*, 74 Cal. App. 4th 939, 947 (1999) (refusing to
23   construe "another state" to include "another jurisdiction" for purposes of Welfare &
     Institutions Code 6600 because if the legislature had intended the term to mean
24   "another jurisdiction," it could have used that phrase as it did in Penal Code § 668).

25   [24] *See also Lubner v. City of Los Angeles*, 45 Cal. App. 4th 525, 528-30 (1996)
     (refusing to allow recovery for damage to plaintiff artists' reputation due to
26   destruction by simple negligence under CAPA where "the plain language of the
     statute does not support the [plaintiffs], and we have found nothing to lead us to the
27   conclusion that the Legislature could not possibly have left out such a remedy" and
     noting "where a statute creates a right that did not exist at common law and provides a
28   comprehensive and detailed remedial scheme for its enforcement, the statutory
     remedy is exclusive").

DEFENDANTS' JOINT MOTION TO DISMISS

1  the court selects an organization "involving the fine arts in California to receive any
2  punitive damages."   Cal Civ. Code § 987(e)(3).   It defies reason to posit that
3  California law allows an artist to recover punitive damages for the relatively
4  mundane failure of a seller to pay a 5% royalty when said artist's work is resold,
5  when that same artist cannot personally recover any punitive damages *when her*
6  *work is maliciously destroyed by another*—a far graver and more egregious harm to
7  the artist and the public interest.  *See id.* § 987(a) ("The Legislature hereby finds and
8  declares that the physical alteration or destruction of fine art, which is an expression
9  of the artist's personality, is detrimental to the artist's reputation, and artists therefore
10 have an interest in protecting their works of fine art against any alteration or
11 destruction; and that there is also a public interest in preserving the integrity of
12 cultural and artistic creations.").   Thus, allowing an artist to recover punitive
13 damages under section 986 simply cannot be reconciled with section 987.

14 **V.   THE CLAIMS OF THE ESTATE OF ROBERT GRAHAM FAIL**

15       The claims of the Estate of Robert Graham must be dismissed because "an
16 estate or trust is *not* a legal entity and has no capacity to sue."  *Estate of Migliaccio v.*
17 *Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095, 1100 (C.D. Cal. 2006); *In re*
18 *Peterson*, 156 Cal. App. 4th 676, 679 n.1 (2007) ("A probate or trust estate is not a
19 legal entity; it is simply a collection of assets and liabilities. As such, it has no
20 capacity to sue or be sued, or to defend an action. Any litigation must be maintained
21 by, or against, the executor or administrator of the estate.") (quoting *Galdjie v.*
22 *Darwish*, 113 Cal. App. 4th 1331, 1344 (2003)).

23 **VI.   PLAINTIFFS' PLEADING OF THEIR CLAIMS IS INSUFFICIENT**

24       In addition to the substantive grounds for dismissal of Plaintiffs' claims,
25 Plaintiffs' complaints are insufficiently pled and should be dismissed for two reasons.
26 First, Plaintiffs plead only the legal elements of their claims in conclusory terms (*i.e.*,
27 that Defendants conducted sales for which royalties under the CRRA were required),
28 and fail to identify any specific transactions for which they are allegedly owed

1  royalties.   Second, Plaintiffs have tried to rescue claims that are time-barred by

2  asserting fraudulent concealment, but their fraudulent concealment theory is wrong

3  as a matter of law, and they have failed to plead the requisite allegations concerning

4  when and how they discovered the purported concealment and their alleged claims.

5  ## A.   Plaintiffs Have Not Alleged Facts To Support Their Claims

6          To comply with the requirements of Rule 8, "each plaintiff must plead a short

7  and plain statement of the elements of his or her claim, identifying the transaction or

8  occurrence giving rise to the claim and the elements of the prima facie case."

9  *Bautista v. Los Angeles Cnty.*, 216 F.3d 837, 840 (9th Cir. 2000).   Here, Plaintiffs

10  fail to satisfy those requirements because they have not identified any "transaction or

11  occurrence giving rise to the claim" of any of the Plaintiffs.   Plaintiffs allege only

12  that, "[o]n information and belief," "they are each owed Royalties in connection with

13  the sale of works of Fine Art" by Defendants.   (SoCompl. ¶ 14; ChCompl. ¶ 15.)   No

14  specific sales are identified.   Instead, Plaintiffs plead that, because of Defendants'

15  "acts of concealment, Plaintiffs at this time can only surmise the total amount of

16  Royalties owed to them."   (SoCompl. ¶ 14; ChCompl. ¶ 15.)

17          Because Plaintiffs have not identified any specific sales that give rise to their

18  individual claims, their complaints are insufficient.   *Bautista*, 216 F.3d at 840

19  (complaint which pled "on behalf of all plaintiffs collectively" that defendant

20  discriminated against them was insufficient, since it did not allege the "operative

21  facts giving rise to an enforceable right in favor of [each] plaintiff").[25]   Indeed,

