1  PAUL T. FRIEDMAN (CA SBN 98381)
   PFriedman@mofo.com
2  DEANNE E. MAYNARD (*Pro Hac Vice*)
   DMaynard@mofo.com
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California  94105-2482
   Telephone: 415.268.7000
5  Facsimile:  415.268.7522

6  Attorneys for Defendant SOTHEBY'S, INC.

7  *Additional Counsel Listed on Following Page*

8

9                 UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11                      CENTRAL DIVISION

12

| | |
|---|---|
| 13  ESTATE OF ROBERT GRAHAM, CHUCK CLOSE, LADDIE JOHN 14  DILL, individually and on behalf of all others similarly situated, | CASE NO.:  2:11-cv-08604-JHN-FFM |
| 15 | **DEFENDANTS' JOINT REPLY IN SUPPORT OF THE JOINT** |
| Plaintiffs, 16 | **MOTION TO DISMISS THE COMPLAINTS** |
| 17  v. | |
| SOTHEBY'S, INC., 18 | Hon. Jacqueline H. Nguyen Courtroom:  790 |
| Defendant. 19 | Hearing:  March 12, 2012 at 2:00 p.m. |
| 20  THE SAM FRANCIS FOUNDATION; ESTATE OF ROBERT GRAHAM; 21  CHUCK CLOSE; LADDIE JOHN DILL; individually and on behalf of all 22  others similarly situated, | CASE NO.:  2:11-cv-08605-JHN-FFM |
| 23  Plaintiffs, | |
| 24  v. | |
| 25  CHRISTIE'S, INC., a New York corporation, 26 | |
| Defendant. 27 | |

28

1 | *Additional Counsel*

2 | STEVEN A. REISS (*Pro Hac Vice*)
steven.reiss@weil.com

3 | HOWARD B. COMET (*Pro Hac Vice*)
howard.comet@weil.com

4 | WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue

5 | New York, New York 10153
Telephone: 212.310.8000

6 | Facsimile:  212.310.8007

7 | Attorneys for Defendant SOTHEBY'S, INC.

8 | JASON D. RUSSELL (CA SBN 169219)
jason.russell@skadden.com

9 | HILLARY A. HAMILTON (CA SBN 218233)
hillary.hamilton@skadden.com

10 | JENNIFER E. LAGRANGE (CA SBN 238984)
jennifer.lagrange@skadden.com

11 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue

12 | Los Angeles, California 90071-3144
Telephone:      213.687.5000

13 | Facsimile:      213.687.5600

14 | Attorneys for Defendant CHRISTIE'S, INC.

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ............................................................................................. 3

I.   THE CRRA VIOLATES THE COMMERCE CLAUSE ............... 3

    A.   The CRRA Implicates The Dormant Commerce Clause ..................... 3

    B.   The CRRA Is Per Se Invalid Because It  Directly Regulates Interstate Commerce ............................................................... 4

        1.   The CRRA Overtly Targets Interstate Commerce ..................... 4

        2.   The CRRA Interferes With Legislation In Other States ............ 8

        3.   Plaintiffs' Incorrectly Characterize Defendants' Challenge As A Facial Attack ................................... 10

    C.   The CRRA Is Also Invalid Because It Requires  Royalties To Non-California Artists .................................................. 11

    D.   The Offending Portions Of The CRRA Cannot Be Severed Or Rewritten, Rendering The Entire Statute Unconstitutional ............... 12

II.  THE CRRA EFFECTS A TAKING OF PRIVATE PROPERTY IN VIOLATION OF THE U.S. AND CALIFORNIA CONSTITUTIONS ...... 13

    A.   Takings Analysis Clearly Applies Where, As Here,  The State Transfers Property From One Private  Party To Another Without Just Compensation ....................................................... 13

    B.   The CRRA Effects A Per Se Taking Of Private Property ................. 17

III. THE COPYRIGHT ACT OF 1976 PREEMPTS THE CRRA CLAIM ...... 20

    A.   The Copyright Act Of 1976 Preempts The CRRA ........................... 21

    B.   Plaintiffs Make Too Much Of *Baby Moose* ......................................... 21

    C.   Plaintiffs Make Too Little Of *Quality King* .................................... 23

        1.   *Quality King* Reflects A Broad First Sale Doctrine And Undermines *Morseburg* As Unpersuasively Narrow ............... 23

        2.   *Quality King* Requires That Section 301(a) Be Interpreted With Reference To Section 109(a) ...................... 24

i

# TABLE OF CONTENTS
## (continued)

Page

D.   Plaintiffs Cannot Identify Any "Extra Element" That Makes The Resale Royalty Right "Qualitatively Different" From The Copyright Act's Distribution Right ...................................... 26

IV.   PUNITIVE DAMAGES ARE NOT AVAILABLE UNDER THE CRRA ...................................................................................... 27

A.   Plaintiffs Do Not—Because They Cannot—Offer Any Plausible Opposition To Virtually All Of Defendants' Arguments ................ 27

B.   The CRRA Created A New Right To Resale Royalties And The Remedies Described In The Statute Are Exclusive And Adequate .................................................................................... 28

V.   THE ESTATE OF ROBERT GRAHAM LACKS CAPACITY TO SUE ...................................................................................... 30

VI.   PLAINTIFFS' PLEADING IS INSUFFICIENT .......................... 31

A.   Plaintiffs Have Not Alleged Sufficient Facts ...................... 31

B.   Plaintiffs' Discovery Claim Is Insufficient ......................... 34

CONCLUSION .......................................................................... 36

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

CASES

4

*Abbott Labs. v. Franchise Tax Bd.*,

5
    175 Cal. App. 4th 1346 (Ct. App. 2009) ...................................................... 12, 13

6

*Allgeyer v. Louisiana*,

7
    165 U.S. 578 (1897) ......................................................................................... 6

8

*Amaro v. City of Oakland*,

9
    653 F.3d 808 (9th Cir. 2011) ......................................................................... 34

10

*American Meat Inst. v. Barnett*,

11
    64 F. Supp. 2d 906 (D.S.D. 1999) ................................................................... 6

12

*Amoroso v. Burdette Tomlin Mem'l Hosp.*,
    901 F. Supp. 900 (D.N.J. 1995) ..................................................................... 10

13

*Arista Records LLC v. Doe 3*,

14
    604 F.3d 110 (2d Cir. 2010) .......................................................................... 32

15

*Ashcroft v. Iqbal*,

16
    129 S. Ct. 1937 (2009) ............................................................................. 30, 33

17

*Baby Moose Drawings, Inc. v. Valentine*,

18
    2011 WL 1258529 (C.D. Cal. Apr. 1, 2011) ........................................ 1, 20, 21

19

*Baldwin v. G.A.F. Seelig, Inc.*,

20
    294 U.S. 511 (1935) ......................................................................................... 7

21

*Bautista v. Los Angeles Cnty.*,

22
    216 F.3d 837 (9th Cir. 2000) ......................................................................... 31

23

*Bell Atl. Corp. v. Twombly*,

24
    550 U.S. 544 (2007) ....................................................................................... 32

25

*Bickley v. Schneider Nat'l, Inc.*,
    2009 WL 5841196 (N.D. Cal. Feb. 11, 2009) ................................................ 28

26

*Bigelow v. Virginia*,

27
    421 U.S. 809 (1975) ......................................................................................... 6

28

## TABLE OF AUTHORITIES
### (continued)

Page

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
   489 U.S. 141 (1989) ................................................................................24

*Brewer v. Premier Golf Props.*,
   168 Cal. App. 4th 1243 (Ct. App. 2008) ..........................................28

*Briarpatch Ltd. v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004) ...............................................................26

*Bridgewater v. Taylor*,
   745 F. Supp. 2d 355 (S.D.N.Y. 2010) ..............................................33

*Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*,
   474 F.3d 365 (6th Cir. 2007) ......................................................20, 24

*Brown v. Legal Found. of Washington*,
   538 U.S. 216 (2003) ..................................................................14, 17, 18

*Campbell v. PricewaterhouseCoopers*,
   2008 WL 3836972 (E.D. Cal. Aug. 14, 2008) ................................28

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
   520 U.S. 564 (1997) ..................................................................................4

*Commodore Home Systems, Inc. v. Superior Court*,
   32 Cal.3d 211 (1982) ..............................................................................28

*Commonwealth Edison Co. v. United States*,
   271 F.3d 1327 (Fed. Cir. 2001) .........................................................15

*Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*,
   508 U.S. 602 (1993) ................................................................................19

*Connolly v. Pension Benefit Guar. Corp.*,
   475 U.S. 211 (1986) ................................................................................19

*County of Sonoma v. Superior Ct.*,
   173 Cal. App. 4th 322 (Ct. App. 2009) ..........................................12

iv

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

*Cusano v. Klein,*
   280 F. Supp. 2d 1035 (C.D. Cal. 2003)................................................................35

*Daghlian v. DeVry Univ., Inc.,*
   582 F. Supp. 2d 1231 (C.D. Cal. 2007)................................................................12

*De Anza Santa Cruz Mobile Estates Homeowners Ass'n v. De Anza Santa*
   *Cruz Mobile Estates,*
   94 Cal. App. 4th 890 (Ct. App. 2001) .................................................................29

*Dean Foods Co. v. Brancel,*
   187 F.3d 609 (7th Cir. 1999) ................................................................................7

*Doran v. Embassy Suites Hotel,*
   2002 WL 1968166 (N.D. Cal. Aug. 26, 2002)....................................................29

*Downey v. Humphreys,*
   102 Cal. App. 2d 323 (Ct. App. 1951) ................................................................35

*Durgom v. Janowiak,*
   74 Cal. App. 4th 178 (Ct. App. 1999) .................................................................23

*Eastern Enters. v. Apfel,*
   524 U.S. 498 (1998) .....................................................................................14, 15

*Estate of Migliaccio v. Midland Nat'l Life Ins. Co.,*
   436 F. Supp. 2d 1095 (C.D. Cal. 2006)...............................................................30

*Fossen v. Blue Cross & Blue Shield of Mont., Inc.,*
   660 F.3d 1102 (9th Cir. 2011)..............................................................................22

*Foti v. City of Menlo Park,*
   146 F.3d 629 (9th Cir. 1998) ...............................................................................11

*Fox v. Ethicon Endo-Surgery, Inc.,*
   35 Cal. 4th 797 (2005)..........................................................................................34

*Garcia-Barajas v. Nestle Purina Petcare Co.,*
   2009 WL 2151850 (E.D. Cal. July 16, 2009) .....................................................28

1

2

# TABLE OF AUTHORITIES
## (continued)

Page

3

4

*Garneau v. City of Seattle,*
   147 F.3d 802 (9th Cir. 1998) ................................................................. 19

5

6

*Geier v. American Honda Motor Co.,*
   529 U.S. 861 (2000) ............................................................................. 22

7

8

*Gelow v. Central Pac. Mortg. Corp.,*
   656 F. Supp. 2d 1217 (E.D. Cal. 2009) ................................................. 15

9

*Gitterman v. Vitoulis,*
   564 F. Supp. 46 (S.D.N.Y. 1982) ......................................................... 32

10

11

*Gonzales v. Raich,*
   545 U.S. 1 (2005) ............................................................................. 3, 4

12

13

*Gravquick A/S v. Trimble Navigation Int'l, Ltd.,*
   323 F.3d 1219 (9th Cir. 2003) ................................................................. 7

14

15

*Greenberg v. Western Turf Ass'n,*
   140 Cal. 357 (1903) ............................................................................. 28

16

17

*Guerrero v. Gates,*
   442 F.3d 697 (9th Cir. 2006) ............................................................... 34

18

19

*Gulley v. Dzurenda,*
   264 F.R.D. 34 (D. Conn. 2010) ............................................................ 36

20

*Healy v. Beer Inst.,*
   491 U.S. 324 (1989) ...................................................................... 4, 5, 6

21

22

*Horne v. U.S. Dep't of Agric.,*
   __ F.3d __, 2011 WL 2988902 (9th Cir. July 25, 2011) ....................... 18

23

24

*In re National Century Fin. Enters., Inc.,*
   755 F. Supp. 2d 857 (S.D. Ohio 2010) ................................................... 7

25

26

*In re Park West Galleries, Inc.,*
   2010 WL 56044 (W.D. Wash. Jan. 5, 2010) ....................................... 6, 7

27

28

*In re Peterson,*
   156 Cal. App. 4th 676 (Ct. App. 2007) ................................................ 30

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Wal-Mart Stores, Inc. Wage & Hour Litig.*,
505 F. Supp. 2d 609 (N.D. Cal. 2007).........................................................28, 29