22

23  [25] *Accord Chapman v. Pier I Imports (U.S.) Inc.*, 631 F.3d 939, 954-55 (9th Cir. 2011)
(en banc) (complaint alleging claims under the Americans with Disabilities Act was
24  insufficient since it failed to allege any specific instance where plaintiff was denied
access); *Martinez v. CACH, LLC*, 2011 WL 2560251, at *5 (S.D. Cal. June 27, 2011)
25  ("despite reciting the elements of a claim for actual fraudulent transfer," plaintiff's
complaint did "not include sufficient factual detail to state a plausible claim for
26  relief," since it did "not identify any specific alleged transfers of assets or include
allegations regarding the amounts, mechanisms, or timing of any such transfers");
27  *Richtek Tech. Corp. v. UPI Semiconductor Corp.*, 2011 WL 166292, at *3 (N.D. Cal.
Jan. 19, 2011) ("formulaic statements" that defendants had infringed patents were
28  insufficient, since they did "not identify any acts of alleged infringement"); *Tibble v.*
*(cont'd)*

1  Plaintiffs identify *no basis* for their individual claims.  They plead those claims "on

2  information and belief," but do not identify any source for their information and

3  belief.  And they affirmatively allege that they have no source other than "surmise"

4  regarding the specifics of their individual claims.  (SoCompl. ¶ 15; ChCompl. ¶ 14.)

5       Plaintiffs' claims are not rescued by their class action allegations.  The Ninth

6  Circuit dismissed the complaint in *Bautista*, even though it was styled as a class

7  action, because it:  (1) did not identify the transactions that gave rise to the claim of

8  each named plaintiff; and (2) did not plead each plaintiff's claim in a separate count.

9  216 F.3d at 840-41.   A named plaintiff in a putative class action must plead a

10  sufficient individual claim and establish personal standing.  *Lee v. Oregon*, 107 F.3d

11  1382, 1390 (9th Cir. 1997) ("[T]he fact that Plaintiffs filed their complaint as a class

12  action is of no moment…. If the litigant fails to establish standing, he may not seek

13  relief on behalf of himself or any other member of the class.").[26]  Here, because

14  Plaintiffs have not alleged facts to support their individual claims, they have not

15  established their standing and their complaints must be dismissed.

16      **B.   Plaintiffs' Discovery Theory Is Insufficient**

17       Plaintiffs seek to assert both:  (1) claims based on sales in the three years

18  before these actions were filed; and (2) older claims, apparently extending back to

19  when the CRRA first became effective in 1977.  With respect to the older claims,

20  Plaintiffs have not only failed to identify the transactions that give rise to their claims,

21  but they have also failed to allege facts required to show that their claims are not

22  barred by the statute of limitations.

23  ――――――――――――

24  *(cont'd from previous page)*
*Edison Int'l*, 639 F. Supp. 2d 1122, 1127 (C.D. Cal. 2009) (complaint was insufficient

25  because it "does not identify any specific transactions").

26  [26] *Accord Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) ("[I]f Lierboe has no stacking claim, she cannot represent others who may have

27  such a claim, and her bid to serve as a class representative must fail."); *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001) ("A named plaintiff cannot

28  represent a class alleging constitutional claims that the named plaintiff does not have standing to raise.").

1  An action for damages under the CRRA must be brought "within three years
2  after the date of sale or one year after the discovery of the sale, whichever is longer."
3  Cal. Civ. Code § 986(a)(3).  Here, Plaintiffs allege that they were unable to discover
4  *any* specific claims—either in the last three years or before—because Sotheby's and
5  Christie's "affirmatively engaged in a pattern of conduct intended to conceal"
6  instances in which there were sales that entitled Plaintiffs to royalties.
7  (SoCompl. ¶ 12; ChCompl. ¶ 13.)

8  Plaintiffs rely on this fraudulent concealment theory to assert claims that are
9  more than three years old, by invoking the CRRA discovery provision as a basis for
10  tolling the statute of limitations.  Plaintiffs' theory is based on nondisclosure,
11  alleging that "during the class periods" (*i.e.*, since 1977), Defendants' auction
12  catalogs have not disclosed "the state of residency of a seller of Fine Arts" and have
13  not identified lots "for which the artist will be entitled to the Royalty due under
14  California law."  (SoCompl. ¶¶ 9, 12; CoCompl. ¶¶ 10, 13.)

15  Plaintiffs' fraudulent concealment theory is wrong as a matter of law.  Unless
16  a defendant owes a fiduciary duty to the plaintiff, nondisclosure is not fraudulent
17  concealment.  *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1091-92 (9th Cir. 2005)
18  ("[F]raudulent concealment … requires proof of affirmative conduct upon the part of
19  [the defendant] …, as passive concealment is insufficient for a court to grant
20  equitable tolling unless the defendant had a fiduciary duty to disclose information to
21  the plaintiff.'").[27]  Plaintiffs have not (and cannot) allege that Defendants owed them
22  any fiduciary duty or duty of disclosure because no such duty exists.  It is instead
23  settled law that an  auctioneer owes a fiduciary duty only to the auction consignor.
24  *E.g., T.T. Exclusive Cars, Inc. v. Christie's Inc.*, 1996 WL 737204, at *4 (S.D.N.Y.