*In re Zyprexa Products Liability Litig.*,
2011 WL 4962184 (E.D.N.Y. Oct. 18, 2011) ....................................................10

*K2 Am. Corp. v. Roland Oil & Gas, LLC*,
653 F.3d 1024 (9th Cir. 2011)..........................................................................22

*Kelo v. City of New London*,
545 U.S. 469 (2005) ...............................................................................14, 17

*Laws v. Sony Music Entm't, Inc.*,
448 F.3d 1134 (9th Cir. 2006).....................................................................21, 26

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ......................................................................................13

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ................................................................................14, 19

*Mazza v. American Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012)............................................................................10

*McCarthy v. City of Cleveland*,
626 F.3d 280 (6th Cir. 2010)......................................................................14, 15

*McClung v. City of Sumner*,
548 F.3d 1219 (9th Cir. 2008).........................................................................19

*McIntyre v. Bayer*,
339 F.3d 1097 (9th Cir. 2003) ........................................................................18

*Midwest Title Loans, Inc. v. Mills*,
593 F.3d 660 (7th Cir. 2010)........................................................................7, 8

*Moldo v. Matsco, Inc. (In re Cybernetic Servs.)*,
252 F.3d 1039 (9th Cir. 2001).........................................................................22

*Montz v. Pilgrim Films & Television, Inc.*,
649 F. 3d 975 (9th Cir. 2011) ..........................................................................20

vii

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*Morseburg v. Balyon*,

4

    621 F.2d 972 (9th Cir. 1980) .................................................................. 19

5

*Nathan Kimmel, Inc. v. DowElanco*,

6

    275 F.3d 1199 (9th Cir. 2002) ................................................................ 22

7

*NCAA v. Miller*,

8

    10 F.3d 633 (9th Cir. 1993) ...................................................................... 9

9

*ORL, LLC v. Hancock Bank*,

    2011 WL 2457864 (M.D. Fla. June 20, 2011) ...................................... 33

10

*Orloff v. Los Angeles Turf Club, Inc.*,

11

    30 Cal. 2d 110 (1947) ............................................................................ 29

12

*Parrish v. NFL Players Ass'n*,

13

    534 F. Supp. 2d 1081 (N.D. Cal. 2007) ................................................ 36

14

*Phillips v. Washington Legal Found.*,

15

    524 U.S. 156 (1998) ........................................................................ 14, 16

16

*Podany v. Robertson Stephens, Inc.*,

17

    350 F. Supp. 2d 375 (S.D.N.Y. 2004) ................................................... 33

18

*Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*,

19

    523 U.S. 135 (1998) ........................................................................passim

20

*Reno v. Condon*,

    528 U.S. 141 (2000) ................................................................................ 3

21

*Rios v. Cabrera*,

22

    2010 WL 5111411 (M.D. Pa. Dec. 9, 2010) .......................................... 4

23

*Rocky Mountain Farmers Union v. Goldstene*,

24

    2011 WL 6934797 (E.D. Cal. Dec. 29, 2011) ........................................ 4

25

*Rojas v. Brinderson Constructors, Inc.*,

26

    567 F. Supp. 2d 1205 (C.D. Cal. 2008) ................................................ 33

27

*Ross v. O'Neal*,

28

    2011 WL 5041967 (C.D. Cal. Oct. 17, 2011) ....................................... 30

**TABLE OF AUTHORITIES**
(continued)

Page

*Rutman Wine Co. v. E. & J. Gallo Winery,*
  829 F.2d 729 (9th Cir. 1987) ...................................................................... 33, 35

*S.D. Myers v. City & Cnty. of S. F.,*
  253 F.3d 461 (9th Cir. 2001) ........................................................................ 9, 10

*Schneider v. California Dep't of Corr.,*
  345 F.3d 716 (9th Cir. 2003) ...................................................................... 14, 18

*Schwegmann Bros. Giant Super Markets v. Louisiana Milk Comm'n,*
  365 F. Supp. 1144 (M.D. La. 1973), *aff'd* 416 U.S. 922 (1974) ....................... 6

*Small Prop. Owners of S.F. v. City & Cnty. of S.F.,*
  141 Cal. App. 4th 1388 (Ct. App. 2006) ......................................................... 15

*Smith v. Cimmet,*
  199 Cal. App. 4th 1381 (Ct. App. 2011) ......................................................... 30

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
  538 U.S. 408 (2003) ......................................................................................... 10

*Stern v. Marshall,*
  131 S. Ct. 2594 (2011) ..................................................................................... 16

*Swisher Int'l, Inc. v. Schafer,*
  550 F.3d 1046 (11th Cir. 2008) ....................................................................... 15

*Turnbull & Turnbull v. ARA Transp., Inc.,*
  219 Cal. App. 3d 811 (Ct. App. 1990) ............................................................ 29

*UMG Recordings, Inc. v. Augusto,*
  628 F.3d 1175 (9th Cir. 2011) ......................................................................... 24

*United States v. Juvenile Male,*
  __ F.3d __, 2012 WL 206263 (9th Cir. Jan. 25, 2012) .................................... 11

*United States v. Lopez,*
  514 U.S. 549 (1995) ........................................................................................... 4

*United States v. Michael R.,*
  90 F.3d 340 (9th Cir. 1996) ............................................................................... 3

# TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Reynard,*
  473 F.3d 1008 (9th Cir. 2007) ........................................................ 3

*United States v. Rodrigues,*
  159 F.3d 439 (9th Cir. 1998) ........................................................ 35

*United States v. Sperry Corp.,*
  493 U.S. 52 (1989) ........................................................ 16

*United States v. Stewart,*
  451 F.3d 1071 (9th Cir. 2006) ........................................................ 3

*Vance v. Barrett,*
  345 F.3d 1083 (9th Cir. 2003) ........................................................ 16, 17

*Washington Legal Found. v. Legal Found. of Washington,*
  271 F.3d 835 (9th Cir. 2001) (en banc) ........................................................ 17

*Webb's Fabulous Pharmacies, Inc. v. Beckwith,*
  449 U.S. 155 (1980) ........................................................ 14

*West Virginia CWP Fund v. Stacy,*
  __ F.3d __, 2011 WL 6062116 (4th Cir. Dec. 7, 2011) ........................................................ 15

*Wickard v. Filburn,*
  317 U.S. 111 (1942) ........................................................ 3, 4

*Wolf v. Superior Ct.,*
  107 Cal. App. 4th 25 (Ct. App. 2003) ........................................................ 35

*Woo v. Home Loan Group, L.P.,*
  2007 WL 6624925 (S.D. Cal. July 27, 2007) ........................................................ 28

*Yee v. City of Escondido,*
  503 U.S. 519 (1992) ........................................................ 19

1

<b><u>TABLE OF AUTHORITIES</u></b><br>(continued)

2

<b><u>Page</u></b>

3   **STATUTES**

4

5
17 U.S.C.
   § 106 .......................................................................................... 25
   § 109 .......................................................................................... 20
   § 301 .................................................................................... 20, 25
   § 602 .......................................................................................... 25

Cal. Civ. Code
   § 986 ................................................................................ 1, 4, 16
   § 3294 .............................................................................. 2, 28

Cal. Probate Code
   § 34 ............................................................................................ 30
   § 44 ............................................................................................ 30
   § 58 ............................................................................................ 30
   §§ 550-554 .............................................................................. 32

Cal. Civ. Pro. Code
   § 377.30 .................................................................................. 30
   § 377.32 .................................................................................. 30

6

7

8

9

10

11

12

13

14

15

16

17

18   **OTHER AUTHORITIES**

19
24 Cal. Jur. 3d, *Decedents' Estates* § 10 ...................................... 32

6 R.C.N.Y. § 2-122 .......................................................................... 8

*Black's Law Dictionary* (9th ed. 2009) ................................ 4, 30

L.R. 15-1 ........................................................................................ 36

20

21

22

23

24

25

26

27

28

<small>DEFENDANTS' JOINT REPLY</small>

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition confirms that this Court should grant the Motion to Dismiss[1] for six reasons:

*First*, the California Resale Royalties Act, California Civil Code § 986 ("CRRA"), violates the dormant Commerce Clause because it directly regulates interstate commerce and fails the *Pike* balancing test. Plaintiffs' argument that the dormant Commerce Clause does not apply borders on the frivolous. Plaintiffs' argument that the CRRA does not regulate conduct "outside" California simply because it involves a California resident seller improperly focuses on the residency of the seller, rather than the situs of the conduct. And Plaintiffs' argument that the Court cannot evaluate the CRRA under the *Pike* balancing test ignores binding authority holding that states have no legitimate interest in regulating for the protection of non-residents (e.g., non-resident artists).

*Second*, the CRRA constitutes a per se taking in violation of the United States and California Constitutions. Plaintiffs' suggestion that the CRRA is beyond the scope of the Takings Clause because it involves money owed to private individuals is contrary to well-settled Supreme Court law. Plaintiffs' contention that the Takings Clause does not apply to obligations to pay money has also been rejected, as even Plaintiffs admit, where the payment obligation involves specific identifiable funds, such as the funds that Defendants hold in trust from the proceeds of art sales. And Plaintiffs' attempt to convert the Takings challenge into a Due Process argument ignores their own authority, which acknowledges that the challenges are similar but the protections afforded are different.

*Third*, the Copyright Act of 1976 (the "Copyright Act") preempts claims brought under the CRRA. Plaintiffs failed to respond to Defendants' explanation of why this Court's prior opinion in *Baby Moose Drawings, Inc. v. Valentine*, 2011 WL

---

[1]  This reply uses the same abbreviations as the Motion to Dismiss ("Motion" or "Mot."). All emphasis in quotations is added, and internal citations, quotation marks, and brackets are omitted, unless otherwise noted.

1258529 (C.D. Cal. Apr. 1, 2011), does not apply. Plaintiffs incorrectly discount the significance of the Supreme Court's opinion in *Quality King Distributors, Inc. v. L'anza Research International, Inc.*, 523 U.S. 135, 152 (1998), which explains that the first sale doctrine means more than what Plaintiffs suggest. And Plaintiffs fail to grapple with the fact that the Copyright Act requires preemption unless the challenged law protects rights that are qualitatively different from the rights protected by copyright.

*Fourth*, Plaintiffs are not entitled to punitive damages as a matter of law. Plaintiffs admit that the CRRA contains no provision allowing punitive damages, and their contention that the punitive damages are available under California Civil Code § 3294 ignores the "new right-exclusive remedy" doctrine.

*Fifth*, the Estate of Robert Graham lacks capacity to sue. Plaintiffs' contention that the Estate of Robert Graham may sue simply because Plaintiffs alleged it could sue lacks any basis in law or logic.

*Sixth*, at a minimum, Plaintiffs have failed to sufficiently state a claim for relief because they have not identified a single transaction covered under the CRRA, and many of their claims are facially time-barred. Plaintiffs' citation to inapposite caselaw does nothing to absolve their failure to plead a single transaction. And Plaintiffs' protestation that they are not relying on fraudulent concealment to toll their claims is belied by their actual allegations.

For these reasons, Plaintiffs fail to state a claim under the CRRA. Because Plaintiffs' UCL claims are based on the "deprivat[ion]" of royalties under the CRRA (SoCompl. ¶¶ 41-46; ChCompl. ¶¶ 42-47), they necessarily fall with the CRRA claims. Therefore, Plaintiffs' complaints should be dismissed with prejudice.

# ARGUMENT

## I.   THE CRRA VIOLATES THE COMMERCE CLAUSE

The CRRA violates the dormant Commerce Clause because it:  (1) directly regulates interstate commerce, and (2) places an undue burden on interstate commerce.  (Mot. at 9-17.)  Plaintiffs' arguments to the contrary lack merit.[2]

### A.   The CRRA Implicates The Dormant Commerce Clause

Plaintiffs argue the CRRA does not implicate the dormant Commerce Clause, even when it is applied to sales outside California, because it regulates the conduct of California residents.   (Opp. at 8.)   Plaintiffs are wrong.   *First*, the dormant Commerce Clause applies because the CRRA purports to regulate "thing[s] in interstate commerce," which include anything used in interstate commerce. *Reno v. Condon*, 528 U.S. 141, 148 (2000) (vehicle information); *United States v. Reynard*, 473 F.3d 1008, 1023 (9th Cir. 2007) (DNA sample).  Fine art is such a thing.