25
26  [27] *Accord Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) ("Silence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure.");
27  *Lauter v. Anoufrieva*, 2010 WL 3504745, at *22 (C.D. Cal. July 14, 2010) ("Unless a
28  defendant has a fiduciary duty to disclose information to the plaintiff, passive concealment is insufficient for a court to grant equitable tolling.").

DEFENDANTS' JOINT MOTION TO DISMISS

1    Dec. 24, 1996) ("as an agent for the consignor," an auctioneer's fiduciary duties "are

2    owed to [the consignor]").  Plaintiffs' nondisclosure claim is therefore wrong as a

3    matter of law.[28]

4         In addition, Plaintiffs fail to plead required elements of fraudulent

5    concealment.  "When a plaintiff relies on a theory of fraudulent concealment … to

6    save a cause of action that otherwise appears on its face to be time-barred, he or she

7    must specifically plead facts which, if proved, would support the theory."  *Yumul v.*

8    *Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1131 (C.D. Cal. 2010).  In order to plead

9    "fraudulent concealment, the complaint must show: (1) when the fraud was

10   discovered; (2) the circumstances under which it was discovered; and (3) that the

11   plaintiff was not at fault for failing to discover it or had no actual or presumptive

12   knowledge of facts sufficient to put him on inquiry."  *Platt Elec. Supply, Inc. v.*

13   *EOFF Elec., Inc.*, 522 F.3d 1049, 1055 (9th Cir. 2008).  A fraudulent concealment

14   theory must also be pled with particularity, as required by Rule 9(b).  *Yumul*, 733 F.

15   Supp. 2d at 1132-33 (citing authorities).

16        Here, Plaintiffs have not alleged that they recently discovered the "fraud,"

17   *i.e.*, that they only recently learned that Defendants' auction catalogs do not identify

18   the residence of sellers.  Nor have Plaintiffs alleged when or how they discovered

19   that they have claims more than three years old, or why they did not assert those

20   claims within three years of the sales.  Where, as here, a complaint invokes the

21   discovery rule, but fails to include such allegations, it must be dismissed.  *Yumul*,

22   733 F. Supp. 2d at 1131-33 (class action complaint dismissed, *inter alia*, because

23   plaintiff "has not alleged the time and manner of her discovery of the facts giving

24   _____

25   [28] Plaintiffs cannot credibly argue that auctioneers owe them a duty of disclosure
     merely because the CRRA requires royalty payments.  That argument incorrectly

26   equates the alleged misconduct in not paying the royalty with fraudulent concealment.
     A claim of fraudulent concealment "requires active conduct by a defendant, above and

27   beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the
     plaintiff from suing in time."  *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1177 (9th Cir.

28   2000); *accord Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006); *Sadsad v. Wash.
     Mut. Bank F.A.*, 2009 WL 4349801, at *2 (C.D. Cal. Nov. 25, 2009).

1  rise to her claims").[29]

2        Finally, the Court should also dismiss Plaintiffs' claims because Plaintiffs'
3  failure to allege either the specifics of those claims or their purported discovery
4  apparently flows from a deliberate strategy for asserting time-barred claims. At least
5  some of the Plaintiffs presumably can identify specific sales of their works by
6  California sellers. But if Plaintiffs had done that, they would have effectively
7  admitted that the information needed to discover specific sales is available to them.
8  Plaintiffs could not then have explained why they did not assert all of their claims
9  within three years of the sales. In an effort to conceal this problem, Plaintiffs
10 omitted required allegations from their complaints. The Court should reject this
11 strategy, which is designed to greatly expand the size of the putative plaintiff class
12 and greatly increase the dollar amount at stake.

13                              **CONCLUSION**

14       For the reasons discussed above, the Court should dismiss Plaintiffs'
15 complaints with prejudice.

16 Dated:    January 12, 2012    Respectfully submitted,

17                         By:   /s/ Paul T. Friedman
18                                Paul T. Friedman

19                         Attorneys for Defendant SOTHEBY'S, INC.

20                         By:   /s/ Jason D. Russell
                                  Jason D. Russell

21                         Attorneys for Defendant CHRISTIE'S, INC.

22

23

24 _____

25 [29] *Accord Keilholtz v. Lennox Hearth Prods. Inc.*, 2009 WL 2905960, at *5 (N.D. Cal.
   Sept. 8, 2009) (complaint dismissed because it "fails to allege when the fraud was
26 discovered by class members who have time-barred claims, [and] the circumstances
   under which it was discovered…. Plaintiffs therefore fail to allege sufficient facts to
27 invoke tolling based on fraudulent concealment."); *McKelvey v. Boeing N.A., Inc.*, 74
   Cal. App. 4th 151, 160, (1999) (complaints dismissed because "none of them disclose
28 the time and manner of discovery by any plaintiff").