*Second*, the dormant Commerce Clause applies because the CRRA regulates an activity having a substantial relationship to interstate commerce.  The sale of goods substantially affects interstate commerce when there is an established interstate market for such goods because the existence of such goods has "a substantial influence on price and market conditions" or "supply and demand." *Gonzales v. Raich*, 545 U.S. 1, 18-19 (2005); *Wickard v. Filburn*, 317 U.S. 111, 128 (1942) ("a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions"); *United States v. Stewart*, 451 F.3d 1071, 1077 (9th Cir. 2006) ("market for machineguns is established and lucrative, like the market for marijuana"); *United States v. Michael R.*, 90 F.3d 340, 344-45 (9th Cir. 1996) (similar).

---

[2]  Plaintiffs spend two pages arguing a point Defendants did not raise:  whether the CRRA discriminates against interstate commerce.   (Opp. at 8-10.)   Defendants reserve the right to address this issue if it becomes necessary at a later date.

1    Plainly, there is a vibrant interstate fine art market.  Plaintiffs fail to dispute

2    that their claims are primarily based on sales in New York by two New York auction

3    houses, which by definition involve *inter*state commerce.[3]  Plaintiffs' suggestion that

4    the CRRA has no substantial effect on interstate commerce because it concerns

5    California's regulation of its "own residents" (Opp. at 8), ignores that the CRRA

6    requires in-state residents to pay royalties *when the sale occurs out-of-state*, Cal. Civ.

7    Code § 986(a).  It also ignores the myriad cases in which courts have held that state

8    statutes violate the Commerce Clause when they apply to the out-of-state conduct of

9    that state's residents.  (*See infra* at 4-10.)[4]

10   **B.    The CRRA Is Per Se Invalid Because It**
11   **Directly Regulates Interstate Commerce**

12   **1.    The CRRA Overtly Targets Interstate Commerce**

13   Plaintiffs incorrectly argue that the CRRA does not overtly regulate interstate

14   commerce, including New York auctions, because the CRRA requires involvement

15   of a California resident seller.  (Opp. at 10-12.)  Courts have consistently rejected

16   state laws that project legislation into another state based on nothing more than the

17   involvement of one of the legislating state's residents.  (Mot. at 9-10.)[5]  This is

18

---

19   [3]  Notably, even when a statute regulates *intra*state activity, that alone is insufficient
20   to defeat application of the dormant Commerce Clause because Supreme Court law
     "firmly establishes Congress' power to regulate *purely local activities* that are part of
     an economic class of activities that have a substantial effect on interstate commerce."
21   *Raich*, 545 U.S. at 17; *accord Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
     520 U.S. 564, 573 (1997); *United States v. Lopez*, 514 U.S. 549, 559 (1995);
22   *Wickard*, 317 U.S. at 118-19, 125.

23   [4]  Plaintiffs' argument conveniently avoids any discussion of "residency," not
     surprisingly, because a person can be a "resident" of California but a citizen of
24   another state. *Black's Law Dictionary* (9th ed. 2009) (a "resident is not necessarily
     either a citizen or a domiciliary"; "resident" defined as: (1) "[a] person who lives in a
25   particular place" and (2) "[a] person who has a home in a particular place").

26   [5]  *See also Healy v. Beer Inst.*, 491 U.S. 324, 337-41 (1989) (Connecticut statute that
     applied to "Connecticut brewers … or out-of-state shippers" was invalid because it
27   "controll[ed] commercial activity occurring wholly outside the boundary of the
     State"); *Rios v. Cabrera*, 2010 WL 511141, at *3 (M.D. Pa. Dec. 9, 2010) (where
28   Pennsylvania resident sold insurance policy to a New York resident in New York,
     applying Pennsylvania consumer protection statute would constitute a direct

4

1  because the "critical inquiry" in identifying an impermissible direct regulation is

2  whether the regulation "control[s] *conduct* beyond the boundaries of the State."

3  *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).  The critical inquiry is thus the situs of

4  the conduct, not the residency of the seller.  *Id.*

5      Regardless of whether a state statute is intended to provide protections for that

6  state's residents or, as here, to impose obligations on them, the statute cannot be

7  applied either to state residents or non-residents when they are involved in conduct

8  that occurs wholly outside the state.[6]  Thus, there is no basis for Plaintiffs'

9  distinction between a statute applied to a state's own residents and a statute applied

10  to non-residents.  (Opp. at 11.)  Plaintiffs cite no case supporting such a distinction.

11      Plaintiffs do not deny that they seek to apply the CRRA to sales that occurred

12  wholly outside California.  Where, as here, the regulated conduct is a sale, courts

13  consider the location of the conduct to be where the sales contract was formed.[7]

14
15  regulation); *accord Rocky Mountain Farmers Union v. Goldstene*, 2011 WL
    6934797, at *13 (E.D. Cal. Dec. 29, 2011) ("Defendants' arguments improperly
16  focus on whether or not the LCFS directly regulates the out-of-state entities";
    California fuel standard that regulated "only fuel-providers in California" but sought
17  to regulate mostly corn produced entirely outside California was an impermissible
    direct regulation).

18  [6]  In addition to the cases cited in fn. 4, *see Bigelow v. Virginia*, 421 U.S. 809, 823-
    24 (1975) (Virginia could not regulate abortion services provided to Virginia
19  residents in New York: Virginia could not "prevent its residents from traveling to
    New York to obtain those services or, as the State conceded … prosecute them for
20  going there….   A State does not acquire power or supervision over the internal
    affairs of another State merely because the welfare and health of its own citizens
21  may be affected when they travel to that State"); *Allgeyer v. Louisiana*, 165 U.S. 578,
    588 (1897) (Louisiana statute that regulated Louisiana resident's right to enter into
22  an insurance contract in New York with a New York company was invalid);
    *American Meat Inst. v. Barnett*, 64 F. Supp. 2d 906, 917-19 (D.S.D. 1999) (South
23  Dakota statute that regulated prices for out-of-state hog purchases by South Dakota
    buyers was invalid; "the Dormant Commerce Clause invalidates state statutes which
24  require people or businesses to conduct their out-of-state commerce in a certain
    way").

25  [7]  *See In re Park West Galleries, Inc.*, 2010 WL 56044, at *4 (W.D. Wash. Jan. 5,
    2010) ("Despite plaintiffs' effort to highlight every contact Park West has with
26  Florida, the commerce at issue in this case (*i.e.*, the sale and purchase of artwork)
    occurred on international waters."); *Schwegmann Bros. Giant Super Markets v.*
27  *Louisiana Milk Comm'n*, 365 F. Supp. 1144, 1155 (M.D. La. 1973) (three-judge
    court) (where ice milk was produced in Tennessee, title passed there, and Tennessee
28  producer had no business operations in Louisiana other than delivering ice milk in

5

1  Plaintiffs do not and cannot dispute that Defendants' New York auction sales

2  occurred wholly outside California because the offer and acceptance in those

3  auctions took place entirely in New York. (Mot. at 10-11 & n.4.)

4  Plaintiffs try to distinguish only two of Defendants' cases—*Midwest Title* and

5  *Park West*—arguing that the plaintiffs' home states in those cases could not regulate

6  transactions that took place out-of-state because the defendants had "no connection

7  with the plaintiffs' home state." (Opp. at 10-11.)  As discussed, there is no basis for

8  Plaintiffs' purported distinction between a state statute applied to a state's own

9  residents and a state statute applied to non-residents.  The key to a direct regulation

10  inquiry is not the residency of either the plaintiff or the defendant, but whether a

11  state is attempting to regulate conduct outside its borders.  *Healy*, 491 U.S. at 336.

12  Moreover, Defendants in the present cases are New York auction houses, not

13  California companies.  Defendants therefore have the same lack of connection to

14  California that the defendants in *Midwest Title* and *Park West* had with the regulating

15  states:  they engaged in out-of-state transactions in which one of the participants was

16  a resident of the regulating state.[8]  Under Plaintiffs' own reasoning, therefore, the

17  CRRA cannot be applied to the non-California Defendants in the present cases.

18  Louisiana, there was "no doubt" that Louisiana could "not regulate" the price

19  received by the Tennessee producer), *aff'd* 416 U.S. 922 (1974); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521-23 (1935) (New York had no power to regulate the

20  price paid to Vermont milk sellers for milk that was produced and sold in Vermont, and then transported into New York, nor did New York have the power to prohibit

21  the sale of such milk in New York); *see also Dean Foods Co. v. Brancel*, 187 F.3d 609, 619 (7th Cir. 1999) ("the sales indisputably occurred in Illinois": "the product

22  actually arrived in Illinois" and "it was only at that point, when the necessary formalities of contract law had taken place, that title, possession, and risk of loss

23  passed"); *In re National Century Fin. Enters., Inc.*, 755 F. Supp. 2d 857, 882 (S.D. Ohio 2010) ("[T]he 'commerce' or 'conduct' reached by the Securities Act is the

24  securities transaction …") (quotations in original).

25  [8]  *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 662 (7th Cir. 2010) (direct regulation where Indiana statute applied to out-of-state sale, advertised in Indiana,

26  involving Indiana resident); *Park West*, 2010 WL 56044, at *4 ("the projection of FDUTPA into international waters would result in the regulation of commerce

27  wholly outside Florida's boundaries," and "[n]ot even Florida's substantial and legitimate interest in protecting its citizens from unfair trade practices can justify the

28  direct and substantial effect FDUTPA would have on international commerce if it were applied to foreign transactions whenever a Florida citizen were involved").

1  Plaintiffs also argue that, because Defendants agreed with California resident
2  sellers to act as their agents in New York auctions, "the Royalty Act regulates the
3  relations between them." (Opp. at 11). This makes no sense. The issue is not the
4  relations between California resident sellers and their agents (the Defendants).
5  Rather, it is whether California can regulate conduct of sellers and their agents when
6  that conduct occurs wholly outside of California, at a New York auction. That
7  application of the CRRA is plainly extraterritorial.

8  Finally, Plaintiffs' reliance on *Gravquick A/S v. Trimble Navigation*
9  *International, Ltd.*, 323 F.3d 1219 (9th Cir. 2003) is misplaced. In that case,
10 Gravquick, a Danish company, sued Trimble, a California company, for refusing to
11 renew a contract to distribute California-made equipment in Denmark. *Id.* at 1221.
12 The contract contained a California choice-of-law provision, but Trimble argued that
13 applying California law would violate the dormant Commerce Clause. *Id.* at 1223-
14 24. The Ninth Circuit rejected that argument because California law was not being
15 applied to regulate conduct that occurred wholly outside California. *Id.* at 1224. It
16 also rejected the argument because California law was not being applied by
17 legislative fiat; it "only applie[d] to this case *because the parties chose to be*
18 *governed by California law.*" *Id.*

19 Plaintiffs ignore the fact that the conduct involved in *Gravquick* did not occur
20 wholly outside California, and they incorrectly try to equate the voluntary choice of
21 law provision in *Gravquick* with Defendants' decision to be involved in conduct in
22 New York that includes California residents. (Opp. at 14-15.) As discussed, the
23 Supreme Court and lower courts have uniformly held that where, as here, a sales
24 transaction occurs wholly outside the regulating state, the Commerce Clause
25 precludes application of the regulating state's laws to that transaction even if a state
26 resident is involved. (*See supra* at 4-7.) Under Plaintiffs' reasoning, all of those
27 cases were wrongly decided. Plaintiffs' reliance on *Gravquick* fails because (1) they
28 do not and cannot allege that the CRRA governs here by virtue of any voluntary

7

contractual choice to have New York auctions governed by California law; and (2) they seek to apply the CRRA, by legislative fiat, to conduct that occurred wholly outside California.[9]

**2.    The CRRA Interferes With Legislation In Other States**

In addition to overtly targeting interstate commerce, the CRRA interferes with another state's sovereignty by imposing a royalty for New York auction sales despite New York's own consideration and rejection of a resale royalty act.  (Mot. at 11-13.)  The CRRA also interferes with New York City's own comprehensive scheme for regulating New York auctions.  *See* Rules of the City of New York, available on Westlaw at 6 R.C.N.Y. § 2-122.  The practical effect of the CRRA is to impose a resale royalty scheme within New York's borders where New York has already decided against it.

Plaintiffs downplay Defendants' proof that other states *have* considered but *refused to enact* resale royalty legislation (Mot. at 12-13) by claiming Defendants "read too much into failed legislation" (Opp. at 12).  Plaintiffs ignore that failed legislation shows that the state legislatures declined to adopt similar laws and may well have made a policy decision that the legislation would be harmful to their interests.  *See Midwest Title*, 593 F.3d at 667-68 (holding that "the absence of an Illinois counterpart to the Indiana law makes clear [that Illinois] thinks [loan transactions] shouldn't be restricted in the way that Indiana thinks they should be," and "[t]o allow Indiana to apply its law against title loans when its residents transact in a different state that has a different law would be arbitrarily to exalt the public policy of one state over that of another").  Notably, the Ninth Circuit has endorsed the view that adopting less stringent standards (or, as here, no royalty obligation) is

---

[9] Plaintiffs argue that California law may be applied to New York auctions because "one of the parties is a Californian, and at least that party … is bound by California law."  (Opp. at 14.)  Plaintiffs' argument begs the exact question before the Court. The Commerce Clause requires a determination that where, as here, California residents engage in sales transactions that take place wholly outside of California, they are *not* bound by California law with respect to those transactions.

just as meaningful as adopting more stringent standards (here, a royalty obligation). *See NCAA v. Miller*, 10 F.3d 633, 639-40 (9th Cir. 1993) (where other states passed legislation with conflicting obligations *and* "similar legislation ha[d] been introduced in five other states" that could subject the NCAA to conflicting requirements, requiring nationwide compliance with the most stringent standard would run afoul of the Commerce Clause because "a state with a less stringent standard might well consider its standard a maximum as well as a minimum").

This position, endorsed by the Ninth Circuit and other courts, makes sense. In contrast, Plaintiffs apparently believe that no significance can ever be accorded to a legislature's decision not to enact legislation, unless perhaps the legislature also affirmatively enacts a resolution explaining why it declined to pass the legislation. As the case law indicates, Plaintiffs are wrong. When a state statute has the effect of regulating conduct in other states, the decision by those states not to adopt similar legislation is given substantial weight in analyzing whether the statute violates the Commerce Clause.

Plaintiffs' reliance on *S.D. Myers v. City & County of San Francisco*, 253 F.3d 461 (9th Cir. 2001) is misplaced. (Opp. at 12-14.) Myers' bid on a city contract was rejected when it declined to certify compliance with a city ordinance requiring contractors to provide benefits to employees with domestic partners. 253 F.3d at 465-66. *First*, the court held that the ordinance was not a direct regulation because it "contain[ed] no language explicitly or implicitly targeting either out-of-state entities or entities engaged in interstate commerce," and affected Myers only after it chose to contract with the city. *Id*. at 468-69 ("[I]t is significant to our direct regulation inquiry that the City imposes the Ordinance through contract rather than by legislative fiat."). *Second*, the court held that the ordinance was not a direct regulation because Myers had failed to demonstrate that its "practical effect" was to regulate interstate commerce: because Myers brought only a facial challenge, it had to prove that the practical effect was that the ordinance "directly regulate[d]

9

1  interstate commerce *under all circumstances*," which meant that, "at a minimum,

2  Myers … either [had to] present evidence that conflicting, legitimate legislation is

3  already in place or that the threat of such legislation is both actual and imminent." *Id*.

4  at 469-70.  Instead, Myers asked the court to "speculate about possible legislation,"

5  which it refused to do.  *Id*. at 470.

6  Unlike *Myers*, the CRRA *does* explicitly target agents and sales outside

7  California (Mot. at 11), and it applies by legislative fiat, not because Defendants

8  invoked California law.  Moreover, Defendants are challenging the CRRA as applied

9  by Plaintiffs, and thus are not subject to the heightened standard.  (*See infra* at 10-11.)

10 Regardless, Defendants would prevail under the heightened standard because there is

11 conflicting legislation.  (Mot. at 12-13.)

12 Lastly, Plaintiffs argue that California law should follow California residents

13 wherever they go, (Opp. at 11, 14), which flies in the face of state sovereignty.

14 *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 592 (9th Cir. 2012) (rejecting

15 application of California law to out-of-state sales by a California company because

16 "each state has an interest in setting the appropriate level of liability for companies

17 conducting business within its territory").[10]

### 3. Plaintiffs Incorrectly Characterize Defendants' Challenge As A Facial Attack

20 Plaintiffs wrongly characterize Defendants' Commerce Clause arguments as a

21 facial attack.  (Opp. at 7, 15-16.)  This action was brought by the Plaintiffs, who seek

22 to apply the CRRA to Defendants' New York auctions.  Defendants may therefore

---

[10]  *See also In re Zyprexa Products Liability Litig.*, 2011 WL 4962184, at *3 (E.D.N.Y. Oct. 18, 2011) ("Georgia cannot legitimately expect its law to apply outside of its borders simply by virtue of one of its residents having traveled to another state."); *Amoroso v. Burdette Tomlin Mem'l Hosp.*, 901 F. Supp. 900, 906 (D.N.J. 1995) ("Citizens do not, however, carry their home state's laws with them wherever they go."); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction.").

1   argue that the CRRA is unconstitutional as applied by the Plaintiffs, even if the

2   statute may be capable of valid application in other situations.  *Foti v. City of Menlo*

3   *Park*, 146 F.3d 629, 635 (9th Cir. 1998).  Because the constitutionality of the CRRA

4   has been drawn into question as a defense to Plaintiffs' application and enforcement

5   of the statute, Defendants' challenge is—by definition—an as-applied challenge.

6   *See, e.g.*, *United States v. Juvenile Male*, __ F.3d __, 2012 WL 206263, at *6 (9th

7   Cir. Jan. 25, 2012) ("[E]ach defendant objects both specifically to the special

8   condition requiring registration and generally to the constitutionality of SORNA as

9   applied to juveniles…").  Although Plaintiffs' failure to adequately plead their

10  claims made it impossible to identify any sales, Defendants argued that the CRRA

11  directly regulates interstate commerce as-applied to the transactions here—art sales

12  at New York auctions.  (Mot. at 10-11, 13.)  This is not a facial challenge, and as

13  explained above, Defendants satisfied their burden.

14      **C.    The CRRA Is Also Invalid Because It Requires**
15              **Royalties To Non-California Artists**

16      Because the CRRA directly regulates interstate commerce, it is per se invalid

17  as set forth above.  (Mot. at 14.)  In addition, it is invalid under the *Pike* balancing

18  test when applied to require payment to non-California artists.  (*Id.* at 14-17.)  Indeed,

19  California's Legislative Counsel recognized that the CRRA suffers from this fatal

20  flaw:  California has no legitimate local interest in furthering the fiscal rights of

21  artists that reside out of the state or the country, even where a California resident

22  seller is involved.  (*Id.*)  This analysis is particularly significant because it was not

23  prepared for litigation and it lacks any adversarial motive.   Not surprisingly,

24  Plaintiffs have no response to it.  Neither do Plaintiffs dispute or respond to case law

25  that uniformly holds that a statute violates the Commerce Clause where, as here, it

26  purports to provide benefits for non-residents.  (*Id.*)

27      Instead, Plaintiffs assert that the Court cannot apply *Pike* on a motion to

28  dismiss (Opp. at 16), but ignore contrary cases from the Ninth Circuit and this Court.

1  (Mot. at 14 n.6.)  And Plaintiffs argue about the balancing of the burden imposed by

2  the CRRA (Opp. at 16-18), but the Court need not engage in that inquiry because the

3  CRRA serves no legitimate "local" purpose at all, and therefore there is nothing to be

4  weighed in the analysis (Mot. at 16-17).

### D.  The Offending Portions Of The CRRA Cannot Be Severed Or Rewritten, Rendering The Entire Statute Unconstitutional

7        Plaintiffs contend that the extraterritorial portion of the CRRA can be excised

8  to make the CRRA constitutional for in-state sales (Opp. at 15 & n.1), but the

9  CRRA's severability clause, Section 986(e), cannot save it.  A severability clause

10  "does not conclusively dictate" that an invalid portion be severed because "[t]o be

11  severable, the invalid provision must be grammatically, functionally, and volitionally

12  separable."  *Abbott Labs. v. Franchise Tax Bd*., 175 Cal. App. 4th 1346, 1357 (Ct.

13  App. 2009).  At a minimum, to limit the CRRA to an arguably proper scope, the

14  Court would need to sever the extraterritorial portion and redefine the term "artists"

15  to "California artists."  But this would not save the CRRA because a phrase is not

16  volitionally separable where it cannot be said with certainty that the legislature

17  would have enacted the statute without the offending phrase.[11]  Here, the legislature

18  considered a version of the statute that would have applied only to sales within

19  California, but after Professor Merryman warned that sellers would consign art to

20  auction houses outside California, AB 1391 was amended to apply "[w]henever a

21  work of fine art is sold and the buyer or the seller resides in California *or* the sale

22  takes place in California...."  (Russell Decl., Ex. 1 at 4:3-8, Ex. 2 at 41, Ex. 3 at 66,

---

[11]  *See County of Sonoma v. Superior Ct.*, 173 Cal. App. 4th 322, 352 (Ct. App. 2009) (no volitional severability where "we cannot be certain that the Legislature would have enacted the measure without the … requirement"); *Daghlian v. DeVry Univ., Inc.*, 582 F. Supp. 2d 1231, 1260 (C.D. Cal. 2007) (refusing to sever exemption after rendering statute unconstitutional under the Commerce Clause for lack of volitional severability:  "definitional provisions are a fundamental part of the statute" and "highlighted by the fact that in 2004, the legislature *broadened* the exemption to all WASC-accredited schools"; previously it had applied in a more limited manner) (emphasis in original).

1   Ex. 4 at 74:4-6.)   Without evidence the legislature would have passed AB 1391
2   without the amendment, it cannot be severed.

3       Even if the extraterritorial provision could be severed, the Court cannot
4   rewrite the statute to render it constitutional.   Although the Court has authority to
5   rewrite a statute to preserve its constitutionality, it may do so only "if it can conclude
6   with confidence that (i) it is possible to reform the statute in a manner that closely
7   effectuates policy judgments clearly articulated by the enacting body, and (ii) the
8   enacting body would have preferred such a reformed version of the statute to
9   invalidation of the statute."  *Abbott Labs*., 175 Cal. App. 4th at 1360.   It may not
10  rewrite a statute "when the suggested reformation is inconsistent with the
11  Legislature's intent, or when that intent cannot be ascertained."  *Id*.   The legislature
12  acted to benefit all U.S. artists, not just California artists.   (Russell Decl., Ex. 2 at 41.)
13  There is nothing to indicate the legislature would have enacted AB 1391 without this
14  broad scope.   Thus, the Court may not rewrite the CRRA.

15  **II.     THE CRRA EFFECTS A TAKING OF PRIVATE PROPERTY IN**
16  **        VIOLATION OF THE U.S. AND CALIFORNIA CONSTITUTIONS**

17      **A.     Takings Analysis Clearly Applies Where, As Here,**
18      **        The State Transfers Property From One Private**
    **        Party To Another Without Just Compensation**

19      As the Supreme Court has confirmed, "[t]he paradigmatic taking requiring just
20  compensation is a direct government appropriation or physical invasion of private
21  property."   *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).
22  Notwithstanding that the CRRA accomplishes exactly that, Plaintiffs advance several
23  arguments why the Takings Clause is inapplicable here.   Each argument is
24  unsuccessful.

25      *First*, Plaintiffs contend that because the property confiscated by the CRRA
26  "is owed to private individuals" and not the government, the CRRA is "beyond the
27  scope of the Takings Clause."  (Opp. at 20.)   This suggestion is plainly incorrect.
28  The Supreme Court has found per se takings where the government ordered the

13

transfer of property, including money, from one private party to another.  *See, e.g.*, *Brown v. Legal Found. of Washington*, 538 U.S. 216, 224-25 (2003) (finding a per se taking when the government ordered interest on IOLTA accounts "*to be paid directly by the financial institution [holding the clients' funds] to the Legal Foundation of Washington*"); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (per se taking where the government permitted a private cable television company to install a cable on private property).  Plaintiffs' suggestion that the government could avoid the Takings Clause simply by mandating direct transfers of property among private parties turns the Takings Clause on its head.[12]

*Second*, Plaintiffs argue that the Takings Clause does not apply to obligations to pay money.  (Opp. at 21-23, 25-28.)  This proposition, too, has been rejected by the Supreme Court.  The Supreme Court has several times affirmed that monetary interests can be protected property under the Fifth Amendment, *see, e.g.*, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980); *Phillips v. Washington Legal Found.*, 524 U.S. 156 (1998), and that obligations to transfer protected monetary interests implicate the Takings Clause, *see Webb's*, 449 U.S. at 164; *Brown*, 538 U.S. at 235.  The Ninth Circuit has followed course.  *See, e.g.*, *Schneider v. California Dep't of Corr.* (*Schneider II*), 345 F.3d 716, 720 (9th Cir. 2003).

In an attempt to avoid this clear line of authority, Plaintiffs cite several out-of-circuit cases that rely on Justice Kennedy's concurrence in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), as well as the dissenting opinion in that case.  These cases generally hold that the Takings Clause is not an appropriate vehicle to challenge a statute that "does not seize or otherwise impair an *identifiable* fund of money."  *McCarthy v. City of Cleveland*, 626 F.3d 280, 286 (6th Cir. 2010); *see also*

---

[12]  Indeed, the additional requirement that the taking be for "public use," *see, e.g.*, *Kelo v. City of New London*, 545 U.S. 469, 477 (2005), would be meaningless if the Takings Clause did not apply when the government dictates direct transfers of property between private parties.

1   *Eastern Enters.*, 524 U.S. at 540 (Kennedy, J., concurring) (concluding that there

2   was no Takings claim because the challenged statute "does not operate upon or alter

3   an *identified property interest*"). But as Plaintiffs recognize, the Supreme Court has

4   found compensable takings where, as here, "the state law at issue operated to seize a

5   sum of money from a specific fund." *McCarthy*, 626 F.3d at 284.[13] Indeed,

6   Plaintiffs concede that there is a per se taking when the government appropriates

7   "specific, identifiable property." (Opp. at 24.)

8   Despite Plaintiffs' descriptions to the contrary, the CRRA, by its own terms,

9   seizes money from a specifically identifiable fund—the proceeds from the sale of a

10  specific work of art.[14] As Plaintiffs admit, Defendants hold the proceeds from sales

11  of art works in trust for the sellers, not as fungible amounts of money available for

12  Defendants' various obligations.[15] (*See* Opp. at 8, 23; Mot. at 21.) Moreover, in at

13

14  [13] *See also West Virginia CWP Fund v. Stacy*, __ F.3d __, 2011 WL 6062116, at *6
15  (4th Cir. Dec. 7, 2011) (rejecting Takings claim because the challenged statute
     "merely requires petitioner to pay money—and thus does not infringe *a specific,*
16  *identifiable property interest*"); *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1056
     (11th Cir. 2008) (Takings Clause "is not an appropriate vehicle to challenge the
17  power of [a legislature] to impose a mere monetary obligation *without regard to an*
     *identifiable property interest*"); *Small Prop. Owners of S.F. v. City & Cnty. of S.F.*,
18  141 Cal. App. 4th 1388, 1400-02 (Ct. App. 2006) (holding that "a monetary
     obligation is subject to the Takings Clause if the obligation operates upon, alters, or
19  is measured by an identified property interest").

20  [14] The circuit cases Plaintiffs cite are easily distinguishable, as none involved
     payments that implicated a specific fund. *See McCarthy*, 626 F.3d 280 (tickets for
21  traffic violations); *West Virginia CWP Fund*, 2011 WL 6062116 (survivor's benefits
     to spouses of deceased miners); *Swisher Int'l*, 550 F.3d 1046 (assessments on
22  tobacco producers facilitating the transition from price supports to the free market);
     *Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001)
23  (monetary assessments imposed for the remediation of uranium processing facilities).

24  [15] The same distinction is drawn in the context of conversion claims, which cannot
     arise from a mere obligation to pay money, but can be based on a failure to remit
25  specific, identifiable funds to the owner. The law is settled that where, as here, an
     agent receives payments on behalf of its principal, the funds received by the agent
26  are specific, identifiable property that can be the subject of a conversion claim. *E.g.*,
     *Gelow v. Central Pac. Mortg. Corp.*, 656 F. Supp. 2d 1217, 1230 (E.D. Cal. 2009)
27  ("A generalized claim for money is not actionable as conversion. If, however, 'there
     is a specific, identifiable sum involved, such as where an agent accepts a sum of
28  money to be paid to another and fails to make the payment,' a cause of action for
     conversion exists.") (citing cases).

DEFENDANTS' JOINT REPLY

1    least two respects, the CRRA expressly treats the sales proceeds as identifiable

2    funds.  First, the CRRA provides that "[a]ny amounts of money held by any seller or

3    agent for the payment of artists pursuant to this section shall be exempt from

4    enforcement of a money judgment by the creditors of the seller or agent."  Cal. Civ.

5    Code § 986(a)(6).  Second, the CRRA directs agents, like Defendants, to "withhold"

6    the CRRA royalty payment from the sales proceeds, not from an unspecified pool of

7    fungible money.  *Id.* § 986(a)(1).[16]  Plaintiffs cannot escape that the CRRA mandates

8    the confiscation of money from identifiable property interests, not the payment of an

9    arbitrary amount of money unconnected to a specific fund.

10    Moreover, Plaintiffs' reliance on *United States v. Sperry Corp.*, 493 U.S. 52

11    (1989) is misplaced.  The statute in *Sperry* did not effect a taking because the

12    required payment was a reasonable "fee for services," *id.* at 62, not because the

13    statute compelled a payment of money, as Plaintiffs suggest.  (Opp. at 25.)[17]  The 5%

14    royalty mandated by the CRRA is not a government "fee for services," particularly

15    because the royalty is paid to private parties, not the government.

16    *Third*, Plaintiffs argue at length that Defendants' Takings argument is a

17    "thinly-disguised Due Process argument."  (Opp. at 19-22.)  But as the cases relied

18    on by Plaintiffs hold, although the Takings Clause and the Due Process clause are

19    "similar," the "protections afforded by each are distinct."  *Vance v. Barrett*, 345 F.3d

20    _____

21    [16]  Plaintiffs' suggestion (Opp. at 27-28) that the CRRA does not require the royalty
22    to come from any specific source is an untenable interpretation: the CRRA expressly
     requires the agent to "withhold" 5% of the funds that the agent would otherwise
     remit to its principal.  The only source from which the agent can "withhold" funds
23    from its principal is the proceeds from the principal's sale of art works.  Nor do
     Plaintiffs suggest any possible basis on which California could require an agent to
24    pay royalties from the agent's own funds or from any other funds held by the agent,
     aside from the sales proceeds the agent receives on behalf of the seller.  *See Stern v.*
25    *Marshall*, 131 S. Ct. 2594, 2606 (2011) ("[The avoidance] canon of construction
     does not give us the prerogative to ignore the legislative will in order to avoid
26    constitutional adjudication … [and] rewrite the statute.").

27    [17]  *Phillips* expressly recognized this distinction, citing *Sperry* for the proposition
     that "[o]ur holding [that interest on IOLTA funds constitutes protected property
28    under the Takings Clause] does not prohibit a State from imposing reasonable fees it
     incurs in generating and allocating interest income."  524 U.S. at 171.

1083, 1088-89 (9th Cir. 2003).  Indeed, as *Vance* explained, "[t]he Takings Clause limits the government's ability to confiscate property without paying for it."  *Id.* at 1089.  Despite Plaintiffs' attempt to rewrite Defendants' moving papers,[18] this is exactly the challenge Defendants have made:   the CRRA confiscates private property, and it is without question that the CRRA provides no compensation for the taking.  (Mot. at 18-19 ("As the CRRA provides no compensation, it cannot stand under the Fifth Amendment.").)[19]

## B.   The CRRA Effects A Per Se Taking Of Private Property

The Supreme Court made clear in *Brown* that the government transfer of a monetary property interest from one private party to another (or the government) is a per se taking triggering the government's categorical duty to pay just compensation.  *See Brown*, 538 U.S. at 217-18 (because the "interest earned in IOLTA accounts is the private property of the owner of the principal … the transfer of the interest to the Foundation here seems more akin to the occupation of a small amount of rooftop space in *Loretto*").  Although Plaintiffs urge an "ad hoc" approach instead (Opp. at 28-31), *Brown* expressly rejected the ad hoc approach for Takings claims regarding direct transfers of property interests.  *See* 538 U.S. at 234-35 (disagreeing with the Ninth Circuit decision below, which had applied an ad hoc analysis, *see Washington Legal Found. v. Legal Found. of Washington*, 271 F.3d 835 (9th Cir. 2001) (en banc)).[20]  *Brown* clearly applies here and Plaintiffs' effort to avoid *Brown*—and the

---

[18]   *See, e.g.*, Opp. at 21 ("Defendants' contention is not that the Royalty Act is invalid because it does not provide just compensation for the taking of "property.").

[19]   Defendants also argued that even if the CRRA provided compensation, there still would be an impermissible taking of private property for *private* rather than public use.  (Mot. at 19 & n.11.)  Plaintiffs' argument that the private use issue is a "Due Process, rather than Takings Clause issue" (Opp. at 25-26 n.15) reflects a basic misunderstanding of the Takings Clause, which squarely prevents the government from taking property for a non-public use.  *See, e.g.*, *Kelo*, 545 U.S. at 477-78.

[20]   Plaintiffs' reliance (Opp. at 29) on the Ninth Circuit's decision in *Washington Legal Foundation* is thus misplaced because the Supreme Court expressly rejected that portion of the Ninth Circuit's opinion.

17

1  Ninth Circuit authority following it—is unsuccessful.   (Mot. at 21-23); *see also*

2  *Schneider II*, 345 F.3d at 720; *McIntyre v. Bayer*, 339 F.3d 1097 (9th Cir. 2003).

3         Plaintiffs first suggest that the CRRA does not work a per se taking because

4  the obligation to pay a royalty arises only when an owner "chooses" to sell an

5  artwork.  (Opp. at 24.)  This contention is illogical and indeed collides head on with

6  *Brown*.  The plaintiffs in *Brown* were individuals who regularly "purchase[d] and

7  [sold] real estate," and by virtue of such activities, were required to deposit funds in

8  IOLTA accounts.  *See* 538 U.S. at 228.  The *Brown* plaintiffs of course made a

9  choice to engage in the activity requiring them to deposit funds in IOLTA accounts,

10  but that did not stop the Supreme Court from finding that the IOLTA program

11  triggered a per se taking of their property.  Plaintiffs do not explain how the CRRA is

12  any different.

13         Plaintiffs also rely on *Horne v. U.S. Dep't of Agriculture*, __ F.3d __, 2011

14  WL 2988902 (9th Cir. July 25, 2011), but that case is inapposite.  The plaintiffs in

15  *Horne* challenged USDA raisin regulations that were part of a program of price and

16  production controls in a highly regulated agricultural market.  The court held that by

17  "voluntarily" marketing their product in this "stream of interstate commerce," the

18  plaintiffs could not complain that the regulations effected a physical rather than

19  regulatory taking.  *Id.* at *6.  "Simply put," the court held, the raisin regulation "is a

20  use restriction, not a direct appropriation."  *Id.   See also id.* at *7 ("[Plaintiffs']

21  argument is founded on an erroneous belief that they have a property right to market

22  their raisins free of regulatory controls.").

23         The CRRA, by contrast, does not impose a use restriction on the owners of

24  works of fine art, but instead directly appropriates a portion of the proceeds from

25  their resales.   The CRRA is thus not part of a system of price or production

26  controls—classic examples of governmental action subject to ad hoc analysis—but

27

28

1 rather directly imposes an obligation to pay a portion of the resale proceeds to the
2 artist. *See Morseburg v. Balyon*, 621 F.2d 972 (9th Cir. 1980).[21]

3      Plaintiffs' other attempts to distinguish *Brown* reiterate many of their basic
4 errors concerning the Takings Clause and are unconvincing. Plaintiffs suggest that
5 the per se approach does not apply when funds are not paid directly to the
6 government. As discussed, *supra* at 13-14, there is no logic to this suggestion. And
7 *Garneau v. City of Seattle*, 147 F.3d 802 (9th Cir. 1998), on which Plaintiffs rely, is
8 of no help because the parties in that case *stipulated* that a regulatory takings
9 analysis applied, so the court did not consider whether there was a per se taking. *Id.*
10 at 807.[22] Moreover, as discussed at pages 15-16, *supra*, there is no basis for
11 Plaintiffs' suggestion that *Brown* does not apply because the CRRA requires the
12 payment of "fungible money," rather than the payment of money from a specific
13 identifiable fund. Finally, Plaintiffs make the additional argument that there is no
14 per se taking here because the CRRA confiscates only 5% of the proceeds and not
15 more. (*See, e.g.*, Opp. at 23-24, 25-26.) That argument, however, is squarely
16 foreclosed by *Loretto* and *Brown*, which hold that a compensable per se taking
17 occurs regardless of the size of the amount taken. *See Loretto*, 458 U.S. at 436.

18      In the end, Plaintiffs cannot dispute that the CRRA effects a per se taking of
19 private property. Because the CRRA offers no compensation for the taking, it cannot
20 stand under the Fifth Amendment.

21 _____

22 [21]   Plaintiffs' reliance on *Yee v. City of Escondido*, 503 U.S. 519 (1992) and
23 *McClung v. City of Sumner*, 548 F.3d 1219 (9th Cir. 2008) is similarly misplaced.
*Yee* involved a rent control ordinance and *McClung* a land-use condition, both classic
24 examples of regulation typically susceptible to an ad hoc takings analysis.

25 [22]   Although Plaintiffs suggest otherwise, the Court's application of the ad hoc
approach in *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986) and
26 *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for
S. Cal.*, 508 U.S. 602 (1993) had nothing to do with whether the government ordered
27 payments among private parties. Rather, the Court applied the ad hoc approach in
those cases because the required payments were only incidental to broader
28 governmental programs regulating multiemployer pension plans and were not direct
appropriations of private property.

19

1    III.    **THE COPYRIGHT ACT OF 1976 PREEMPTS THE CRRA CLAIM**

2    Plaintiffs' CRRA claim is preempted by the federal Copyright Act in two

3    independent ways:  (1) under conflict preemption principles, because it conflicts with

4    the Copyright Act's first sale provision, which bars restrictions or royalties on resale

5    after a first sale of a copyrighted work has been made, 17 U.S.C. § 109(a), and

6    (2) expressly, because the CRRA purports to create state law rights "equivalent" to

7    those protected by the Copyright Act, which the Copyright Act expressly forbids, *id.*

8    § 301(a).  (Mot. at 39-45.)  Plaintiffs' effort to avoid preemption of their CRRA

9    claim (Opp. at 31-40), misses the mark in at least three fundamental respects:

10   *First*, Plaintiffs fail entirely to respond to the limited reach of this Court's

11   prior opinion in *Baby Moose*, 2011 WL 1258529, and so they incorrectly rely on that

12   opinion for holdings it did not make.

13   *Second*, Plaintiffs wrongly discount the significance of the Supreme Court's

14   ruling in *Quality King* rejecting the Ninth Circuit's approach as a "cramped reading"

15   of the Copyright Act.  *Quality King*, 523 U.S. at 152.  As *Quality King* and its

16   progeny make plain, the first sale doctrine does more than merely prohibit total

17   restraints on the downstream transfer of ownership.  Rather, "once a copyright owner

18   consents to release a copy of a work to an individual (by sale, gift, or otherwise), the

19   copyright owner relinquishes *all rights* to that particular copy."  *Brilliance Audio,*

20   *Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 373 (6th Cir. 2007).  Moreover,

21   *Quality King* belies Plaintiffs' assertions that Section 301(a), which refers to Section

22   106, can be construed without consideration of Section 109's first sale provision,

23   itself referenced in Section 106.

24   *Third*, Plaintiffs do not grapple with the requirement that preemption flows

25   under Section 301(a) unless a state law protects "rights that are *qualitatively different*

26   from the rights protected by copyright."  *Montz v. Pilgrim Films & Television, Inc.*,

27   649 F. 3d 975, 980 (9th Cir. 2011).  Plaintiffs purport to identify multiple "extra

28

element[s]" to a CRRA claim, but none "changes the nature of the action." *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1143 (9th Cir. 2006).

### A.     The Copyright Act Of 1976 Preempts The CRRA

As the Motion makes plain, the Copyright Act of 1976 preempts the CRRA for two independent reasons. *First*, the CRRA impermissibly conflicts with the first sale doctrine codified in Section 109(a).  Through the federal distribution right of Section 106(3) and the first sale limitation of Section 109(a), Congress struck a careful balance between creator control and the free trade in copyrightable works. This balance requires a vigorous first sale limitation on the rights of creators.  The CRRA upsets this balance by granting certain artists a significant and unwaivable financial interest in their copyrighted works, enforceable long after the first sale of those works.   This the CRRA cannot do.   The CRRA conflicts with the text, purposes, and objectives of the Copyright Act, and it is therefore preempted by it.

*Second*, the CRRA purports to grant state law rights that are "equivalent" to the exclusive rights protected by the Copyright Act, which Section 301(a) of the Copyright Act expressly forbids.  The CRRA seeks to grant certain artists additional remuneration upon resale of their works, and in so doing attempts to create distribution rights equivalent to those in Section 106(3) of the Copyright Act and limited by the first sale doctrine expressly incorporated therein.  The resale royalty right the CRRA creates is not "qualitatively different" from the copyright rights—their "essence" and "nature" are the same.  *Laws*, 448 F.3d at 1143-44.  The Copyright Act accordingly expressly preempts the CRRA.

### B.     Plaintiffs Make Too Much Of *Baby Moose*

This Court's opinion in *Baby Moose* considered only whether the Copyright Act "*completely preempted*" the CRRA, 2011 WL 1258529, at *2-3, not whether the Copyright Act *defensively preempted* the CRRA.  (Mot. at 36-37.)  Plaintiffs make no response to this straightforward explanation of the narrow scope of this Court's

---

1    prior opinion.  Instead, Plaintiffs baldly assert that Defendants have raised "the very
2    preemption arguments" this Court rejected.  (Opp. at 31.)  That is not so.

3          Complete preemption and defensive preemption are distinct—only complete
4    preemption can support removal from state court, which was the limited issue before
5    this Court in *Baby Moose*.  (Mot. at 36-37.)  Complete ("field") preemption occurs
6    only "where the scheme of federal regulation is sufficiently comprehensive to make
7    reasonable the inference that Congress left no room for supplementary state
8    regulation."  *Moldo v. Matsco, Inc. (In re Cybernetic Servs.)*, 252 F.3d 1039, 1045
9    (9th Cir. 2001).  By contrast, a "defense of federal preemption of a state-law claim,
10   even conflict preemption under a federal statute, is an insufficient basis for original
11   federal question jurisdiction under § 1331(a) and removal jurisdiction under
12   § 1441(a)."  *K2 Am. Corp. v. Roland Oil & Gas, LLC*, 653 F.3d 1024, 1029 n.6 (9th
13   Cir. 2011).   Similarly, express preemption will not ordinarily support removal
14   jurisdiction.  *See Fossen v. Blue Cross & Blue Shield of Mont., Inc.*, 660 F.3d 1102,
15   1107 (9th Cir. 2011) (distinguishing express from complete preemption under
16   ERISA).

17          Conflict and ordinary express preemption were thus not decided in *Baby
18   Moose*.  *Baby Moose* also reflected the Ninth Circuit's strong presumption against
19   removal from state court, and presented this Court with no occasion to consider
20   whether the Copyright Act preempts the CRRA under the more limited preemption
21   principles presented here, where federal jurisdiction is not contested.

22          Moreover, traditional conflict principles apply even when a federal statute
23   contains an express preemption clause.  *See Geier v. American Honda Motor Co.*,
24   529 U.S. 861, 867 (2000); *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1204
25   (9th Cir. 2002); (Mot. at 26-27).  Accordingly, both express and conflict preemption
26   require preemption of the CRRA, and neither conflicts with the Court's prior
27   decision in *Baby Moose*.

28

DEFENDANTS' JOINT REPLY

1    Plaintiffs also rely on both *Durgom v. Janowiak*, 74 Cal. App. 4th 178 (Ct.

2  App. 1999), and the legislative history of the Visual Artists Rights Act of 1990,

3  (Opp. at 34, 39-40), without any rebuttal to the Motion's explanation that neither

4  provides a sound basis for rejecting preemption in this case.  (Mot. at 38-39.)

5    **C.**    **Plaintiffs Make Too Little Of *Quality King***

6       **1.**    ***Quality King* Reflects A Broad First Sale Doctrine And**
           **Undermines *Morseburg* As Unpersuasively Narrow**

7

8    In contrast to Plaintiffs' over reading of *Baby Moose*, Plaintiffs erroneously

9  downplay the importance of the Supreme Court's ruling in *Quality King*.   In so

10  doing, Plaintiffs fail to heed the Supreme Court's stern rejection of the Ninth

11  Circuit's previous approach to interpreting and applying the first sale doctrine.

12    *Quality King* explained that the first sale doctrine codified in Section 109(a)

13  has a "necessarily broad reach."  *Quality King*, 523 U.S. at 152.  "The whole point of

14  the first sale doctrine is that once the copyright owner places a copyrighted item in

15  the stream of commerce by selling it, he has exhausted his exclusive statutory right

16  to control its distribution."   *Id.*   In holding that the first sale doctrine applies to

17  domestically manufactured goods, even if they are first sold abroad, the Supreme

18  Court soundly rejected the contrary approach previously used by the Ninth Circuit.

19    *Quality King*'s broad language in describing and enforcing the first sale

20  doctrine is critical in two respects.  *First*, *Quality King* made clear that the Ninth

21  Circuit's analysis of the first sale doctrine was improperly narrow.  *Morseburg* pre-

22  dated *Quality King* and, like the Ninth Circuit decision reversed by *Quality King*,

23  likewise relied on an unduly narrow understanding of the first sale doctrine.  The

24  Supreme Court's reversal of the Ninth Circuit in *Quality King* thus eliminates the

25  persuasive value of *Morseburg*'s preemption analysis.  This is so even if the first sale

26  provisions of the 1909 and 1976 Copyright Acts should be interpreted similarly.

27  Plaintiffs' assertion that *Bobbs-Merrill* does not support Defendants' argument

28  because of the meaning attributed to *Bobbs-Merrill* in *Morseburg*, (Opp. at 35-36), is

1 thus similarly unpersuasive. And *Morseburg*'s limited holding, expressly applicable
2 only to the 1909 Copyright Act, leaves this Court free to decide these issues
3 regarding the first sale doctrine in the first instance.

4      *Second*, *Quality King* endorsed a much broader view of the first sale doctrine
5 than Plaintiffs acknowledge. It is simply incorrect to argue, as Plaintiffs do, that
6 resale royalty requirements do not run afoul of the first sale doctrine. (Opp. at 36-
7 37.) *Quality King* described the first sale doctrine in terms of *exhaustion*, which
8 leaves no room for downstream obligations applicable to resale. *See Quality King*,
9 523 U.S. at 152. Following *Quality King*, the Ninth Circuit also has given voice to a
10 broader first sale doctrine. *See UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175,
11 1179-80 (9th Cir. 2011) (describing *Bobbs-Merrill* as involving an "attempt to limit
12 resale below a certain price"); (Mot. at 28.). The CRRA "upsets the traditional
13 bargain between the rights of copyright owners and the personal property rights of an
14 individual who owns a particular copy," which "provides that once a copyright
15 owner consents to release a copy of a work to an individual (by sale, gift, or
16 otherwise), the copyright owner relinquishes *all rights* to that particular copy."
17 *Brilliance Audio*, 474 F. 3d at 373.

18      This the CRRA cannot do. "Where it is clear how [federal intellectual
19 property] laws strike that balance in a particular circumstance, that is not a judgment
20 the States may second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
21 489 U.S. 141, 152 (1989). *Quality King* and its progeny thus undermine
22 *Morseburg*'s analysis of the first sale doctrine. That doctrine preempts state statutes,
23 like the CRRA, that impose downstream restrictions on sales of copyrighted works.

24        **2.**    ***Quality King* Requires That Section 301(a) Be**
25                **Interpreted With Reference To Section 109(a)**

26      Plaintiffs wrongly discount *Quality King* for another, distinct reason: *Quality*
27 *King* belies Plaintiffs' assertion that, because the express preemption provision of
28 Section 301(a) references only Section 106, the express preemption provision can be

1  interpreted without reference to the first sale doctrine.  (Opp. at 33.)  *Quality King*

2  rejected an analogous claim.

3      Section 301(a) provides, in relevant part, "all legal or equitable rights that are

4  equivalent to any of the exclusive rights within the general scope of copyright as

5  specified by section 106 … are governed exclusively by this title."   17 U.S.C.

6  § 301(a).   But the preemptive scope is not limited to Section 106 in isolation.

7  Section 106 itself references, and subjects copyright rights to, Section 109(a).  *See*

8  17 U.S.C. § 106 ("*Subject to sections 107 through 122*, the owner of copyright under

9  this title has the exclusive rights to ….").  As *Quality King* explained, Section 106

10 must be read to incorporate the nuances of copyright in Sections 107 through 120,

11 which Section 106 references.  *See Quality King*, 523 U.S. at 144.

12     In *Quality King*, the parties disputed whether the first sale doctrine limits

13 Section 602(a).  *Id.* at 145-46.  Section 602(a) makes the unauthorized importation of

14 copyrighted works "an infringement of the exclusive right to distribute copies or

15 phonorecords under section 106."   17 U.S.C. § 602(a)(1).   The Supreme Court

16 observed that "[t]he introductory language in § 106 expressly states that all of the

17 exclusive rights granted by that section—including, of course, the distribution right

18 granted by subsection (3)—are limited by the provisions of §§ 107 through 120,"

19 which includes § 109(a)'s codification of the first sale doctrine.  *Quality King*, 523

20 U.S. at 144.  In other words, the Court reasoned that Section 602(a)'s incorporation

21 of the distribution right under Section 106 was necessarily limited by the first sale

22 provision of Section 109(a).  The Court held that there had been no unauthorized

23 importation under Section 602(a) because that provision protected only against "an

24 infringement of an exclusive right under section 106, and … that limited right does

25 not encompass resales by lawful owners …."  *Id.* at 145.

26     The same reasoning applies here.   Accordingly, an express preemption

27 argument that takes the first sale doctrine into account does not "fail" as Plaintiffs

28

1  suggest, (Opp. at 33).  Rather, any state statute that runs afoul of that doctrine, like

2  the CRRA, is expressly preempted by Section 301(a).  (Mot. at 33-36.)

### D.  Plaintiffs Cannot Identify Any "Extra Element" That Makes The Resale Royalty Right "Qualitatively Different" From The Copyright Act's Distribution Right

5      Plaintiffs repeatedly assert that their CRRA claim involves different elements

6  than a claim under the Copyright Act.  (Opp. at 33-35.)  But Plaintiffs fail entirely to

7  rebut the fact that none of these supposed "extra element[s] … changes the nature of

8  the action." *Laws*, 448 F.3d at 1143.  Plaintiffs acknowledge that a state law claim

9  governing the subject matter of copyright escapes preemption only if it "includes an

10 'extra element' that makes the right asserted *qualitatively* different from those

11 protected under the Copyright Act."  (Opp. at 33.)  But they do not grapple with the

12 requirement that "extra element[s]" must transform the "underlying nature" of the

13 relevant cause of action.  (Mot. at 36 (quoting *Laws*, 448 F.3d at 1144).)  This is no

14 small failure.  Most courts of appeals have "take[n] a restrictive view of what extra

15 elements transform an otherwise equivalent claim into one that is qualitatively

16 different from a copyright infringement claim." *Briarpatch Ltd. v. Phoenix Pictures,*

17 *Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).

18     None of Plaintiffs' asserted "extra elements"—a residency, citizenship, or

19 sales price requirement, (Opp. at 34)—renders the essential character of a CRRA

20 claim distinct from that of a copyright claim for unauthorized distribution.  The

21 elements cited by Plaintiffs define the persons who can assert CRRA claims and the

22 specific sales transactions to which the statute applies.  But where an artist can assert

23 a CRRA claim, the essential character of that claim is the same as a copyright claim.

24 Both claims seek recompense for distribution of a copyrighted work.  (Mot. at 36.)

25 And the first sale doctrine, as an expressly incorporated facet of the Section 106

26 distribution right, governs precisely the same distributions as the CRRA.  Section

27 109(a)'s limitation on subsequent restraints on alienation thus limits both the federal

28 Section 106 claim and, through Section 301(a), the state law CRRA claim.

26

1  **IV.   <u>PUNITIVE DAMAGES ARE NOT AVAILABLE UNDER THE CRRA</u>**

2      **A.   <u>Plaintiffs Do Not—Because They Cannot—Offer Any Plausible</u>**
3           **<u>Opposition To Virtually All Of Defendants' Arguments</u>**

4        Defendants' Motion established that there is no basis for punitive damages

5  under the law governing either of Plaintiffs' claims.  (Mot. at 39-45.)   Plaintiffs

6  ignore, and thus concede, Defendants' showing that punitive damages are not

7  available under the UCL (*id.* at 39-40), and do not even try to refute Defendants'

8  argument that where, as here, a statute makes no mention of punitive damages, the

9  law does not permit "reading words or elements into a statute that do not appear on

10  its face" (*id.* at 40-41).   Indeed, Plaintiffs *admit* the CRRA contains no provision

11  permitting such damages, and have no answer to the legislative history showing that

12  Sen. Sieroty suggested *adding* punitive damages as a remedy when the legislature

13  strengthened the CRRA via a 1982 amendment.  (Opp. at 42.)

14        Unable to counter the settled principle that where the Legislature "has

15  carefully employed a term in one place and excluded it in another, it should not be

16  implied where excluded," (*see* Mot. at 43), Plaintiffs argue that Section 987's

17  express allowance for punitive damages is a result of the legislature "ha[ving] to

18  include a specific damages provision in CAPA to achieve th[e] result" that a punitive

19  damages award for destruction of art inures not to the artist, but to the public.  (Opp.

20  at 42.)   This underscores Defendants' very point:  the Legislature knows how to

21  impose punitive damages when it wants to.  Plaintiffs do not even try to explain why

22  an artist should receive exemplary damages when he is owed what Plaintiffs call an

23  "insubstantial" 5-percent royalty (*id.* at 19), but the same artist takes nothing if

24  someone willfully mutilates or destroys his artwork—a fundamental logical

25  disconnect proving that punitive damages are not available here.  (Mot. at 44-45.)

26

27

28

**B.    The CRRA Created A New Right To Resale Royalties And The Remedies Described In The Statute Are Exclusive And Adequate**

Plaintiffs argue that punitive damages are available because their CRRA claim "falls squarely within" the rubric of the catch-all statutory provision, Cal. Civ. Code § 3294.  (Opp. at 40).  But under the new right-exclusive remedy doctrine (*see* Mot. at 41 n.20 (collecting cases)), the law is clear that "[w]here a right is created by statute and the statute does not expressly permit punitive damages, punitive damages under California Civil Code section 3294 are not available."  *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 620 (N.D. Cal. 2007).[23]  It is indisputable that, until 1976, an artist's right to collect a resale royalty was not recognized under California law (or anywhere in the United States).  The remedies described in the CRRA are thus exclusive and do *not* include punitive damages.

Plaintiffs rely on *Commodore Home Systems, Inc. v. Superior Court*, 32 Cal.3d 211 (1982), and *Greenberg v. Western Turf Ass'n*, 140 Cal. 357 (1903) to claim that punitive damages are available despite the CRRA's omission of that remedy, but courts have repeatedly rejected this *exact* argument because the statutes at issue in those cases, unlike here, "embodie[d] a right *whose common law analogue would have supported a cause of action* for which punitive damages were recoverable[.]"  *Brewer v. Premier Golf Props.*, 168 Cal. App. 4th 1243, 1255 (Ct. App. 2008); *see also Garcia-Barajas v. Nestle Purina Petcare Co.*, 2009 WL 2151850, at *4 (E.D. Cal. July 16, 2009).  Because Plaintiffs cannot show that any common law analogue for the CRRA exists—to the contrary, no U.S. jurisdiction has

---

[23]  *See also Bickley v. Schneider Nat'l, Inc.*, 2009 WL 5841196, at *1 (N.D. Cal. Feb. 11, 2009) (same, collecting cases); *Campbell v. PricewaterhouseCoopers*, 2008 WL 3836972, at *7 (E.D. Cal. Aug. 14, 2008) (no punitive damages where "claims for missed meal breaks, itemized wage statements, and waiting time penalties were not available at common law and accordingly the statutory remedy is exclusive"); *Woo v. Home Loan Group, L.P.*, 2007 WL 6624925, at *6 (S.D. Cal. July 27, 2007) ("[R]ight to reimbursement [] is a new right, not existing in the common law, and therefore liability under section 2802 is limited to that expressed in the statute.").

1  such a common law rule and every legislature (state or federal) asked to adopt such a

2  law has declined—their cited authority is wholly inapposite.

3      Plaintiffs also argue that "the expressly-provided remedies are inadequate"

4  because only punitive damages will "fully effectuate [Defendants'] compliance with

5  the Act."  (Opp. at 41-42).  But courts routinely reject claims that "the statutory

6  penalties ... are not substantial enough ...  to deter [defendants] or others from

7  committing the same acts in the future" because "in essence, plaintiffs seek to have

8  this Court substitute its own judgment for that of [the] legislature's regarding the

9  appropriate punishment for violations of the [statute]," which naturally courts decline

10  to do.  *In re Wal-Mart Stores, Inc.*, 505 F. Supp. 2d at 621 (collecting cases).[24]

11      Plaintiffs cite only one case where the statutory remedy was held to be

12  "plainly inadequate," *Orloff v. Los Angeles Turf Club, Inc.*, 30 Cal. 2d 110, 114

13  (1947).   In *Orloff*, an African-American plaintiff who was repeatedly denied

14  admittance to a racetrack sought injunctive relief in addition to the $100

15  compensatory damages mandated by the statute.  The court concluded that "the sum

16  of $100 is a relatively insignificant recovery when we consider that a positive and

17  unequivocal right has been established and violated." *Id*.  Plaintiffs can hardly claim

18  such an egregious violation requiring this Court to step in for the legislature to allow

19  the recovery of punitive damages, in addition to the full royalties provided by the

20  CRRA.

21

22  [24]  *See also Doran v. Embassy Suites Hotel*, 2002 WL 1968166, at *3 (N.D. Cal. Aug.

23  26, 2002) (rejecting request for punitive damages under Section 3294 because while
"[t]he Court shares Plaintiffs' concern about the importance of compliance ... [t]he

24  Court has no doubt, however, that the Legislature took the importance of disability
rights into account when it crafted" remedies of actual damages and attorney's fees

25  but "evidently concluded that *the extensive remedies that it enacted were adequate
for enforcement of this important law*"); *De Anza Santa Cruz Mobile Estates

26  Homeowners Ass'n v. De Anza Santa Cruz Mobile Estates,* 94 Cal. App. 4th 890, 916
(Ct. App. 2001) ("[i]t cannot be said in our case that the remedy provided by the

27  [statute] was inadequate" where the statute authorized, *inter alia*, recovery of actual
damages, and costs and attorney's fees) (cited by Plaintiffs); *Turnbull & Turnbull v.

28  ARA Transp., Inc.,* 219 Cal. App. 3d 811, 826-27 (Ct. App. 1990) (plaintiff limited to
recovery outlined in statute) (cited by Plaintiffs).

## V. THE ESTATE OF ROBERT GRAHAM LACKS CAPACITY TO SUE

Defendants moved to dismiss the claims asserted by the Estate of Robert Graham because an estate lacks capacity to sue. Plaintiffs do not distinguish or even mention the case law Defendants cited, which is directly on point.[25]

Plaintiffs instead argue that the Graham estate may sue because the CRRA grants rights to the "heirs, legatees or personal representative" of a deceased artist, and they have alleged that the Graham estate is "the heir, legatee and/or personal representative of artist Robert Graham." (Opp. at 43.) Although Plaintiffs say their allegation must be accepted as true (Opp. at 43), "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *accord Ross v. O'Neal*, 2011 WL 5041967, at *1 (C.D. Cal. Oct. 17, 2011) (same).

Plaintiffs' allegation is a legal conclusion and is obviously incorrect. The terms "heir," "legatee," and "personal representative" are legal terms, which refer to persons who have rights or duties regarding an estate; not the estate itself.[26] An estate is "simply a collection of assets and liabilities," which "has no capacity to sue or be sued." *Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1390 (Ct. App. 2011). Instead, a personal representative must appear for the estate. *Id.* at 1390-91.[27]

---

[25] (Mot. at 45 (citing *Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095, 1100 (C.D. Cal. 2006) (dismissing claim by estate because "an estate or trust is *not* a legal entity and has no capacity to sue" (emphasis in original)) and *In re Peterson*, 156 Cal. App. 4th 676, 679 n.1 (Ct. App. 2007) ("Any litigation must be maintained by, or against, the executor or administrator of the estate.")); *see also Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1390-91 (Ct. App. 2011) (same).

[26] An "heir" takes "property of the decedent by intestate succession." Cal. Probate Code § 44. A "legatee" is synonymous with a "devisee." *Black's Law Dictionary* (9th ed. 2009) (definitions of "legatee" and "devisee"). It "means any person designated in a will to receive a devise." Cal. Probate Code § 34. And a "personal representative" is an "executor" or "administrator" of an estate. Cal. Probate Code § 58(a); *Smith*, 199 Cal. App. 4th at 1391 n.3.

[27] As Plaintiffs note, a decedent's successor in interest may sometimes bring suit. (Opp at 43, n.28, citing Cal. Civ. Pro. Code § 377.30.) That fact is not relevant here. A successor sues on his own behalf and not on behalf of the estate. To sue, he must file a declaration proving, *inter alia*, that he succeeded "to the decedent's interest in

30

1       Plaintiffs also cite Section 552 of the California Probate Code as an exception
2 to the rule that estates lack capacity.  (Opp. at 44.)  But that statute authorizes actions
3 against insurers of the deceased, in which the estate normally has no part.  The action
4 cannot include claims against the estate unless the personal representative is joined
5 as a party to defend the claims—which confirms that only a personal representative
6 can litigate for an estate.[28]

7       Finally, while Plaintiffs "request leave to amend to name the individual the
8 Court determines would have standing to pursue these claims" (Opp. at 44 n.29),
9 they fail to explain how the Court can make such a determination when they have not
10 proposed any specific party, nor disclosed (i) whether probate proceedings for the
11 Graham estate are pending, or (ii) whether a personal representative has been
12 appointed, and if so, who that is.  The Court should consider Plaintiffs' request for
13 leave to amend, therefore, only if they file a motion for leave which identifies a
14 proposed plaintiff and alleges facts sufficient to establish standing.

15 **VI.   PLAINTIFFS' PLEADING IS INSUFFICIENT**

16     **A.   Plaintiffs Have Not Alleged Sufficient Facts**

17       Defendants' Motion cited numerous cases, including *Bautista v. Los Angeles*
18 *County*, 216 F.3d 837, 840 (9th Cir. 2000), which hold that a complaint must
19 "identify[] the transaction or occurrence giving rise to the claim."  (Mot. at 46 &
20 n.25.)  Plaintiffs do not distinguish or even discuss these cases.  Nor do Plaintiffs

---

21 the action."  Cal. Civ. Pro. Code § 377.32(a)(5)(B).  Here, Plaintiffs allege that the
22 claims belong to the estate, not a successor.  As such, the claims can be asserted only
by a personal representative.  *Estate of Migliaccio*, 436 F. Supp. 2d at 1100.

23 [28]  *See* 24 Cal. Jur. 3d, *Decedents' Estates* § 10 ("An action to establish the
24 decedent's liability for which he or she was protected by insurance may be
commenced or continued against the decedent's estate without the need to join as a
25 party the decedent's personal representative or successor in interest…. The action is,
in effect, brought against the insurer, although the action must name the decedent's
26 estate as defendant …. The insurer may deny or contest liability in an action against
the decedent's insurer under this statute or by an independent action.  Unless the
27 personal representative is joined as a party, a judgment in either type of action does
not adjudicate rights by or against the estate…. [A] judgment in favor of the plaintiff
28 is enforceable only from the insurance coverage and not against property in the
estate.") (citing Cal. Probate Code §§ 550-554).

1   dispute that they failed to identify a single transaction that gives rise to their claims.

2   Plaintiffs instead rely almost entirely on a single case, *Gitterman v. Vitoulis*, 564

3   F. Supp. 46 (S.D.N.Y. 1982), which does not support their position.  (Opp. at 45-46.)

4        The *Gitterman* complaint described in detail the defendants' alleged thefts of

5   jewelry from the plaintiffs, including the time, place, and manner of the thefts.

6   *Gitterman*, 564 F. Supp. at 47-48.  Because the plaintiffs asserted RICO claims, they

7   had to allege additional conduct by the defendants—aside from the thefts of their

8   jewelry—in order to plead "racketeering activity." *Id.* at 49.  Solely as to the

9   racketeering allegations, the court held that plaintiffs could plead on information and

10  belief and could draw inferences from the specific facts that had been pled. *Id.* at 49-

11  50.

12       *Gitterman* is obviously distinguishable not only because no RICO or

13  racketeering allegations are involved here, but also because the *Gitterman* complaint

14  precisely identified the transactions on which the plaintiffs' claims were based.  In

15  contrast, the complaints in these CRRA actions do not identify even a *single*

16  transaction in which one of Plaintiffs' art works was publicly auctioned or otherwise

17  sold by Defendants.

18       Plaintiffs' reliance on *Arista Records LLC v. Doe 3*, 604 F.3d 110 (2d Cir.

19  2010), is also misplaced.  (Opp. at 46.)  *Arista* holds that a plaintiff may plead on

20  information and belief, so long as the complaint alleges facts rather than legal

21  conclusions.  *Arista*, 604 F.3d at 120-22.  In *Arista*, to the extent "allegations [were]

22  made on information and belief, virtually all of them [were] supported by factual

23  assertions," which were highly detailed. *Id.* at 121.

24       Here, Plaintiffs' complaints are insufficient because they do not allege any

25  *facts* on information and belief.  Nor do Plaintiffs allege any information that they

26  believe shows Defendants conducted specific sales for which royalties are due.  To

27  the contrary, Plaintiffs actually allege that they can only "surmise" about specific

28  sales.  (SoCompl. ¶ 14; ChCompl. ¶ 15.)  Surmise or speculation is insufficient. *Bell*

32

1  *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a complaint must plead facts
2  sufficient "to raise a right to relief above the speculative level").

3      Plaintiffs nonetheless argue that they have "allege[d] on information and belief
4  that defendants have violated their rights under the Royalty Act.  That should be
5  sufficient to permit discovery to proceed."  (Opp. at 46.)  Plaintiffs' argument puts
6  the cart before the horse and is contrary to the law.

7      As the Ninth Circuit has held, it "defies common sense" for Plaintiffs to
8  contend that, even if their pleadings are insufficient, they should be allowed to take
9  discovery in the hope of finding evidence to support their claims.  *Rutman Wine*
10 *Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("[I[f the allegations
11 of the complaint fail to establish the requisite elements of the cause of action, our
12 requiring costly and time consuming discovery ... would represent an abdication of
13 our judicial responsibility.").  It "is plaintiffs' duty to investigate and discover the
14 factual bases of their claims before filing a complaint; discovery is not an open range
15 for plaintiffs to ride roughshod in the hope that their claims may find support."
16 *Rojas v. Brinderson Constructors, Inc.*, 567 F. Supp. 2d 1205, 1212 (C.D. Cal.
17 2008).[29]

18     Plaintiffs' supposed inability to identify specific sales is also suspect.  While
19 Plaintiffs say that they cannot identify specific sales without discovery, they have
20 requested leave to amend if the Court dismisses their complaints.  (Opp. at 48 n.30.)
21 Unless Plaintiffs are able to identify specific sales *without* discovery, there is no
22 point to their request for leave to amend.

23

24

---

25 [29]  *Accord Ashcroft*, 129 S. Ct. at 1950 (Rule 8 "does not unlock the doors of
discovery for a plaintiff armed with nothing more than conclusions"); *Podany v.*
26 *Robertson Stephens, Inc.*, 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004) ("[D]iscovery is
authorized solely for parties to develop the facts in a lawsuit in which a plaintiff has
27 stated a legally cognizable claim, not in order to permit a plaintiff to find out whether
he has a claim ….."); *ORL, LLC v. Hancock Bank*, 2011 WL 2457864, at *2
28 (M.D. Fla. June 20, 2011); *Bridgewater v. Taylor*, 745 F. Supp. 2d 355, 358-59
(S.D.N.Y. 2010).

### B.   <u>Plaintiffs' Discovery Claim Is Insufficient</u>

Plaintiffs' claims based on sales beyond the 3 year time limit in the CRRA are also insufficient, because they do not allege facts to support any discovery exception. Among other things, the complaints do not allege when or how Plaintiffs discovered their claims or why they were not asserted earlier. (Mot. at 49.) Plaintiffs do not dispute that those allegations are missing. They try instead to sidestep that defect by denying that their discovery claim is based on fraudulent concealment. Plaintiffs argue they have "not alleged *fraud*, but merely that defendants 'affirmatively engaged in a pattern of conduct intended to conceal' their violations." (Opp. at 46.)

Even if Plaintiffs had not alleged fraudulent concealment (which they have), their complaints would still be insufficient. In order to rely on *any* discovery theory—regardless of whether it is fraudulent concealment or simply delayed discovery—a plaintiff's complaint "must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005) (emphasis in original).

In addition, Plaintiffs *are* arguing fraudulent concealment. In the statute of limitations context, "fraudulent concealment" is synonymous with "equitable estoppel," and refers to any active misconduct by the defendant that prevents the plaintiff from filing a timely action.[30] Here, Plaintiffs' concealment theory is wrong as a matter of law because they allege only silence, rather than active misconduct. In the absence of a fiduciary duty, silence is insufficient. (Mot. at 48-49 & n.27.)

---

[30] "Equitable estoppel, also termed fraudulent concealment, halts the statute of limitations when there is active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time." *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006); *accord Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011) ("The doctrine of equitable estoppel, often referred to as fraudulent concealment, is based on the principle that a party should not be allowed to benefit from its own wrongdoing.").

34

1    Plaintiffs do not dispute that they have alleged only silence.  They argue

2  instead that Defendants hold royalty payments in trust for them and owe them a

3  fiduciary duty.  Plaintiffs rely on the rule that a person who "acquires property

4  belonging to another," is required "to hold the property for the benefit of the owner."

5  (Opp. at 47.)  But Plaintiffs do not and cannot explain how that rule applies here,

6  since they do not "own" the royalties required by the CRRA.  The CRRA gives

7  artists a right to payment, but it does not transfer ownership to artists of funds held

8  by a seller or his agent.

9    "A person or an institution who has a claim to money does not own the money.

10  The money does not belong to that person or institution."  *United States v. Rodrigues*,

11  159 F.3d 439, 448 (9th Cir. 1998).  Rather, it is "owed [to] them."  *Id.*  Likewise, a

12  right to payment or a debt "is not a trust and does not create a fiduciary relationship."

13  *Wolf v. Superior Ct.*, 107 Cal. App. 4th 25, 30-31 (Ct. App. 2003).[31]  Plaintiffs'

14  theory for tolling the statute of limitations is thus wrong as a matter of law.

15    Finally, the Court should not consider Plaintiffs' request for leave to amend

16  (Opp. at 48 n.30), unless they file a motion with proposed pleadings.  Plaintiffs do

17  not dispute that they deliberately failed to identify specific sales because, if they had

18  done that, they would have undermined their contention that they could not discover

19  their claims.  (Mot. at 50.)  And to maintain the fiction that they cannot identify

20  specific sales without formal discovery, Plaintiffs also failed to allege when or how

21  they discovered any claims.

22    Plaintiffs offer no reason to think they can cure these defects.  To the contrary,

23  Plaintiffs argue that they *cannot* plead the requisite facts.  (Opp. at 44-46.)  If that is

24  true, an amendment would be futile and should not be allowed.  *Rutman*, 829 F.2d at

25

26  _____

27  [31]  *Accord Cusano v. Klein*, 280 F. Supp. 2d 1035, 1040-41 (C.D. Cal. 2003) (a right
    to royalty payments does not give rise to a trust or a fiduciary duty); *Downey v.*

28  *Humphreys*, 102 Cal. App. 2d 323, 332 (Ct. App. 1951) ("A debt is not a trust and
    there is not a fiduciary relation between debtor and creditor as such.").

1  738 (leave may be denied if "the pleadings before the court demonstrate that further

2  amendment would be futile").

3  Under these circumstances, the Court should require a motion for leave to

4  amend, accompanied by proposed pleadings. *Parrish v. NFL Players Ass'n*, 534 F.

5  Supp. 2d 1081, 1100-01 (N.D. Cal. 2007) (since plaintiffs failed to explain when or

6  how they discovered their claims or what triggered their suit, the court required a

7  motion, with a proposed pleading).[32]  Discovery should also be stayed, since any

8  amendment may greatly affect the scope of discovery. *Id.* at 1101 (staying discovery

9  pending motion for leave to amend).

10  ## CONCLUSION

11  For the reasons discussed above and in the Motion, the Court should dismiss

12  Plaintiffs' complaints with prejudice.

13

14  Dated: February 27, 2012          Respectfully submitted,

15                                    By: /s/  Paul T. Friedman

16                                         Paul T. Friedman

                                      Attorneys for Defendant SOTHEBY'S, INC.

17                                    By: /s/  Jason D. Russell

18                                         Jason D. Russell

19                                    Attorneys for Defendant CHRISTIE'S, INC.

20

21

22

23

24

25

---

26  [32]  In many courts, requests for leave to amend require a proposed pleading as a
matter of course. *See Gulley v. Dzurenda*, 264 F.R.D. 34, 36 (D. Conn. 2010) (citing
27  cases).  This Court's Local Rules contemplate that a motion for leave to amend will
include a proposed pleading.  L.R. 15-1 (a "proposed amended pleading" must be
28  filed as a separate document).

36